JAMES N. SAUL, OSB No. 152809
Earthrise Law Center
at Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219-7799
Telephone: (503) 768-6929
Fax: (503) 768-6642
E-mail: jsaul@lclark.edu

*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES, a non-profit organization,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL REGAN, in his official capacity as Administrator of the Environmental Protection Agency; and MICHELLE PIRZADEH, in her official capacity as Acting Regional Administrator Environmental Protection Agency Region 10,<br><br>Defendants. | Case No: 3:21-cv-01136<br><br>**COMPLAINT**<br><br>(Pursuant to the Clean Water Act, 33 U.S.C. § 1365(a)(2), and the Administrative Procedure Act, 5 U.S.C. §§ 702–706) |

## INTRODUCTION

1.      Through this action, plaintiff Northwest Environmental Advocates ("NWEA") challenges the failure of the defendants United States Environmental Protection Agency ("EPA"), EPA Administrator Michael Regan, and Acting EPA Regional Administrator Michelle Pirzadeh, to ensure the protection and restoration of fresh and marine waters of the State of Oregon in violation of the mandates of the Clean Water Act ("CWA" or "Act"), 33 U.S.C. §§ 1251 *et seq.,* and EPA's implementing regulations.

2.      In this action, NWEA seeks review of various actions and inactions taken by Defendants pursuant to Section 303(d) of the Act, 33 U.S.C. § 1313(d). That section, along with its federal implementing regulations, imposes upon EPA a series of mandatory duties that, as further described below, fall into two distinct but related regulatory programs: the "impaired waters" program that requires states—or, if they fail, EPA—to identify surface waters that do not meet applicable water quality standards; and the total maximum daily load or "TMDL" program that requires states—or again, if they fail, EPA—to develop science-based clean-up plans for those waters in a timely fashion.

3.      The CWA and federal regulations require each state to review the status of all its waters every two years to determine which waterbodies, if any, are falling short of established goals that ensure those waterbodies are clean enough to support human and ecological uses, such as drinking, swimming, fishing, and wildlife habitat. The state must identify all such "impaired" waters or "water quality limited segments" ("WQLS") and submit that list, along with a priority ranking for developing pollution clean-up plans called "Total Maximum Daily Loads" ("TMDLs") that the state is required to develop for each impaired waterbody, to EPA for

approval. Additionally, this priority ranking must include a schedule for the impaired waters targeted for TMDLs in the coming two-year period.

4.      EPA, in turn, must review the state's submission of its list of impaired waters and the state's priorities and determine whether the state has complied with the law. Where the state has fallen short, the CWA requires EPA to step in and establish a proper, timely, lawful list of impaired waters, and if necessary, develop the TMDL clean-up plans for those waterbodies. Here, EPA neglected its duties and failed to develop TMDL clean-up plans for a large number of Oregon waters that are impaired but remain in need of TMDLs—some dating since 1998.

5.      On December 31, 2017, Oregon submitted its most recently prepared impaired waters list or "303(d) list" to EPA for approval. This list included data beginning from 1998 but did not include any data from 2014 & 2016, because Oregon failed to submit lists those years. On November 12, 2020, EPA approved this list, terming it a "2014-2020" list, effectively merging the four instances that Oregon should have submitted data into one large submission. Moreover, within this approved list includes over a thousand WQLS identified between the years 1998 and 2012 that still require the development of TMDLs and are the subject of this action.

6.      Neither the Oregon Department of Environmental Quality ("DEQ") nor EPA has developed TMDLs in a timely fashion—indeed, since 2010, no new TMDLs have been established by Oregon or EPA that had not been originally completed by Oregon and submitted to EPA and/or approved by EPA prior to December 31, 2010, with the sole exception of EPA's 2020 draft TMDL for temperature in the Columbia River. This combination of a list of impaired waters needing TMDLs that is both inadequate and growing rapidly, and the corresponding lack of TMDLs, has resulted in a near collapse of the water pollution regulatory scheme in Oregon. Without the preparation of TMDLs and the resulting assignment of pollutant load reductions to

be achieved by various contributing sources, DEQ and EPA are unable to properly limit the discharge of pollutants to ensure the eventual attainment of Oregon water quality standards in waters with levels of pollutants unsafe for humans and ecological uses.

7.      This serious deficiency in the State's water pollution regulatory scheme fails to protect the large number of endangered and threatened aquatic species that depend upon the quality of Oregon waters. In addition, this longstanding pollution threatens to sully the reputation of a state known nationwide for its clean water and its freshwater and marine recreational activities.

8.      The Ninth Circuit has recognized the "constructive submission" theory, holding that "where a state has 'clearly and unambiguously' decided that it will not submit TMDLs for the entire state, that decision will be 'construed as a constructive submission of no TMDLs, which in turn triggers the EPA's nondiscretionary duty to act'" under the Clean Water Act. *Columbia Riverkeeper v. Wheeler*, 944 F.3d 1204, 1208 (9th Cir. 2019) (quoting *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 880, 883 (9th Cir. 2002)).

9.      As detailed below, NWEA alleges that Oregon has effectively abandoned its TMDL program, thereby "constructively submitting" to EPA a host of TMDLs for waters that have been impaired for many years or even decades. NWEA further alleges that EPA violated the Clean Water Act by failing to disapprove of Oregon's constructively submitted TMDLs and failing to establish its own TMDLs for these waters. Additionally, or in the alternative, NWEA alleges that EPA's failure to review and disapprove Oregon's constructively submitted TMDLs, its failure to prepare TMDLs itself for Oregon's impaired waters, and its approval of Oregon's unlawful TMDL prioritization schedule violated the Administrative Procedure Act ("APA") and was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## JURISDICTION AND VENUE

10.     This action arises under the citizen suit provision of the Clean Water Act, 33

U.S.C. § 1365(a)(2), and the judicial review provisions of the Administrative Procedure Act, 5

U.S.C. §§ 702–706.

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

question jurisdiction) and 33 U.S.C. § 1365(a) (CWA citizen suit jurisdiction). The requested

relief is proper under 28 U.S.C. § 2201(a), 28 U.S.C. § 2202, 33 U.S.C. § 1365(a), and 5 U.S.C.

§§ 705, 706 (APA relief pending review and scope of review).

12.     As required by 33 U.S.C. § 1365(b)(1)(A), by letter dated April 3, 2021, NWEA

provided EPA with written notice of NWEA's intent to file suit regarding EPA's Clean Water

Act violations alleged below. A copy of that notice letter is attached here as Exhibit A, and is

incorporated herein by reference.

13.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because a

substantial part of the events or omissions giving rise to the claims occurred in Oregon.

14.     Pursuant to Local Rule 3-2(b), Divisional Venue is proper in this Court because a

substantial part of the events and omissions giving rise to NWEA's claims occurred in

Multnomah County, and because NWEA resides in Multnomah County.

## PARTIES

15.     The plaintiff in this action is NORTHWEST ENVIRONMENTAL

ADVOCATES. Established in 1969, NWEA is a regional non-profit environmental organization

incorporated under the laws of Oregon in 1981 and organized under section 501(c)(3) of the

Internal Revenue Code. NWEA's principal place of business is in Portland, Oregon. NWEA's

mission is to work through advocacy and education to protect and restore water and air quality,

wetlands, and wildlife habitat in the Northwest and the nation, including Oregon. NWEA employs advocacy with administrative agencies, community organizing, strategic partnerships, public record requests, information sharing, expert analysis, lobbying, education, and litigation to ensure better implementation of the laws that protect and restore the natural environment.

16.     NWEA's members regularly use and enjoy the waters of the State of Oregon, including waters that are currently impaired by pollution. NWEA's members regularly use and enjoy these waters and adjacent lands and have definite future plans to continue using them for recreational, subsistence, scientific, aesthetic, spiritual, commercial, conservation, educational, employment, and other purposes. Many of these interests revolve around viewing sensitive salmonid species and other aquatic species that are under threat by pollution in the covered waters.

17.     Various NWEA members regularly engage in recreational or aesthetic activities on, in, or near one or more of the hundreds of waters in Oregon that are presently impaired and therefore in need of a TMDL. Such activities include fishing, boating, swimming, hiking, wildlife observation, and photography. The recreational and aesthetic experiences of these NWEA members are diminished because of the waters' impaired status and the lack of a TMDL which would appropriately limit the pollution discharged into those waters.

18.     The recreational, aesthetic, conservation, scientific, and other interests of NWEA and its members have been, are being, and unless relief is granted, will continue to be adversely affected and irreparably injured by EPA's failure to comply with the CWA.

19.     Defendant U.S. ENVIRONMENTAL PROTECTION AGENCY is the federal agency charged with the administration of the CWA, and specifically with approving or

disapproving state identification of impaired waters and state TMDL submissions under section 303(d)(2) of the CWA, 33 U.S.C. § 1313(d)(2).

20.     Defendant MICHAEL REGAN is sued in his official capacity as the Administrator of the EPA. In that role, he is charged with the duty to uphold the CWA and its implementing regulations and to take required regulatory actions according to the schedules established therein.

21.     Defendant MICHELLE PIRZADEH is sued in her official capacity as the Acting Regional Administrator of Region 10 of the EPA. In that role, she is charged with the duty to uphold the CWA and its implementing regulations and to take required regulatory actions according to the schedules established therein.

## LEGAL BACKGROUND

**A. The Clean Water Act and Water Quality Standards that Establish the Need and Basis for Water Quality-Based Pollution Controls**

22.     Congress adopted amendments to the CWA in 1972 in an effort "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). While the primary goal of the CWA is to eliminate the discharge of pollutants into navigable waters entirely, Congress established "an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife." *Id.* § 1251(a)(1)–(2).

23.     To meet these statutory goals, the CWA requires states to develop water quality standards that establish, and then protect, the desired conditions of each waterway within the state's regulatory jurisdiction. 33 U.S.C. § 1313(a). These water quality standards must be sufficient to "protect the public health or welfare, enhance the quality of water and serve the purposes of [the CWA]." *Id.* § 1313(c)(2)(a).

24.      Water quality standards must include three elements: (1) one or more designated beneficial uses of a waterway; (2) numeric and narrative criteria specifying the water quality conditions, such as maximum amounts of toxic pollutants, maximum temperature levels, and the like, that are necessary to protect the designated uses; and (3) an antidegradation policy that ensures that beneficial uses dating to 1975 are protected and high quality waters will be maintained and protected. 33 U.S.C. §§ 1313(c)(2), (d)(4)(B); 40 C.F.R. Part 131, Subpart B. Overall, water quality standards establish the water quality goals for a waterbody. 40 C.F.R. §§ 131.2, 131.10(d).

25.      After designating water quality standards, the state is required to submit standards to EPA for approval or disapproval. 33 U.S.C. § 1313 (a)(3)(A). Upon receipt of the state's submission, EPA is charged with approving or disapproving a state's water quality standards and, in some instances, establishing standards for a state. See 33 U.S.C. § 1313 (c)(2)(A), (3).

26.      Once approved by EPA, water quality standards serve, among other things, as the regulatory basis for establishing water quality-based pollution controls for so-called point sources of pollution, as required by sections 301 and 306 of the CWA, 33 U.S.C. §§ 1311, 1316. Point source discharges are regulated under National Pollutant Discharge Elimination System ("NPDES") permits, which must contain limitations "necessary to meet water quality standards." 33 U.S.C. §§ 1311(b)(1)(C), 1342(a). Water quality standards serve as the basis for section 401 certifications by state authorities for any federal action, such as the construction or operation of a hydroelectric dam, that may result in any discharge.  33 U.S.C. § 1341(a)(1).

27.      Water quality standards also are used to establish water quality-based pollution controls for nonpoint source pollution. Unlike point source pollution, nonpoint source pollution is generally considered to be any pollution that cannot be traced to a single discrete conveyance.

Examples include pesticide and sediment runoff from agricultural or forestry lands, nutrient and human pathogen releases from on-site septic systems, and increased stream temperatures caused by solar radiation as the result of removed riparian vegetation.[1]

28.     Unlike the NPDES program for point source discharge regulation, Congress did not establish a federal permitting scheme for nonpoint sources of pollution, such as pollution from timber harvesting and agricultural activities. Instead, Congress assigned states the task of implementing water quality standards for nonpoint sources, with oversight, guidance, assistance, and funding from EPA.[2] *See, e.g.*, 33 U.S.C. §§ 1288, 1313, 1329. Even so, water quality standards apply to all pollution sources, point and nonpoint alike. "[S]tates are required to set water quality standards for *all* waters within their boundaries regardless of the sources of the pollution entering the waters." *Pronsolino v. Nastri*, 291 F.3d 1123, 1127 (9th Cir. 2002) (emphasis in original).

## B.  Listing of Impaired Waters: Every Two Years the State Must Identify Waters that are Not Meeting the Water Quality Standards

29.     The CWA requires states to identify waters that fail to meet water quality standards and to create a priority ranking of those waters factoring the "severity of the pollution" and the waters' designated uses. 33 U.S.C. § 1313(d)(1)(a).

30.     Section 303(d)(2) of the CWA requires states to submit to EPA "from time to time" a list of "waters identified and the loads established under" subsections 303(d)(1)(A)–(D),

---

[1] See *Basic Information about Nonpoint Source (NPS) Pollution*, U. S. ENVTL. PROTECTION AGENCY, https://www.epa.gov/nps/basic-information-about-nonpoint-source-nps-pollution (last visited June 14, 2021).

[2]  In addition, Congress passed the Coastal Zone Act Reauthorization Amendments ("CZARA") that calls for states to use section 319 of the CWA to carry out approved coastal nonpoint source pollution control programs to meet water quality standards in coastal watersheds. *See* 16 U.S.C. § 1455b(a)(2).  CZARA calls for the use of section 303(d) programs to carry out coastal water quality protection.  *Id.*

including, among other components, a list of waters for which technology-based effluent limitations "are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(A); (2). *See also* 40 C.F.R. §§ 130.7(b); 130.10(b), (d).

31.     Such waters are called "water quality limited segments" (WQLS) or "impaired" waters. 40 C.F.R. § 131.3(h) ("Water quality limited segment means any segment where it is known that water quality does not meet applicable water quality standards, and/or is not expected to meet applicable water quality standards[.]).".

32.     EPA has promulgated rules that establish the frequency of such submissions, consistent with the statute. Every two years states shall compile a list of impaired waters and submit them to EPA for approval. 33 U.S.C. § 1313(d)(1)(A), (d)(2). These lists are commonly called "303(d) lists" in reference to section 303(d) of the CWA or "impaired waters list."

33.     The 303(d) lists serve several important functions, in addition to identifying which waterbodies must receive the required TMDL clean-up plans. The list provides the public and local governments with specific information about the health of the waterbodies throughout the state and identifies waterbodies that may not be safe to use. It identifies where improved nonpoint source controls of polluted runoff from land activities, such as farming and logging, are needed, as well as priorities for habitat restoration. Most importantly, a waterbody's inclusion on the 303(d) list triggers additional protections under the CWA's NPDES permitting requirements to ensure impaired waters are not further degraded and are cleaned up, consistent with the CWA's prohibition on point sources' causing or contributing to violations of water quality standards. *See* 40 C.F.R. §§ 122.4, 122.44.

34.     For purposes of listing impaired waters, the applicable water quality standards are the same as those established pursuant to section 303(c) of the CWA, which include waters'

designated uses, numeric criteria, narrative criteria, and antidegradation requirements. 40 C.F.R. § 130.7(b)(3).

35.    In order to identify and rank WQLS for TMDL development, each state, at a minimum, "shall assemble and evaluate all existing and readily available water quality-related data and information" for specific categories of waters that include, but are not limited to, those for which "water quality problems have been reported by local, state, or federal agencies; members of the public; or academic institutions." 40 C.F.R. § 130.7(b)(5), (b)(5)(iii).

36.    EPA recommends that states place their surface waters into five unique assessment categories. These categories are:

(1)    Attaining the water quality standard and no use is threatened;

(2)    Attaining some of the designated uses; no use is threatened; and insufficient or no data and information is available to determine if the remaining uses are attained or threatened;

(3)    Insufficient or no data and information to determine if any designated use is attained;

(4)    Impaired or threatened for one or more designated uses but does not require the development of a TMDL because: (A) a TMDL has already been completed; (B) other pollution controls are expected to result in the clean-up of the impairment; or (C) the impairment is not caused by a pollutant; and

(5)    The water quality standard is not attained because the segment is impaired or threatened for one or more designated uses by a pollutant(s), and requires a TMDL.

Waters placed in category 5 comprise the state's 303(d) list of impaired waters for which TMDLs are required.

37.     States must submit an updated impaired waters list to EPA on April 1 of every other year for EPA's review and approval. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(1). EPA must act on the state-submitted list within 30 days and, if it disapproves the list, EPA must establish a replacement list within 30 days of the disapproval. 33 U.S.C. § 1313(d)(2).

### C.  Total Maximum Daily Loads: The States Must Develop Clean-Up Plans to Ensure Pollutant Levels in Impaired Waters are Reduced to Meet Water Quality Standards

38.     Along with each new 303(d) list, a state must establish and submit to EPA a "priority ranking" of its impaired waters, "taking into account the severity of the pollution and the uses to be made of such waters." 33 U.S.C. § 1313(d)(1)(A). This priority ranking must also "specifically include the identification of waters targeted for TMDL development in the next two years." 40 C.F.R. § 130.7(b)(4).

39.     For each of its 303(d)-listed impaired waters, a state must establish a "total maximum daily load" of pollutants "established at a level necessary to implement the applicable water quality standards[.]" 33 U.S.C. § 1313(d)(1)(C). To encourage prompt state action even where water quality data are imperfect, the Act requires that TMDLs include a "margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." *Id*.

40.     States must prepare TMDLs "in accordance with the priority ranking." 40 C.F.R. § 130.7(c)(1). Federal regulations provide that "[s]chedules for submissions of TMDLs shall be determined by the [EPA] Regional Administrator and the State." 40 C.F.R. § 130.7(d)(1).

41.     A TMDL is the total daily loading of a pollutant for a particular waterbody or waterbody segment. *See* 40 C.F.R. §130.2(i). The total amount of a pollutant that may enter a

waterbody while still meeting water quality standards is called its "loading capacity." 40 C.F.R. § 130.2(f). TMDLs for individual waterbodies or segments are typically bundled together by watershed or subbasin in the same analytical document that is submitted to EPA for approval.

42.     After calculating a waterbody's loading capacity, a TMDL then distributes portions of the total loading capacity to individual sources or categories of pollution sources. These allocations include both "load allocations" and "waste load allocations," for nonpoint and point sources of pollution respectively. 40 C.F.R. § 130.2(g), (h), (i). The purpose of load and waste load allocations is to allocate the total amount of pollution that may enter a waterbody between all the sources of pollution, including both point and nonpoint sources, thereby restricting pollution inputs sufficiently to attain and maintain water quality standards. Only if nonpoint source controls provide the basis for more stringent load allocations can waste load allocations for point sources be made less stringent. *Id* at § 130.2(i).

43.     As with water quality standards, a state must submit TMDLs to EPA for approval or disapproval. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.2(d). EPA must act on a TMDL submission within 30 days and, if it disapproves the TMDL, EPA must establish a replacement TMDL within 30 days of the disapproval. 33 U.S.C. § 1313(d)(2).

44.     Upon EPA approval or promulgation of a TMDL, all future NPDES permits must be consistent with the TMDL's assumptions and requirements of waste load allocations for point sources. 40 C.F.R. § 122.44(d)(1)(vii)(B). The approved load allocations serve as the basis for state and local programs for controlling nonpoint source pollution, including state programs that receive federal funds under section 319 of the CWA, 33 U.S.C. § 1329. Once EPA approves a TMDL, the state must also incorporate the TMDL into its "continuing planning process" under section 303(e) of the CWA. 33 U.S.C. § 1313(e)(3)(C).

45.     In guidance published more than 20 years ago, EPA recognized that it "needs an overall plan for completing and approving TMDLs for all listed waters" and that each EPA Region should "secure a specific written agreement with each State in the Region establishing an appropriate schedule for the establishment of TMDLs for all waters on the most recent section 303(d) list," with those schedules being "expeditious" and extending "from eight to thirteen years in length." Memorandum from Robert Perciasepe, Assistant Administrator, EPA Office of Water, to Regional Administrators and Regional Water Division Directors: New Policies for Establishing and Implementing Total Maximum Daily Loads (TMDLs) (1997) at 3. Subsequent EPA guidance has clarified that this time frame is "8 to 13 years *from the date of the original water/pollutant combination listing*." EPA, Guidance for 2004 Assessment, Listing and Reporting Requirements Pursuant to Sections 303(d) and 305(b) of the Clean Water Act (July 21, 2003) (emphasis added).

46.     Thus, as other courts within the Ninth Circuit have noted, section 303(d) of the CWA "expressly requires the EPA to step into the states' shoes if their TMDL submissions . . . are inadequate." *Alaska Ctr. for the Env't v. Reilly*, 762 F. Supp. 1422, 1429 (W.D. Wash. 1991). Further, because "Congress prescribed early deadlines for the TMDL process," appropriate TMDL schedules must be counted in "months and a few years, not decades." *Idaho Sportsmen's Coal. v. Browner,* 951 F. Supp. 962, 967 (W.D. Wash. 1996).

47.     Congress intended for TMDLs to be developed promptly, without undue delay. To that end, the Ninth Circuit has adopted—and recently reaffirmed—the "constructive submission" doctrine, pursuant to which a clear and unambiguous decision by a state not to submit a TMDL to EPA will be construed as the constructive submission of no TMDLs, "which in turn triggers the EPA's nondiscretionary duty to act" under CWA Section 303(d)(2) by

preparing its own TMDLs instead. *Columbia Riverkeeper v. Wheeler*, 944 F.3d 1204, 1208 (9th

Cir. 2019) (citing *San Francisco Baykeeper v. Whitman*, 297 F.3d 877, 881 (9th Cir. 2002)). In

so holding, the Ninth Circuit explained that

> Where a state has failed to develop and issue a particular TMDL for a prolonged
> period of time, and has failed to develop a schedule and credible plan for producing
> that TMDL, it has no longer simply failed to prioritize this obligation. Instead, there
> has been a constructive submission of no TMDL, which triggers the EPA's
> mandatory duty to act.

*Id.* at 1211.

**D.  Judicial Review under the Clean Water Act's Citizen Suit Provision**

48.      The Clean Water Act authorizes citizen suits against the EPA Administrator

"where there is alleged a failure of the Administrator to perform any act or duty under this

chapter which is not discretionary with the Administrator." 33 U.S.C. § 1365(a)(2).

49.      The district courts have jurisdiction over suits against the Administrator arising

under the citizen suit provision, and may "order the Administrator to perform such act or duty"

the non-performance of which is the basis for the claim. 33 U.S.C. § 1365(a).

50.      Regulations promulgated by EPA to implement the Clean Water Act may

establish for the agency a non-discretionary duty the failure to undertake of which is subject to

review under the citizen suit provision of the Clean Water Act where the duty is clear-cut and

readily ascertainable from the regulatory language.

**E.  Judicial Review under the Administrative Procedure Act**

51.      Section 702 of the Administrative Procedure Act ("APA") provides a private

cause of action to any person "suffering legal wrong because of agency action, or adversely

affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

52.     Only final agency actions are reviewable under the APA. 5 U.S.C. § 704. Agency

action includes a "failure to act." *Id*. § 551(13). Under the APA, a court must "hold unlawful and

set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law;" "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right;" or "without observance of procedure

required by law." 5 U.S.C. § 706(2)(A), (C), (D).

## **FACTUAL BACKGROUND**

### A. Oregon's Water Quality Standards

53.     The Oregon Department of Environmental Quality (DEQ), with oversight from

the Oregon Environmental Quality Commission (EQC), promulgates and implements water

quality standards, develops TMDLs, and issues NPDES permits for waters located within the

State of Oregon.

54.      DEQ designates the beneficial uses for Oregon fresh and marine waters. Oregon

beneficial uses include (1) fish and aquatic life; (2) water contact recreation; (3) fishing; (4)

domestic and industrial water supply; (5) boating; (6) irrigation; (7) livestock watering; (8)

aesthetic quality; (9) wildlife and hunting; (10) hydropower; and (11) commercial navigation and

transportation.[3] DEQ designates beneficial uses by hydrological basin—there are 21 in Oregon—

and DEQ has assigned narrative and/or numeric criteria to protect each of these designated

beneficial uses.[4]

---

[3] Department of Environmental Quality, Beneficial Uses of Oregon's Waters, OREGON.GOV.
https://www.oregon.gov/deq/wq/Pages/WQ-Standards-Uses.aspx (Last visited July 14, 2021).
[4] *Id*.

55.     DEQ has established both numeric and narrative water quality criteria for many parameters and pollutants, applicable to surface waters in Oregon. These criteria are codified at OAR Chapter 340, Division 041.

56.     Oregon also has an antidegradation policy that seeks "to guide decisions that affect water quality to prevent unnecessary further degradation from new or increased point and nonpoint sources of pollution, and to protect, maintain, and enhance existing surface water quality to ensure the full protection of all existing beneficial uses." ORS 340-014-0004. Existing uses are defined as "those uses actually attained in the water body on or after November 28, 1975, whether or not they are included in the water quality standards." 40 C.F.R. § 131.3(e).

**B. Oregon's TMDL Program History**

57.     Oregon's TMDL program did not exist until the Northwest Environmental Defense Center ("NEDC") and EPA negotiated a consent decree in 1987 in which EPA was required to establish TMDLs for 11 WQLS within two years and to complete TMDLs at the rate of 20 percent annually, but in no event fewer than two per year, from subsequent 303(d) lists.

58.     After seven years, Oregon's TMDL program languished; and so, in 1994, NWEA and NEDC filed another suit to compel EPA to produce a complete list of WQLS for Oregon, a case resolved with a consent decree that resulted in Oregon's 1994/1996 303(d) list.

59.     Progress remained slow, however, and NWEA and NEDC filed suit in 1996 to, once again, compel EPA to identify a complete list of WQLS in Oregon and to establish TMDLs for those waters (Case No. 00-679-HO, first filed in Western WA as No. C96-1438 WD). At the time of that suit, more than 900 WQLS in Oregon needed TMDLs, but EPA had approved only 14 TMDLs.

60.      Oregon then completed and EPA approved the 1998 303(d) list that identified a total of 1,158 WQLS in need of TMDLs.

61.      Pursuant to a new consent decree between NWEA, NEDC, and EPA, entered by the Court on October 17, 2000 in *Nw. Envtl. Defense Ctr. v. Browner* (D. Or. No. 86-1578-HO), EPA was required to ensure the completion of no fewer than 1,153 TMDLs over the approximately ten-year period ending on January 1, 2010.

62.      Since the January 1, 2010 expiration of that ten-year TMDL schedule, no new TMDLs have been established by Oregon or EPA that had not been originally completed by Oregon and submitted to EPA and/or approved by EPA prior to December 31, 2010 —with the sole exception of EPA's 2020 draft TMDL for temperature in the Columbia River, the result of *Columbia Riverkeeper v. Wheeler*.

63.      The 303(d) lists prepared by Oregon and EPA in 2002, 2004/2006, 2010, and 2012 added at least 2,596 WQLS requiring TMDLs, nearly all of which still remain on Oregon's 303(d) list to this day and therefore still require TMDLs.

64.      Oregon submitted its most recently prepared 303(d) list—a list that included data only through December 31, 2017, but nonetheless was termed by Oregon a "2018/2020" Integrated Report, to EPA on April 21, 2020.

65.      EPA approved the list on November 12, 2020, terming it a "2014-2020" list because Oregon had failed to submit lists in 2014, 2016, and 2018.

66.      This most recent 303(d) list includes approximately 3,741 WQLS in need of TMDLs, 714 of which are re-listings under a separate court order for replacement, and includes thousands of WQLS first listed long ago that still require the development of TMDLs: 354 in

1998; 157 in 2002; 432 in 2004; 1,568 in 2010 (many of which were initially listed in previous years); and 439 in 2012.

67.     Of the total currently-listed WQLS, Oregon has identified 1,213 as a "high" priority for TMDL development, the vast majority of which are the WQLS for which Oregon must issue replacement TMDLs, along with many other segments that will be included in those replacement TMDLs. As a result, for example, only 12 of 354 WQLS that have been listed since 1998 that are not within this group subject to replacement are considered "high" priority for TMDL development.

**C.   TMDLs Play a Crucial Role in an Effective Clean Water Act Regulatory Program**

68.     A robust and effective TMDL program is essential for achieving the Clean Water Act's overarching goals, including full attainment of state water quality standards and the elimination of pollution from both point sources (e.g., factories and sewage treatment plants) and nonpoint sources (e.g., diffuse runoff from agricultural and forest lands). As the Ninth Circuit has noted, TMDLs "ensure that the cumulative impacts of multiple point source discharges and nonpoint source pollution are accounted for" by state water quality regulators, which then use TMDLs to "institute whatever additional cleanup actions are necessary, which can include further controls on point and nonpoint pollution sources." *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 880 (9th Cir. 2002).

69.     The timely preparation of TMDLs is especially important for waters where the pollution causing the in-stream impairment comes from multiple sources impacting water quality at the watershed scale. Often states, including Oregon, will delay imposing the necessary pollution reductions from *specific* sources until they have created a TMDL allocating the necessary pollution reductions among *multiple* sources contributing to the impairment.

COMPLAINT                                                                       Page **19** of 27

70.     For example, NWEA has a pending Clean Water Act citizen suit against the City

of Medford in Southern Oregon over the City's discharges of nutrient pollution (nitrogen and

phosphorus) from its municipal wastewater treatment facility into the Rogue River. *See Nw.*

*Envtl. Advocates v. City of Medford*, Case No. 18-cv-00856-CL (D. Or. filed May 16, 2018).

Oregon DEQ has long been aware that the nutrients in the City's effluent were contributing to

adverse changes in the aquatic ecosystem (such as the growth of nuisance algae) downstream of

the facility, yet the agency has so far declined to impose limits on the City's discharges of

nutrients, claiming that it "doesn't know enough about nutrient cycling in the Rogue River and

the type and level of nutrient reduction needed to instruct Medford on what they need to do."[5]

DEQ wanted to first prepare a TMDL to "identify sources of nutrients, and determine how much

of a reduction in nutrient contribution is needed from each source"[6]—but DEQ has no plan to

prepare that TMDL. Thus, organizations such as NWEA are forced to pick up DEQ's slack

through citizen suit litigation that could easily have been avoided.

71.     Similarly, Oregon's failure to complete TMDLs for the MidCoast basin has

adversely affected the state's ability to control polluted runoff from nonpoint sources. In 2013,

this failure became the basis for two federal agencies' proposing to disapprove Oregon's Coastal

Nonpoint Pollution Control Program, pursuant to the Coastal Zone Act Reauthorization

Amendments of 1990, 16 U.S.C. § 1455b. *See* National Oceanic and Atmospheric

Administration (NOAA)/EPA, Oregon Coastal Nonpoint Program NOAA/EPA Proposed

Finding (December 20, 2013) at 7–8. The completion of MidCoast TMDLs was a pilot project to

---

[5] DEQ Memorandum, "Final Message Map: DEQ Rogue River Algae Reconnaissance Survey
and Medford Wastewater Treatment Plant" (Sept. 25, 2014), filed as Dkt. #41–4 in *Nw. Envtl.*
*Advocates v. City of Medford*, Case No. 18-cv-00856-CL.
[6] *Id.*

demonstrate that Oregon could and would use TMDLs to control pollution from logging in coastal watersheds where existing state logging practices are inadequate to protect water quality and salmon. *See Nw. Envtl. Advocates v. Locke, et al.* (D. Or. No. 09-0017-PK), Final Settlement Agreement (September 27, 2010), Agreed Order Dismissing APA Claims (September 28, 2010). In 2015, EPA and NOAA formally determined that Oregon's logging practices do not protect salmon. *See* National Oceanic and Atmospheric Administration/EPA, NOAA/EPA Finding that Oregon has Not Submitted a Fully Approvable Coastal Nonpoint Program (January 30, 2015).

<u>**FIRST CLAIM FOR RELIEF**</u>
**Violations of the Clean Water Act:**
**Failure to Review and Disapprove Oregon's Constructively Submitted TMDLs for Most Remaining WQLS in Oregon**

72.     Plaintiff realleges all preceding paragraphs.

73.     DEQ has failed to establish TMDLs for approximately 2,964 WQLS found on Oregon's most recent 303(d) list that either (a) were first listed as impaired on Oregon's 2012 list or prior lists, or (b) have no date of listing. This number excludes 714 WQLS that are under a separate court order requiring replacement temperature TMDLs as well as approximately 325 additional temperature WQLS that NWEA understands DEQ will include along with the court-ordered replacement temperature TMDLs.

74.     DEQ has failed to establish TMDLs for approximately 2,529 WQLS on Oregon's most recent 303(d) list, including 2,442 for which it has assigned a "low" priority for TMDL completion, 72 for which it has assigned a "medium" priority for TMDL completion, and 15 for which it has assigned no priority for TMDL completion. Some of these "low" and "medium" priority WQLS are included in the approximately 2,964 WQLS that were first listed as impaired on Oregon's 2012 list or prior lists, cited in paragraph 73 above.

75.     DEQ has failed to establish TMDLs for approximately 1,055 WQLS on Oregon's most recent 303(d) list, including 481 WQLS listed for toxics, seven WQLS listed for ammonia, and 567 WQLS listed for nutrient pollution or related impairment (excess algal growth, aquatic weeds, biocriteria, chlorophyll-a, hazardous algal blooms, pH). All toxics and ammonia listings are assigned a "low" priority for TMDL completion, cited in paragraph 74 above. Most of these toxics, ammonia, and nutrient-related WQLS are included in the approximately 2,964 WQLS that were first listed as impaired on Oregon's 2012 list or prior lists, cited in paragraph 73 above.

76.     DEQ has failed to establish TMDLs for approximately 484 WQLS on Oregon's most recent 303(d) list that represent all impairments in the Willamette River basin other than temperature, bacteria, and mercury, all of which have been assigned a "low" priority or no priority at all. Of these "low" or no priority WQLS for the Willamette basin, 403 were first listed as impaired on Oregon's 2012 or prior lists, cited in paragraph 73 above. DEQ has failed to establish TMDLs for approximately 259 WQLS on Oregon's most recent 303(d) list for the Deschutes River basin and approximately 306 WQLS on Oregon's most recent 303(d) list for the MidCoast basin, all of which have been assigned a "low," "medium," or no priority. Of these WQLS for the Deschutes basin, 212 were first listed as impaired on Oregon's 2012 or prior lists, cited in paragraph 73 above; of these WQLS for the MidCoast basin, 207 were first listed as impaired on Oregon's 2012 list or prior lists, cited in paragraph 73 above.

77.     Further, DEQ currently has no plan or schedule in place for the completion of those needed TMDLs cited in paragraphs 73–76 and lacks the funding and staffing resources needed to complete them in a timely manner, as the Clean Water Act requires. To the best of NWEA's understanding, after accounting for overlapping categories and excluding the

temperature TMDLs covered by or related to the separate court order, a total of approximately 2,467 TMDLs have been constructively submitted to EPA.

78.     EPA, however, has never acted on those constructively submitted TMDLs. Accordingly, EPA has violated the Clean Water Act by failing to review and disapprove Oregon's the constructively submitted TMDLs identified in paragraph 77 "not later than thirty days after the date of submission" as required by Section 303(d)(2), 33 U.S.C. § 1313(d)(2).

79.     Such review and disapproval is a nondiscretionary duty under the Clean Water Act and the EPA Administrator's failure to perform that nondiscretionary duty is subject to judicial review under 33 U.S.C. § 1365(a)(2); NWEA is entitled to an order compelling the Administrator to perform such nondiscretionary duties.

**SECOND CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act:**
**Arbitrary and Capricious Approval of Oregon's 2012 Priority Ranking and**
**Prioritization Schedule**

80.     Plaintiff realleges all preceding paragraphs.

81.     Along with its most recent Integrated Report and 303(d) list, DEQ submitted to EPA a document entitled "TMDL Priorities and Schedule for Oregon's 2018/2020 Integrated Report Submittal (October 2020)" (hereinafter, "Priority Ranking and Schedule"). DEQ submitted that Priority Ranking and Schedule to satisfy the requirements of 40 C.F.R. § 130.7(b)(4), which requires states to include with their 303(d) lists "a priority ranking for all listed water quality-limited segments still requiring TMDLs, taking into account the severity of the pollution and the uses to be made of such waters" and to "specifically include the identification of waters targeted for TMDL development in the next two years."

82.     EPA reviewed and approved Oregon's Priority Ranking and Schedule at the same time it approved Oregon's 2014–2020 303(d) list, on November 12, 2020. *See* Letter from Daniel Opalski, EPA Region 10, to Justin Green, DEQ (Nov. 12, 2020).

83.     EPA's approval of Oregon's TMDL Priority Ranking and Schedule was arbitrary, capricious, and contrary to law for at least the following reasons:

A.  Oregon's Priority Ranking and Schedule fails to account for "the severity of the pollution and the uses to be made of such waters" as required by 40 C.F.R. § 130.7(b)(4).

B.  Oregon's Priority Ranking and Schedule fails to include any waters targeted for TMDL development in the two years following submittal. Indeed, the earliest DEQ anticipates completing *any* TMDL listed on its Priority Ranking and Schedule is "by the end of 2024," and the majority of TMDLs included in that Schedule are not projected to be completed until "the end of 2028."

C.  Oregon's Priority Ranking and Schedule provides no schedule that indicates how long it will take to complete TMDLs that have been on Oregon's 303(d) list for many years, and often decades.

84.     EPA's arbitrary and capricious approval of Oregon's Priority Ranking and Schedule violates the APA, 5 U.S.C. § 706(2)(A), and should therefore be set aside and remanded to the agency.

**THIRD CLAIM FOR RELIEF**
**Violation of the Clean Water Act:**
**Failure of the EPA Regional Administrator to Determine Oregon's Schedule for the Submission of TMDLs as Required by Section 303(d) and 40 C.F.R. § 130.7(d)(1)**

85.     Plaintiff realleges all preceding paragraphs.

86.     Under 33 U.S.C. § 1313(d), defendant Administrator has a non-discretionary duty to ensure that a reasonable schedule is established for the development of TMDLs for all water quality limited segments in the State of Oregon.

87.     Under 40 C.F.R. § 130.7(d)(1), EPA, acting through the appropriate Regional Administrator and in consultation with the state, has a non-discretionary duty to determine each state's schedule for the submission of TMDLs.

88.     Neither EPA, nor the Administrator, nor the Regional Administrator for Region 10 has taken steps to ensure that a reasonable schedule is established for the development of TMDLs for all water quality limited segments in the State of Oregon, contrary to 33 U.S.C. § 1313(d).

89.     Neither EPA, nor the EPA Administrator, nor the Regional Administrator for Region 10 has determined a schedule for Oregon's submission of TMDLs to EPA, contrary to 40 C.F.R. § 130.7(d)(1).

90.     EPA, the Administrator, and the Regional Administrator for Region 10 have therefore failed to perform non-discretionary duties within the meaning of 33 U.S.C. § 1365(a)(2), and NWEA is entitled to an order compelling them to perform such duties.

### FOURTH CLAIM FOR RELIEF
**(In the Alternative)**
**Violations of the Administrative Procedure Act:**
**Failure of the EPA Administrator and Regional Administrator to Determine**
**Washington's Schedule for the Submission of TMDLs**

91.     Plaintiff realleges all preceding paragraphs.

92.     The EPA Administrator's failure to establish a reasonable schedule for development of TMDLs for all water quality limited segments in the State of Oregon, as required

by 33 U.S.C. § 1313(d), is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

93.    The EPA Regional Administrator's failure to determine a schedule for the submission of TMDLs by the State of Oregon, as required by 40 C.F.R. § 130.7(d)(1), constitutes the unreasonable delay of agency action within the meaning of 5 U.S.C. § 706(1).

94.    NWEA is entitled to an order compelling defendants' action unreasonably delayed, and holding unlawful and setting aside defendants' actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## REQUEST FOR RELIEF

WHEREFORE, plaintiff Northwest Environmental Advocates respectfully requests that this Court:

A. Declare that Defendants failed to undertake actions and duties that are non-discretionary within the meaning of the Clean Water Act's citizen suit provision, 33 U.S.C. § 1365(a)(2), when they failed to review and disapprove Oregon's constructive submission of approximately 2,467 TMDLs as required by 33 U.S.C. § 1313(d)(2) and failed to determine a schedule for Oregon's submission of TMDLs to EPA as required by 40 C.F.R. § 130.7(d)(1);

B. Declare that Defendants acted in a manner that is arbitrary, capricious, and not in accordance with the Clean Water Act when they approved Oregon's 2020 TMDL Priority Ranking and Schedule and failed to determine a schedule for the submission of TMDLs by the State of Oregon, as required by 40 C.F.R. § 130.7(d)(1);

C. Order EPA to disapprove those approximately 2,467 TMDLs constructively submitted by Oregon and to disapprove Oregon's 2020 TMDL Priority Ranking and Schedule;

D.  Order EPA to develop a schedule for the completion of all remaining TMDLs for all existing WQLS in the State of Oregon;

E.  Order EPA to undertake all such other actions as are found to be non-discretionary within the meaning of 33 U.S.C. § 1365(a)(2) or that are found to have been unlawfully withheld or unreasonably delayed within the meaning of 5 U.S.C. 706(1);

F.  Award NWEA its reasonable costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 and the CWA, 16 U.S.C. § 1365; and

G.  Grant such other relief as the Court deems just and proper.

Dated this 3rd day of August, 2021.

Respectfully submitted,

s/ James N. Saul
JAMES N. SAUL, OSB No. 152809
Earthrise Law Center
at Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland, OR 97219
Tel: (503) 768-6929
Fax: (503) 768-6642
E-mail: jsaul@lclark.edu

*Attorney for Plaintiff Northwest Environmental Advocates*

# EXHIBIT A



James N. Saul
Clinical Professor & Staff Attorney

Earthrise Law Center at Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219-7799
*phone* 503-768-6929
*fax* 503-768-6642
jsaul@lclark.edu
earthriselaw.org

April 13, 2021

*Via Certified U.S. Mail*

Michael S. Regan, Administrator
U.S. Environmental Protection Agency
Mail Code 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Michelle Pirzadeh, Acting Regional Administrator
U.S. Environmental Protection Agency Region 10
1200 Sixth Avenue, Suite 155
Seattle, WA 98101

Re: **Notice of Intent to Sue for Failure to Perform Mandatory Duties Under Section 303(d) of the Clean Water Act**

Dear Mr. Regan and Ms. Pirzadeh:

  This letter provides notice that Northwest Environmental Advocates ("NWEA") intends to file suit pursuant to section 505(a)(2) of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(2), against the U.S. Environmental Protection Agency ("EPA"), the EPA Administrator, and the EPA Regional Administrator for Region 10 for violating their mandatory duties under CWA section 303(d), 33 U.S.C. § 1313(d), relating to the development and implementation of total maximum daily loads ("TMDLs") in the State of Oregon. The specific bases for NWEA's claims are set forth below.

## A. Legal Background

  Section 303(d)(2) of the CWA requires each state to prepare and "submit to the Administrator from time to time" a list of "waters identified and loads established under" subsections 303(d)(1)(A)-(D), including (among other components) a list of waters for which technology-based effluent limitations "are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(2); *see also* 40 C.F.R. §§ 130.7(b); 130.10(b), (d). This list of waters is commonly known as a "303(d) list" or "impaired waters list" and the waters are known as "water quality limited segments" or "WQLS."

Along with its 303(d) list, states must prepare and submit to the Administrator, in accordance with the state's priority ranking, "the total maximum daily load" (TMDL) of pollutants contributing to the impairments of such waters, "established at a level necessary to implement the applicable water quality standard with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C), *see also* 40 C.F.R. § 1365(a)(2). EPA's regulations require that each state submit its "list of waters, pollutants causing impairment, and the priority ranking including waters targeted for TMDL development within the next two years" to EPA every two years. 40 C.F.R. § 130.7(d)(1). These submissions are due "on April 1 of every even-numbered year." *Id*. States must prepare TMDLs "in accordance with the priority ranking." 40 C.F.R. § 130.7(c)(1). Federal regulations provide that "schedules for submissions of TMDLs shall be determined by the [EPA] Regional Administrator and the State." 40 C.F.R. § 130.7(d)(1).

Once a state submits a TMDL, EPA must "either approve or disapprove" it "not later than thirty days after the date of submission[.]" 33 U.S.C. § 1313(d)(2); *see also* 40 C.F.R. § 130.7(d)(2). EPA's obligation to review and either approve or disapprove a state-submitted TMDL is a non-discretionary duty, *see San Francisco BayKeeper v Whitman*, 297 F.3d 877, 880 (9th Cir. 2002), and the district courts have jurisdiction to "order the Administrator to perform such act or duty" under the CWA's citizen suit provision, 33 U.S.C. § 1365(a)(2).

## B.    Oregon TMDL Program History

Oregon's TMDL program did not exist until the Northwest Environmental Defense Center ("NEDC") and EPA negotiated a consent decree in 1987 in which EPA was required to establish TMDLs for 11 WQLS within two years and to complete TMDLs at the rate of 20 percent annually, but in no event fewer than two per year, from subsequent 303(d) lists. In 1994, NWEA and NEDC filed suit to compel EPA to produce a complete list of WQLS for Oregon, a case resolved with a consent decree that resulted in Oregon's 1994/1996 303(d) list. NWEA and NEDC filed suit in 1996 to, once again, compel EPA to identify a complete list of WQLS in Oregon and to establish TMDLs for those waters (Case No. 00-679-HO, first filed in Western WA as No. C96-1438 WD). At the time of that suit, more than 900 WQLS needed TMDLs but EPA had approved only 14. Oregon then completed and EPA approved the 1998 303(d) list that identified a total of 1,158 WQLS in need of TMDLs. Pursuant to a new consent decree between NWEA, NEDC, and EPA, entered on October 17, 2000, EPA was required to ensure the completion of no fewer than 1,153 TMDLs by December 31, 2010.

Subsequent 303(d) lists prepared by Oregon and EPA in 2002, 2004/2006, 2010, and 2012 added at least 2,596 WQLS requiring TMDLs, nearly all of which still remain on Oregon's 303(d) list and therefore still require TMDLs.[1]  Since the expiration of the TMDL schedule agreed upon in the October 17, 2000 consent decree some ten years ago, **no new TMDLS** have been established by Oregon or EPA that had not been originally completed by Oregon and

---

[1]      In its action on Oregon's 2012 303(d) list, EPA added 714 WQLS for temperature back onto the list due to ongoing litigation that has now been resolved with a court-ordered schedule to complete those replacement TMDLs.

submitted to EPA and/or approved by EPA prior to December 31, 2010 —with the sole exception of EPA's 2020 draft TMDL for temperature in the Columbia River.[2]

Oregon submitted its most recently prepared 303(d) list—a list that included data only through December 31, 2017 but nonetheless was termed by Oregon a "2018/2020" list—to EPA on April 21, 2020. EPA approved the list on November 12, 2020, terming it a "2014-2020" list because Oregon had failed to submit lists in 2014, 2016, and 2018. This most recent list includes approximately 3,741 WQLS in need of TMDLs, 714 of which are under a separate court order for replacement, and includes thousands of WQLS first listed long ago that still require the development of TMDLs: 354 in 1998; 157 in 2002; 432 in 2004; 1,568 in 2010 (many of which were initially listed in previous years); and 439 in 2012. Of the total currently listed WQLS, Oregon has identified 1,213 as a "high" priority for TMDL development, the vast majority of which are the WQLS for which Oregon must issue replacement TMDLs along with many other segments that will be included in those replacement TMDLs. As a result, for example, only 12 of 354 WQLS that have been listed since 1998 are considered "high" priority for TMDL development.

## C.    EPA's Failure to Perform its Nondiscretionary Duty to Either Approve or Disapprove Oregon's Constructively Submitted TMDLs under CWA § 303(d)(2)

The Ninth Circuit has recognized the "constructive submission" theory, holding that where a state has "clearly and unambiguously decided not to submit any TMDLs," EPA has a non-discretionary duty under section 303(d)(2) to develop TMDLs itself. *San Francisco BayKeeper*, 297 F.3d at 883 (citing *Hayes v. Whitman*, 264 F.3d 1017, 1024 (10th Cir. 2001). Although the *San Francisco BayKeeper* court deferred making "a broad, generic determination of the point in time at which a state's inaction may be deemed a constructive submission," the Ninth Circuit previously held that failing to develop TMDLs for 13 years was an undue delay. *Id.* at 883; *Alaska Ctr. for the Env't v. Reilly*, 796 F. Supp. 1374, 1379 (W.D. Wash. 1992), *aff'd sub nom. Alaska Ctr. for Env't v. Browner*, 20 F.3d 981 (9th Cir. 1994).

Most recently, the Ninth Circuit noted the difference between affording less priority to certain TMDLs and declining to issue TMDLs at all. *Columbia Riverkeeper v. Wheeler*, 944 F.3d 1204 (9th Cir. 2019). There, the court held that EPA's mandatory duty to act is triggered by a constructive submission "where a state fails to develop and issue a particular TMDL for a prolonged period of time and has failed to develop a schedule or credible plan for producing that

---

[2]    TMDLs that were first completed prior to December 31, 2010 and subsequently revised include: 2012 revisions to the 2001 Tualatin subbasin TMDL for dissolved oxygen, algae, and pH approved by EPA in 2001 with revisions approved by EPA on December 14, 2012; the 2001 Western Hood subbasin TMDL for temperature that was revised by Oregon in 2018 and approved by EPA in 2018; the 2010 Upper Klamath and Lost River subbasin TMDLs for temperature, dissolved oxygen, pH, ammonia, and chlorophyl-a approved by EPA on September 30, 2019 (for temperature) and March 12, 2019 (for the other parameters); and the 2006 Willamette basin TMDL for mercury approved by EPA in 2006 and subsequently voluntarily remanded by EPA (2016), reissued by Oregon (2019), disapproved by EPA (2019), and reissued by EPA (2021).

TMDL." *Id*. at 1211. The court made clear that the purpose of the CWA would be dramatically undermined should a state or the EPA avoid its statutory obligations by refusing to act. *Id.* at 1210.

NWEA alleges that the State of Oregon has constructively submitted to EPA a TMDL for each of the approximately 2,950 WQLS that are on the current 303(d) list that date to the State's 2012 303(d) list, less the 714 that are under a separate court order for completion of replacement TMDLs. All of those waters have been identified as impaired for at least 9 years; some of them have been impaired for 23 years or more. Of these, Oregon has assigned a "high priority" to developing TMDLs for 1,213 WQLS, which includes the 714 WQLS under separate court order for replacement and includes approximately an additional 325 temperature WQLS that in all probability will be completed with those replacement TMDLs. The court schedule for EPA approval or disapproval of these replacement temperature TMDLs extends to May 29, 2028.  In other words, DEQ does not intend to develop any TMDLs for medium priority WQLS until some years after 2028; all medium priority WQLS are in the MidCoast basin (TMDL development began not later than 2011) and Deschutes River basin (TMDL development began in 2000). Oregon has constructively submitted no TMDLs for the MidCoast and Deschutes River basins, a total of 72 "medium" priority WQLS and a total of 487 "low" priority WQLS.

The Willamette River basin is the 19th largest watershed by volume in the United States and is Oregon's most populous and industrialized basin, home to a majority of Oregonians. Oregon has constructively submitted no TMDLs for 483 "low" priority WQLS in the Willamette River basin that represent impairments by all water quality parameters and pollutants other than temperature, indicator bacteria, and mercury.

Oregon has deemed no WQLS impaired by toxics, ammonia, and nutrients as either "high" or "medium" priority for TMDL development; all of these impairments are determined to be a "low" priority and will, therefore, be subject to TMDL development well after 2028, if ever, regardless of listing date.  Oregon has constructively submitted no TMDLs for WQLS impaired by toxics, ammonia, and nutrients.

For each WQLS identified above, a constructive submission has occurred because Oregon has failed to "develop and issue" the required TMDL "for a prolonged period of time and has failed to develop a schedule or credible plan for producing that TMDL." *Columbia Riverkeeper*, 944 F.3d at 1211. With respect to each of those constructively submitted TMDLs, EPA has failed to complete its mandatory duty under section 303(d)(2) to "either approve or disapprove" the TMDL, 33 U.S.C. § 1313(d)(2), and NWEA intends to file suit to obtain a court order requiring EPA, its Administrator, and Regional Administrator for Region 10 to complete such mandatory duty for each such TMDL. *Id*. § 1365(a)(2).

**D.    Persons Giving Notice and Representing Attorneys**

The name, address, and telephone number of the parties giving notice are:

Northwest Environmental Advocates
P.O. Box 12187
Portland, OR 97212-0187

4

(503) 295-0490

However, you are requested to contact NWEA through its undersigned attorneys as follows:

> James N. Saul
> Earthrise Law Center
> 10101 S. Terwilliger Blvd.
> Portland, OR 97219
> (503) 768-6929
> jsaul@lclark.edu

**E.    Conclusion**

According to Oregon, 44 percent of Oregon's river miles are now considered impaired based on data collected through 2018.  In 2012, only 33 percent of Oregon's river miles were considered impaired.

NWEA would prefer to resolve this dispute short of litigation and is willing to discuss a settlement framework that would resolve the claims alleged herein to the mutual benefit of all parties. If EPA is interested in discussing settlement, we encourage EPA to contact the undersigned counsel immediately. Unless EPA has taken final action that, in NWEA's view, avoids the need for litigation on the claims alleged herein, on or about the 60th day following the date of this Notice Letter, NWEA intends to file suit against EPA pursuant to the CWA's citizen suit provision, 33 U.S.C. § 1365(a)(2).

Sincerely,

James N. Saul
Clinical Professor and Staff Attorney
Earthrise Law Center at
Lewis & Clark Law School

*Copies Sent via U.S. Mail to:*

Merrick B. Garland, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Richard Whitman, Director
Oregon Department of Environmental Quality
700 NE Multnomah Street, Suite 600
Portland, OR 97232-4100