JAMES N. SAUL
Earthrise Law Center
at Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland, OR 97219-7799
Tel: (503) 768-6929
Fax: (503) 768-6642
E-mail: jsaul@lclark.edu

*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES, a non-profit organization,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL REGAN, in his official capacity as Administrator of the Environmental Protection Agency; and MICHELLE PIRZADEH, in her official capacity as Acting Regional Administrator Environmental Protection Agency Region 10,<br><br>Defendants,<br><br>and<br><br>STATE OF OREGON, by and through the OREGON DEPARTMENT OF ENVIRONMENAL QUALITY,<br><br>Intervenor-Defendant. | Case No: 3:21-cv-01136-HZ<br><br><br>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT<br><br>ORAL ARGUMENT REQUESTED |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................ iii

MOTION ...................................................................................................................... 1

MEMORANDUM OF LAW ......................................................................................... 1

INTRODUCTION ........................................................................................................ 1

LEGAL BACKGROUND ............................................................................................ 2

I.      TMDLs play a central role in fulfilling the objectives of the Clean Water Act ................. 2

II.     The constructive submission doctrine has been widely accepted by courts to achieve Congress' goal that TMDLs be developed quickly ........................................... 3

FACTUAL BACKGROUND ........................................................................................ 6

I.      TMDLs are a critical tool for the attainment of water quality standards and for the implementation of both point and nonpoint source pollution reductions ........................... 6

II.     DEQ and EPA struggle to implement an effective TMDL program for Oregon without judicial intervention ....................................................................................... 7

III.    The Mid-Coast and Deschutes Basin examples: DEQ's major TMDL projects have been repeatedly delayed, reduced in scope, and have produced almost nothing .............. 10

IV.   DEQ has no schedule or plan to develop TMDLs for most impaired waters ................... 12

STANDARD AND SCOPE OF REVIEW ................................................................... 15

ARGUMENT .............................................................................................................. 16

I.      NWEA has standing to sue under Article III .................................................................. 16

II.     EPA violated the Clean Water Act by failing to issue TMDLs for Oregon following DEQ's constructive submission of TMDLs (Claim One) .................................................. 18

        A.    DEQ has failed to submit thousands of TMDLs to EPA for a prolonged period of time, and in some cases more than two decades ..................................... 19

        B.    DEQ lacks a schedule and a credible plan for completing its remaining TMDLs ................................................................................................ 23

　　　　　　1.　　Thousands of impaired water segments are not and have never appeared on any DEQ schedule for the development of a TMDL ............24

　　　　　　2.　　Even for those impaired waters appearing on a TMDL schedule, DEQ's track record of delays shows that its schedules are not reliable or credible ....................................................................................26

III.　　EPA's approval of Oregon's 2020 TMDL priority ranking and schedule was arbitrary and capricious under the APA (Claim Two)......................................................28

　　　　A.　　EPA's determination that DEQ considered the severity of the pollution and the uses to be made of Oregon's waters in determining its priority ranking for TMDLs is unsupported by the record ...................................................................28

　　　　B.　　EPA's approval of DEQ's inadequate and incomplete TMDL schedule was arbitrary and capricious.............................................................................................30

IV.　　EPA violated the Clean Water Act by failing to determine a schedule for the submission of TMDLs by Oregon (Claim Three)............................................................31

V.　　EPA's failure to determine a schedule for the submission of TMDLS for Oregon was action unlawfully withheld or unreasonably delayed under the APA (Claim Four)………………………………………………………………….…………..34

CONCLUSION...............................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                      **Page(s)**

*Alaska Ctr. for the Envt. v. Browner*,
    20 F.3d 981 (9th Cir. 1994) ............................................................17, 18, 19, 31

*Alaska Ctr. for the Env't v. Reilly*,
    762 F. Supp. 1422 (W.D. Wash. 1991)...........................................4, 5, 19, 21

*Alaska Ctr. for the Env't v. Reilly*,
    796 F. Supp. 1374 (W.D. Wash. 1992)..............................................19, 32, 35

*Am. Canoe Ass'n, Inc. v. U.S. Envtl. Protection Agency*,
    54 F. Supp. 2d 621 (E.D. Va. 1999) ........................................................22, 33

*Anacostia Riverkeeper, Inc. v. Jackson*,
    713 F. Supp. 2d 50, 55 (D.D.C. 2010) ............................................................22

*Ctr. for Biological Diversity v. U.S. Envtl. Protection Agency*,
    90 F. Supp. 3d 1177 (W.D. Wash. 2015)..........................................................17

*City of Arcadia v. U.S. Envtl. Prot. Agency*,
    411 F.3d 1103 (9th Cir. 2005) .........................................................................4

*Columbia Riverkeeper v. Wheeler*,
    944 F.3d 1204 (9th Cir. 2019) ................................................................ *passim*

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2010) ..........................................................................16

*Ecological Rts. Found. v. Pac. Lumber Co.*,
    230 F.3d 1141 (9th Cir. 2000) ........................................................................18

*Envtl. Law & Policy Ctr. v. U.S. Envtl. Prot. Agency*,
    415 F. Supp. 3d 775 (N.D. Ohio 2019) ...........................................20, 25, 29

*Friends of the Clearwater v. Dombeck*,
    222F.3d 552 (9th Cir. 2000) ...........................................................................16

*Friends of the Earth v. Laidlaw Envtl. Servs., Inc.*,
    528 U.S. 167 (2000)........................................................................................17

*Friends of Wild Swan*,
    74 F. App'x 718 (9th Cir. 2003) .....................................................................31

*Hayes v. Whitman*,
    264 F.3d 1017 (10th Cir. 2001) ................................................................4, 5

*Hunt v. Wash. State Apple Advert. Com'n*,
    432 U.S. 333 (1977)...............................................................................16

*Idaho Sportsman's Coal. v. Browner*,
    951 F. Supp. 962 (W.D. Wash. 1996) ....................................................*passim*

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..............................................................................16

*Nat. Res. Def. Council, Inc. v. U.S. Envtl. Protection Agency*,
    966 F.2d 1292 (9th Cir. 1992) ...............................................................29

*Nat. Res. Def. Council, Inc. v. U.S. Envtl. Protection Agency*,
    490 F. Supp. 3d 190 (D.D.C. 2020) .......................................................22

*Nat. Res. Def. Council, Inc. v. Fox*,
    30 F. Supp. 2d 369 (S.D.N.Y. 1998) ..................................................22, 23

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ...............................................................29

*Nw. Envtl. Advocates v. City of Medford*,
    No. 1:18-CV-00856-CL, 2021 WL 2673126 (D. Or. June 9, 2021)...................7

*Nw. Envtl. Advocates v. U.S. Envtl. Protection Agency*,
    855 F. Supp. 2d 1199 (D. Or. 2012) .........................................................3

*Nw. Envtl. Advocates. v. U.S. Envtl. Protection Agency*,
    2017 WL 1370713 (D. Or. Apr. 11, 2017) ..............................................23

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2005) .................................................................18

*Ohio Valley Envtl. Coal., Inc. v. Pruitt*,
    893 F.3d 225 (4th Cir. 2018) ..............................................................5, 20

*San Francisco Baykeeper v. Whitman*,
    297 F.3d 877 (9th Cir. 2002) .......................................................4, 5, 24, 26

*Scott v. City of Hammond*,
    741 F.2d 992 (7th Cir. 1984) ...................................................................5

*Sierra Club, Inc. v. Leavitt*,
    488 F.3d 904 (11th Cir. 2007) ........................................................................29

*Sierra Club v. McLerran*,
    2015 WL 1188522 (W.D. Wash. Mar. 16, 2015) ............................................25

*Sierra Club v. U.S. Envtl. Protection Agency*,
    162 F. Supp. 2d 406 (D. Md. 2001) ................................................................22

*Sierra Club v. Hankinson*,
    939 F. Supp. 865 (N.D. Ga. 1996) ..................................................................21

*Sierra Club, N. Star Chapter v. Browner*,
    843 F. Supp. 1304 (D. Minn. 1993) ................................................................18

*Scott v. City of Hammond*,
    741 F.2d 992 (7th Cir. 1984) ...........................................................................5

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ...................................................................15, 34

**Federal Statutes**                                                           **Page(s)**

5 U.S.C. § 704 ..........................................................................................................34

5 U.S.C. § 706(1) ...............................................................................................16, 34

5 U.S.C. § 706(1)–(2) ...............................................................................................15

5 U.S.C. § 706(2)(A) ..........................................................................................15, 34

16 U.S.C. § 1455b .....................................................................................................10

16 U.S.C. §§ 1531 *et seq* ...........................................................................................3

33 U.S.C. § 1313(b)(1)(C) ..........................................................................................6

33 U.S.C. § 1313(c)(2)(A) ...........................................................................................3

33 U.S.C. § 1313(d) ...............................................................................................2, 34

33 U.S.C. § 1313(d)(1)(A) .........................................................................................28

33 U.S.C. § 1313(d)(1)(C) .....................................................................................3, 23

33 U.S.C. § 1313(d)(2) ........................................................................... *passim*

33 U.S.C. § 1319(d) .......................................................................................8

33 U.S.C. § 1314(a)(2) ...............................................................................4,8

33 U.S.C. § 1365(a)(2) ...............................................................................15

**Federal Regulations**                                                      **Page(s)**

40 C.F.R. § 130.2(i) .......................................................................................3

40 C.F.R. § 130.7(b)(4) ...................................................................9, 28, 31

40 C.F.R. § 130.7(d)(1) .........................................................2, 32, 33, 34

40 C.F.R. § 130.7(d)(1)–(2) ......................................................................28

40 C.F.R. § 130.7(d)(2) ..................................................................................4

40 C.F.R. § 131.10 ..........................................................................................3

40 C.F.R. § 122.44(d) .....................................................................................6

40 C.F.R. § 122.44(d)(1)(vii)(B) ...............................................................3

**Rules**                                                                    **Page(s)**

Fed. R. Civ. P. 56 ...........................................................................................1

Local Rule 7-1(a) .............................................................................................1

**Other Authorities**                                                        **Page(s)**

EPA, New Policies for Establishing and Implementing
    Total Maximum Daily Loads (TMDLs) (August 1997) ........................... *passim*

65 Fed. Reg. 43,586 (July 13, 2000) .......................................................3

79 Fed. Reg. 51,657 (Aug. 29, 2014) .......................................................3

88 Fed. Reg. 68,370 (Oct. 3, 2023) ..........................................................3

## MOTION

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Northwest Environmental Advocates ("NWEA") respectfully moves this Court for an order granting summary judgment in its favor on all claims for relief, as set forth in NWEA's Complaint (Dkt. #1). The grounds for the motion are set forth in the following Memorandum, the supporting declarations and exhibits, and the excerpts of the administrative record cited below.

As required by Local Rule 7-1(a), the parties made a good faith effort to resolve this dispute but were unable to reach agreement on the subject matter of this motion.

## MEMORANDUM OF LAW

### INTRODUCTION

A half-century after passage of the Clean Water Act ("CWA" or the "Act"), more than 3,700 waters suffer from excess pollution in the State of Oregon, according to the Department of Environmental Quality's ("DEQ") most recent list of impaired waters prepared under section 303(d) of the Act. These degraded waters are found throughout the state; impaired by toxics such as metals and PCBs, conventional pollutants like sediment and pH, and conditions that will only be exacerbated by climate change, including elevated water temperature and harmful algae blooms. The Total Maximum Daily Load ("TMDL") program is the Act's mechanism to restore these waters to compliance with water quality standards—but, under the watch of the Environmental Protection Agency ("EPA"), that program has ground to a virtual halt in Oregon.

Oregon's TMDL program was forced into existence by litigation, enjoying a period of relative success between 2000 and 2010 due to a federal consent decree and related Memoranda of Agreement between EPA and DEQ that saw the completion of over 1,200 TMDLs that decade. But since 2010, DEQ has submitted to EPA *just four* entirely new TMDLs, along with a smattering of revised older TMDLs, some of which were required by this Court's remedy order

in *Nw. Envtl. Advocates v. U.S. Envtl. Protection Agency*, No. 12-cv-01751. EPA offers myriad

excuses for DEQ's stunted TMDL program: lack of data, technical complexity, vagaries of

Oregon law, declining funding—the list goes on. (EPA_0000023–27.) These excuses have no

legal significance. One thing is clear: The agencies are able to comply with the Act when

compelled to do so by court order, but are unwilling to do so when left to their own devices.

DEQ's glacial pace of TMDL submission over the past 13 years, its history of repeatedly

delayed and abandoned TMDL projects, and its lack of a credible schedule or plan to complete

TMDLs for the vast majority of the impaired waters on Oregon's 303(d) list amount to the

"constructive submission" of TMDLs to EPA, which triggers EPA's mandatory duty under 33

U.S.C. § 1313(d)(2) to disapprove them and issue TMDLs of its own. Moreover, EPA's cursory

rubber-stamp of DEQ's 2020 TMDL priority ranking and schedule was arbitrary and capricious

under the Administrative Procedure Act ("APA") and must be set aside. Finally, EPA failed to

take its nondiscretionary duty under the Act and 40 C.F.R. § 130.7(d)(1) to determine, along with

Oregon, a schedule for the submission of TMDLs. The Court should therefore grant NWEA's

motion for summary judgment on all four claims.

## LEGAL BACKGROUND

### I.    TMDLs play a central role in fulfilling the objectives of the Clean Water Act.

Under section 303(d) of the CWA, 33 U.S.C. § 1313(d), states must identify waters that

do not meet water quality standards. Such waters are commonly described as "impaired" and

identified as a "water quality limited segment" ("WQLS"); state lists of WQLSs are known as

the "303(d) list." To restore its impaired waters to compliance with water quality standards,

states must prepare a TMDL—a clean-up plan that establishes pollutant load reductions for

contributing sources. TMDLs allocate these reductions among the contributing point sources and

nonpoint sources such as runoff from logging and farming, and must include a margin of safety

"which takes into account any lack of knowledge concerning the relationship between effluent

limitations and water quality." 33 U.S.C. § 1313(d)(1)(C). *See* 40 C.F.R. § 122.44(d)(1)(vii)(B)

(requiring effluent limitations for point sources to be consistent with an applicable TMDL); *Nw.*

*Envtl. Advocates v. U.S. Envtl. Protection Agency*, 855 F. Supp. 2d 1199, 1210 (D. Or. 2012)

(describing TMDL implementation for nonpoint sources in Oregon). A TMDL is the sum of

these components. 40 C.F.R. § 130.2(i). The end goal of water quality standards—and therefore

TMDLs—is the protection of designated uses, such as drinking water, fish consumption, and

habitat for threatened and endangered species listed under the Endangered Species Act, 16

U.S.C. §§ 1531 *et seq*. *See* 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 131.10.

      EPA notes that the TMDL program is "crucial" to the success of the CWA "because it

brings rigor, accountability, and statutory authority to the process." EPA, New Policies for

Establishing and Implementing Total Maximum Daily Loads (TMDLs) (August 1997) ("TMDL

Guidance").[1] As one court explained, "TMDLs provide a basis for developing other pollution

control measures where technology-based point source controls prove inadequate" and therefore,

to "serve their intended purpose, they must be available early in the development of a state's

program." *Idaho Sportsman's Coal. v. Browner*, 951 F. Supp. 962, 966–68 (W.D. Wash. 1996).

## II.    The constructive submission doctrine has been widely adopted by courts to achieve Congress' goal that TMDLs be developed quickly.

      To achieve its goals, the CWA includes short deadlines for developing TMDLs. At the

outset, states were required to submit a 303(d) list and TMDLs to EPA within 180 days of EPA's

---

[1] Saul Decl. Ex. 4, *also available at* https://www.epa.gov/tmdl/new-policies-establishing-and-implementing-tmdls (last checked November 30, 2023).

1979 identification of pollutants suitable for TMDL development. 33 U.S.C. §§ 1313(d)(2), 1314(a)(2); *Alaska Ctr. for the Env't v. Reilly*, 762 F. Supp. 1422, 1425, and fn.3 (W.D. Wash. 1991). Once submitted, EPA only has 30 days to approve or disapprove a TMDL—and, if disapproved, only 30 days to issue its own replacement. 33 U.S.C. § 1313(d)(2). These statutory provisions create an "expedited timeline" reflecting the "clear expedience" Congress sought for completion of TMDLs. *Columbia Riverkeeper v. Wheeler*, 944 F.3d 1204, 1210 (9th Cir. 2019). The Act, however, does not impose an express deadline for states' TMDL submissions, merely requiring their submission "from time to time," and it is "silent as to what duties the EPA has when a state simply fails to submit a TMDL altogether." *Id.* at 1208; 33 U.S.C. § 1313(d)(2).

Courts have "adopted the constructive submission doctrine to fill this statutory gap." *Columbia Riverkeeper*, 944 F.3d at 1210. First recognized by the Ninth Circuit in *San Francisco Baykeeper v. Whitman*, 297 F.3d 877 (9th Cir. 2002), that court reaffirmed the doctrine several years later by holding that EPA is "under a mandatory duty to establish a TMDL when a State fails over a long period of time to submit a TMDL; this 'prolonged' failure can amount to the 'constructive submission' of an inadequate TMDL, thus triggering the EPA's duty to issue its own." *City of Arcadia v. U.S. Envtl. Prot. Agency*, 411 F.3d 1103, 1105 (9th Cir. 2005). At its most basic level, a constructive submission occurs "when the state's actions clearly and unambiguously express a decision to submit no TMDL for a particular impaired waterbody." *Columbia Riverkeeper*, 944 F.3d at 1210 (quoting *Hayes v. Whitman*, 264 F.3d 1017, 1024 (10th Cir. 2001)). Upon a finding of a constructive submission, EPA is liable for failing to "develop and issue its own TMDL within 30 days" of the submission as the CWA requires. *Id.* at 1211.

The constructive submission doctrine has been applied in varying fact situations. It has been used where a state has failed to submit any TMDLs and lacks a schedule for completing its

required TMDLs. *See, e.g.*, *Alaska Ctr. for the Env't*, 762 F. Supp. at 142 (applying the doctrine to trigger EPA's mandatory duty where Alaska had "not submitted a single TMDL"). It has also been applied to specific waters, where a state has a TMDL program but "has determined not to submit a required TMDL for a given impaired waterbody." *Hayes*, 264 F.3d at 1023 (citing *Scott v. City of Hammond*, 741 F.2d 992, 997 (7th Cir. 1984)). The Ninth Circuit applied the doctrine in this fashion in *Columbia Riverkeeper*, explaining that:

> Where a state has failed to develop and issue a particular TMDL for a prolonged period of time, and has failed to develop a schedule and credible plan for producing that TMDL, it has no longer simply failed to prioritize this obligation. Instead, there has been a constructive submission of no TMDL, which triggers the EPA's mandatory duty to act.

944 F.3d at 1211. In describing the constructive submission doctrine, the Ninth Circuit held that interpreting the CWA in a way "that allows the EPA to indefinitely avoid compliance . . . would undermine the clear expediency that Congress mandated throughout" section 303(d)(2) and "would be difficult to reconcile with the purpose of the statute." 944 F.3d at 1210.

EPA has avoided liability under the constructive submission doctrine only where a state has a firm schedule to complete all required TMDLs in a reasonably short period of time after listing. In *San Francisco Baykeeper*, for example, the Ninth Circuit found no constructive submission where California had completed some TMDLs *and* had "established a schedule for completing *all TMDLs* for waters on its 1998 § 303(d) lists within the next 12 years." 297 F.3d at 880 (emphasis added). The Fourth and Eleventh Circuits ruled similarly, where West Virginia and Oklahoma, respectively, had robust forward-looking TMDL schedules in place at the time of litigation. *See Ohio Valley Envtl. Coal., Inc. v. Pruitt*, 893 F.3d 225, 228, 231 (4th Cir. 2018) (no constructive submission where state and EPA had an eight-year schedule to complete all TMDLs for "573 waters" with a biological impairment); *Hayes*, 264 F.3d at 1024 (no constructive

submission where "Oklahoma has submitted a number of TMDLs and is making progress toward completing about 1500 TMDLs over a twelve-year period.").

## FACTUAL BACKGROUND

I.     **TMDLs are a critical tool for the attainment of water quality standards and for the implementation of both point and nonpoint source pollution reductions.**

TMDLs are how the CWA ensures water quality standards are met to protect uses, such as drinking water and fish. In Oregon, aquatic life uses include ESA-listed threatened and endangered species, as well as species that are declining and rare.[2] Water pollution also affects human health; for example, toxic contaminants pose the greatest risk to people who consume high levels of fish, such as tribal members.[3] When Oregon adopted revised human health criteria to protect such high fish consumers in 2011, it highlighted the need to "make the TMDLs easier to implement" to reduce "toxics from non-NPDES sources." (DEQ_NWEA_012147.)

The deteriorating quality of Oregon waters is demonstrated by its expanding 303(d) list of impaired waters. *See* Saul Decl. Ex. 2. DEQ's TMDL program has not met the challenge of deteriorating water quality for point or nonpoint sources, and the lack of TMDLs undermines DEQ's issuance of NPDES permits to ensure sources do not cause or contribute to violations of water quality standards. 33 U.S.C. § 1313(b)(1)(C); 40 C.F.R. § 122.44(d). Two cities in Oregon's Rogue River Basin illustrate TMDLs' importance to controlling pollution from permitted sources. In 1992, a TMDL for Bear Creek (a Rogue River tributary) resulted in

---

[2] *See e.g.*, 88 Fed. Reg. 68370 (Oct. 3, 2023) (Northwestern pond turtle proposed listing); 79 Fed. Reg. 51657 (Aug. 29, 2014) (Oregon spotted frog listed as threatened).

[3] *See, e.g.*, EPA, Columbia River Fish Contaminant Survey, *available at* https://19january 2017snapshot.epa.gov/columbiariver/columbia-river-fish-contaminant-survey_.html (adults in member tribes may have cancer risks up to 50 times higher than the general public).

stringent nutrient limits in the City of Ashland's permit.[4] Downstream of Ashland, however, the lack of a TMDL was DEQ's justification for failing to include nutrient limits in the City of Medford's permit for many years, at least until NWEA brought a CWA citizen suit leading the district court to find Medford liable for contributing to violations of water quality standards in the Rogue River. *Nw. Envtl. Advocates v. City of Medford*, No. 1:18-CV-00856-CL, 2021 WL 2673126, at *7 (D. Or. June 9, 2021), *report and recommendation adopted*, 2021 WL 4487982 (D. Or. Sept. 30, 2021).[5] TMDLs should be a driver for effective NPDES permits statewide.

## II.   DEQ and EPA struggle to implement an effective TMDL program for Oregon without judicial intervention.

Litigation has been both the catalyst and the driver of the Oregon TMDL program. DEQ did not even start a TMDL program until after EPA settled a 1986 lawsuit via a consent decree requiring EPA or DEQ to, among other things, adopt TMDLs for subsequently listed waters at a rate of 20 percent annually or not less than two each year. (Bell Decl. ¶33 & Ex. 7 at NWEA-000133.) A consent decree issued by this Court in 2000 required the completion of 1,153 TMDLs by December 31, 2010. (EPA_0000011.) That consent decree was supported, in turn, by EPA's having signed Memoranda of Agreement for completion of 1,542 TMDLs through 2008, and another 322 TMDLs through 2010. (EPA_0014907; EPA_0014921–25.) Thanks to public interest litigation and a temporary period of effective EPA oversight, DEQ's TMDL program was relatively productive for a while, and the agency completed 1,206 TMDLs between 2000 to 2010. (EPA_0000011.)

---

[4] *See* DEQ, Bear Creek Watershed TMDL (July 2007), *available at* https://www.oregon.gov/deq/FilterDocs/rogueMR tmdlchp1sec345.pdf at 31.

[5] DEQ maintained that because it hadn't yet prepared a TMDL, "DEQ doesn't know enough about nutrient cycling in the Rogue River and the type and level of nutrient reduction needed to instruct Medford on what they need to do." (Saul Decl. Ex. 7 at NWEA-000290.)

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 7

However, in the 13 years since the expiration of that consent decree, DEQ's TMDL program has languished, marked by abandoned projects and repeatedly postponed TMDLs. (Saul Decl. Exs 1–3.[6]) *Each one* of the TMDL projects EPA approved between December of 2010 and today are revisions to older TMDLs[7]. The rate of production for *revised* TMDLs for this post-consent decree period (January 1, 2011 to December 1, 2023) was 6.5 TMDLs per year, but the rate of *new* TMDLs EPA approved during that period was zero. Even counting the new Upper Yaquina Watershed TMDLs approved in November 2023 (EPA_0098080) and the presumably forthcoming Powder River Basin TMDLs (EPA_0095249), and giving DEQ credit for its TMDL revisions already required by another court order, the average rate of TMDL production only rises to 7.23 WQLSs addressed per year. At this rate, it would take DEQ ***more than 300 years*** to complete TMDLs for all impaired waters on its 2022 303(d) List.[8] (Bell Decl. ¶¶ 24–25.)

---

[6] These three demonstrative exhibits collect and reproduce information found in the administrative record or other admissible agency records, and each exhibit is followed by citations to the documents from which the presented data are sourced.

[7] EPA correctly recognizes that the TMDLs approved post-2010 for the Klamath and Lost River Subbasins, Western Hood River Subbasin, Tualatin Subbasin, and Willamette Basin are all modifications or revisions to existing TMDLs. (EPA_0000012.) The other TMDLs EPA approved during this time were also revisions to older TMDLs, as required by *Nw. Envtl. Advocates v. U.S. Envtl. Protection Agency*, No. 3:12-cv-01751-AC, Dkt# 133 (D. Or. Oct. 12, 2016) (order on voluntary remand for Willamette Mercury and Klamath Temperature TMDLs).

[8] NWEA generally omits discussion of future TMDLs covered under other court order. (*See* EPA_0006887–EPA_0006889 (amended remedy order and schedule in 2012 TMDLs litigation); EPA_0002071, EPA_0002078 (the Snake River–Hells Canyon Methylmercury TMDL ordered in *Nez Perce Tribe v. Or. Dep't Envtl. Quality*, Marion County Circuit Court No. 19CV32752 (Or. 2019)). Additionally, in this brief NWEA only refers to TMDLs that have been completed for listed WQLSs to allow for more accurate comparison to the 2022 303(d) list of WQLS still requiring TMDLs. TMDLs often cover more waters than are on the EPA-approved 303(d) list because additional impairments are discovered as part of the TMDL development process. (*See, e.g.*, EPA_0048426; EPA_0048428 (planned TMDL will cover nine WQLSs and 20 additional impaired segments)).

DEQ occasionally develops short-term TMDL schedules, but they are inevitably incomplete, non-binding, and very rarely met. Since 2010, DEQ has submitted three 303(d) lists with accompanying TMDL priorities and schedules. The first, dated September 2014, was called the "2012 TMDL Priorities and Schedule." (EPA_0007491.) The second was the "TMDL Priorities and Schedule" dated October 2020 ("2020 Schedule") which accompanied Oregon's 2014–2020 303(d) list. (EPA_0006734–37.) DEQ's most current schedule is "TMDL Submission Schedule" dated August 2022 ("2022 Schedule") (EPA_0052806–09), which accompanied Oregon's 2022 303(d) list. DEQ also assigned either a "high," "medium," or "low" TMDL priority ranking to each WQLS. (*See* EPA_0032236, EPA_0049618.) EPA approved both the 2020 and 2022 303(d) lists and TMDL priority rankings but disavowed acting on the TMDL schedules themselves. (EPA_0032221; EPA_0034591–92.)[9]

In addition, EPA and DEQ enter a Performance Partnership Agreement ("PPA") to document the "commitments of EPA and DEQ regarding implementation of federally-delegated" programs, including "program-specific work plans" for the TMDL program. (EPA_0030551.) These biennial PPAs typically identify timelines and tasks for DEQ's specific TMDL projects. (*See* EPA_0030585 (2010-2012 PPA); EPA_0026569 (2012-2014 PPA); EPA_0026387 (2014-2016 PPA); EPA_0025470 (2016-2018 PPA); EPA_0022045 (2018-2020 PPA); EPA_0000956 (2022-2022 PPA); and Saul Decl. Ex. 6 (2022-2024 PPA).) Together with the official TMDL priority rankings and schedules, these PPAs establish DEQ's plan for the completion of TMDLs.

---

[9] In denying EPA's motion to dismiss, this Court held that EPA's November, 2020 approval of DEQ's 2020 303(d) list (EPA_0032214) included a "determination that Oregon submitted a priority ranking and schedule" that complied with 40 C.F.R. § 130.7(b)(4), and that EPA's determination was a final agency action subject to judicial review. Order, Dkt. #15 at 9.

Prior to 2010, EPA was a relatively effective supervisor of Oregon's TMDL program, staying involved to ensure the 2000 consent decree commitments were met. (EPA_0014923.) In the years since, however, EPA's oversight of DEQ's TMDL program has been minimal, despite acknowledging that Oregon "faces significant challenges in TMDL project completion" in the future. (EPA_0000029.) EPA recognizes Oregon's "inability to meet its initial TMDL project schedules" as reflected in Oregon's three 303(d) submissions (i.e., "for years 2010, 2012, and 2014-2020") and "during PPA negotiations" for the 13-year period 2010 through 2022, and admits that it was "aware in 2016 that several TMDL projects were delayed or postponed" (EPA_0000017, EPA_0000020), but failed to step in as Congress intended. While EPA occasionally enquires about the status of ongoing TMDL projects, EPA rarely seeks to influence either DEQ's TMDL priorities or its schedules. (*See, e.g.,* EPA_0022667 (EPA staff stating to DEQ, "your work plan looks good and we can live with it as is"); EPA_0002579 (EPA seeking update on the Powder Basin Bacteria TMDL in 2021 that was overdue then and still not issued)).

As a result, excessive delay and even abandonment of entire TMDLs has become the norm for DEQ. A simple comparison between DEQ's 2020 and 2022 TMDL schedules for ostensibly "high" and "medium" priority TMDLs illustrates Oregon's inability to deliver, since most of the TMDLs slated for completion by 2028 in the 2020 schedule have been either delayed yet again or abandoned entirely. (*See* Bell Decl. ¶ 23; Saul Decl. Ex. 3.)

## II.    The Mid-Coast and Deschutes Basin examples: DEQ's major TMDL projects have been repeatedly delayed, reduced in scope, and have produced almost nothing.

In 2009, NWEA sued EPA and the National Oceanic and Atmospheric Administration ("NOAA") under the Coastal Zone Act Reauthorization Amendments ("CZARA"), 16 U.S.C. § 1455b, alleging they had failed to take final action on Oregon's Coastal Nonpoint Pollution

Program. In settlement of that case, Oregon agreed to complete multiple TMDLs to control

nonpoint source pollution from logging. (EPA_0006043.) As a result of that litigation, EPA and

NOAA directed DEQ to complete TMDLs for the Mid-Coast Basin by June 30, 2012, and to

schedule completion of TMDLs for all other coastal basins in Oregon—the Rogue, Umpqua,

North, and South Coast Basins. (EPA_0006042.) DEQ committed to complete TMDLs for *all*

*coastal basins* by 2021. (Bell Decl. Ex. 5.)

DEQ failed to complete any Mid-Coast TMDLS by 2012, leading to EPA and NOAA's

disapproval of Oregon's Coastal Nonpoint Program. (EPA_0051640.) DEQ continued

developing TMDLs for multiple parameters in the Mid-Coast Basin. (*See, e.g*., EPA_0026569;

EPA_0051653–54; Bell Decl. Ex. 4.) But Mid-Coast TMDL completion dates slipped repeatedly

as their scope shrank. (*See e.g*., EPA_0026387, EPA_0025699, EPA_0025655 ("some TMDLs

expected" in 2017), EPA_0021761 (reduced to "selected subbasins and watersheds for selected

parameters"), EPA_0003300 (TMDLs "paused" in 2018).) To date, an entire basin's worth of

TMDLs—there are 329 WQLSs in the Mid-Coast Basin—are now largely abandoned, apart from

TMDLs for four WQLSs in the Upper Yaquina Subbasin recently completed. (EPA_0096202;

EPA_0098080.)

The history of Deschutes River Basin TMDLs is similar. Underway before 2001,[10] in

2010 Oregon committed to their completion in 2012. (EPA_0030548.) In 2012, TMDLs for the

Little Deschutes Subbasin were "in development," to be completed in 2017. (EPA_0032585.)

DEQ reported to EPA that Deschutes TMDL development was "ongoing" in 2014, 2016, and

2018. (EPA_0026304; EPA_0025655; EPA_0021145.) In 2021, they were still in development.

---

[10] *See* DEQ, TMDL Projects, Deschutes Basin, *available at* https://www.oregon.gov/deq/
wq/tmdls/Pages/TMDLs-Deschutes-Basin.aspx (aerial surveys started 2001, modelling in 2007).

(EPA_0051133.) In the 2020 Schedule, TMDLs for the Upper and Little Deschutes Subbasins were slated for 2028 (EPA_0006737), but by the 2022 Schedule, the completion date had moved to 2030. (EPA_0052807–09; *see* Saul Decl. Ex. 3.) More than 23 years since work on these TMDLs were started, 203 Deschutes Basin WQLSs are now proposed for completion seven years hence—taking a total of 30 years, if DEQ were to meet the current schedule.

## IV.    Oregon has no schedule or plan to develop TMDLs for most impaired waters.

As discussed, DEQ has failed to complete most TMDLs for WQLSs appearing on a schedule. But beyond those few TMDLs flagged for completion, there simply is no credible plan for the rest of—indeed, the *vast majority* of—Oregon's impaired waters. These waters have never appeared on any purported TMDL schedule and are described by category below.[11]

The first category includes all waters for which DEQ has assigned a *low priority* for a TMDL. Because DEQ's TMDL schedules include only those TMDLs flagged as high or medium priority (*see, e.g.*, EPA_0052806), "low" priority WQLSs are ignored altogether and have never appeared on any TMDL schedule. The 2022 List shows a whopping 2,014 "low" priority WQLS for which there is no plan or schedule for any TMDLs. (*See* Bell Decl. ¶ 21.)

The second category is *long overdue* TMDLs for waters that have been impaired for a decade or more. DEQ's 2022 List includes a total of 1,891 WQLSs that, regardless of the purported TMDL priority, were first listed in 2012 or earlier—in other words, have been on the list and requiring a TMDL for eleven years or more. Of these, 451 WQLSs have been on the list for **more than two decades**, including the 337 WQLSs first listed in 1998.

---

[11] Note that the categories discussed herein are not mutually exclusive, and WQLS may be a part of multiple categories.

The table below shows the number of WQLSs on Oregon's 2022 List, organized by year listed and by TMDL priority (*see* Bell Decl. ¶ 21.):

**Table 1:**
**Number of non-replacement WQLSs remaining on 2022 list by year listed and priority**

| Year listed | High priority | Medium priority | Low priority | Total | Years overdue |
|---|---|---|---|---|---|
| 1998 | 14 | 45 | 278 | 337 | 25 years |
| 2002 | 3 | 26 | 85 | 114 | 21 years |
| 2004 | 21 | 71 | 230 | 322 | 19 years |
| 2010 | 39 | 34 | 633 | 706 | 13 years |
| 2012 | 5 | 30 | 372 | 407 | 11 years |
| 2018 | 10 | 38 | 265 | 313 | 5-9 years |
| 2022 | 8 | 16 | 151 | 175 | 1 year |
| **Totals** | **100** | **260** | **2,014** | **2,374** | |

A third category includes TMDLs for *specific pollutants or parameters* that DEQ routinely ignores for TMDL development. For example, DEQ's 2022 List includes 490 WQLSs for toxic pollutants, all of which are assigned a "low" priority for which DEQ has no plan to complete TMDLs. (Bell Decl. ¶ 22.) This de-prioritization is consistent with the Oregon history of TMDLs for toxics; EPA and DEQ have completed only 37 TMDLs for toxic WQLSs in the program's 26 years. (Bell Decl. ¶ 26.) The 2022 List also includes 171 WQLSs for the related problems of sedimentation and turbidity, but DEQ does not propose to complete any until 2030 (for only two WQLSs), (EPA_0052808), even though it recognizes that turbidity affects drinking water, and excess sedimentation harms salmon habitat. (*See, e.g.,* EPA_0053933; NWEA_DEQ_011875; EPA_0049618 (Upper North Fork Siuslaw River, listed in 1998 for sedimentation, citing decline of salmonid populations where "sedimentation has been identified as a concern[.]"). All 150 sedimentation WQLSs are ranked as "low" priority. Biocriteria[12] is

---

[12] The same is true of biocriteria WQLSs that are related to nutrient pollution, one reason EPA considers them "crucial." EPA, *Biological Assessments and Criteria: Crucial Components*

another example of a parameter largely ignored by DEQ for TMDL development; despite 394

biocriteria WQLSs on the 2022 List, none are "high" priority and DEQ proposes to complete

only two "medium" priority biocriteria TMDLs by April 2030. (EPA_0052808.) The table below

shows the WQLSs on the 2022 List that are listed for these oft-ignored pollutants, along with

their assigned TMDL priority (*see* Bell Decl. ¶ 22):

**Table 2:**
**Number of non-replacement WQLS by selected pollutants, parameters, and priority**

| Parameter or pollutant | Total | High | Medium | Low |
|---|---|---|---|---|
| Toxic pollutants | 490 | 0 | 0 | 490 |
| Nutrient-related (dissolved oxygen, pH, alkalinity, harmful algal blooms, aquatic weeds, chlorophyll-a, shellfish toxins, phosphorus) | 701 | 13 | 109 | 539 |
| Biocriteria | 394 | 0 | 2 | 392 |
| Turbidity, sedimentation | 171 | 0 | 2 | 169 |

A fourth category includes *all* impaired waters in the Willamette River Basin. There are

491 WQLSs in the Willamette Basin, all of which are a "low" priority for DEQ even though it is

the most populated and industrialized of Oregon's basins. Of these, 304 WQLSs are for nutrient-

related impairments and 116 are for toxic contaminants. Given the concentration of municipal

and industrial pollution sources in this basin, TMDLs are critical for the development of

effective NPDES permits for these pollutants; yet DEQ has seemingly abandoned all efforts to

develop non-temperature TMDLs in the Willamette Basin.[13]

---

*of Water Quality Programs* (Summer 2002), *available at* https://www.epa.gov/sites/default/files/
2019-02/documents/biological-assessment-crucial-components.pdf.
    [13] There are 1,978 NPDES-permitted pollution sources in the Willamette Basin.
(EPA_0015170.) An early draft of the 2020 PPA included as an output of the TMDL program:
"Evaluate and develop potential approaches for the remaining category 5 [i.e., 303(d)] and 3
listings for the Willamette Basin." (EPA_0011085.) This goal was dropped from the final 2020
PPA, and does not appear in the 2022 PPA. (EPA_0000957–987; Saul Decl. Ex. 6 at NWEA-
000243–45.)

## STANDARD AND SCOPE OF REVIEW

The CWA includes a citizen suit provision authorizing suit against the EPA Administrator for an "alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 33 U.S.C. § 1365(a)(2). District courts have jurisdiction to "order the Administrator to perform such act or duty," *id.*, which may be imposed by the Act or regulations promulgated under the Act. Order, Dkt. #15, at 16. The Court has held that NWEA satisfied the Act's pre-suit notice requirement. Order, Dkt. #15, at 15.

For agency actions not subject to the citizen suit provision, the Administrative Procedure Act ("APA") provides the basis for judicial review. 5 U.S.C. § 706(1)–(2); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011). The APA authorizes the district courts to "hold unlawful and set aside" final agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

This Court previously held that its review of NWEA Claim Nos.1, 3, and 4 is not limited to EPA's record and that "the record is open . . . and may be supplemented as appropriate by any party." Order, Dkt. #32, at 8. The Court instructed the parties to "justify any proposed supplementation given the existing record and the evidentiary needs of the case." Dkt. #32 at 8. In support of its motion for summary judgment, NWEA cites four documents produced by either EPA or DEQ in response to discovery requests[14], and also offers several other extra-record agency documents into evidence in support of NWEA's arguments on Claims 1, 3, and 4.[15] Additional citations to public DEQ documents—for example, older TMDLs found on DEQ's website—are found in the footnotes and in the indices of sources consulted to prepare NWEA's

---

[14] *See* Saul Decl. ¶¶ 9–12 & Exs. 8–11.
[15] *See* Bell Decl. ¶¶ 27–34 & Exs. 1–8; Saul Decl. ¶ 7–8 & Exs. 6–7.

three demonstrative exhibits. (Saul Decl. Exs. 1–3.) These documents build upon the existing record and contain relevant facts not found in EPA's administrative records. They will aid the Court in understanding the full history of DEQ's TMDL program—including prior to and during the last consent decree that expired in 2010—and the need for further judicial intervention. *See*, *e.g.*, *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (considering extra-record evidence in an unreasonable delay suit under 5 U.S.C. § 706(1) because it was "relevant to the question of whether relief should be granted.").[16]

## ARGUMENT

**I.      NWEA has standing to sue under Article III.**

To have standing under Article III, a plaintiff must (1) suffer a cognizable injury in fact that is (2) fairly traceable to the defendant's actions, which (3) can be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). An organization has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State App. Advert. Com'n*, 432 U.S. 333, 343 (1977).

The efficacy of Oregon's TMDL program—and EPA's supervision of it—is germane to NWEA's mission to protect and restore water quality in the region. (Bell Decl. ¶¶ 3–15.) Furthermore, the extant lawsuit may proceed without involvement of individual members of

---

[16] The Court may take judicial notice of documents and information on either EPA or DEQ's official websites, as well as other facts from agency records that are "not subject to reasonable dispute" under Federal Rule of Evidence 201. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

NWEA. The remaining elements of NWEA's standing are satisfied though declaration testimony from several NWEA members who would have standing in their individual capacity.

First, NWEA's members have suffered a cognizable injury in fact. Environmental plaintiffs "adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000). The Ninth Circuit has held that members who have been "adversely affected by the inadequate water quality of a representative number of waters throughout the state" have standing to challenge the adequacy of a state TMDL program. *Alaska Ctr. for the Envt. v. Browner*, 20 F.3d 981, 985 (9th Cir. 1994). *See also Ctr. for Biological Diversity v. U.S. Envtl. Protection Agency*, 90 F. Supp. 3d 1177, 1188 (W.D. Wash. 2015) (plaintiff had standing where its members used "a sample set" that was "geographically representative of" the affected waters).

Here, NWEA's members regularly use a representative set of Oregon's WQLSs lacking TMDLs, and their aesthetic, recreational, and other interests in those waters have been adversely affected due to ongoing water quality impairment. Several NWEA members regularly fish, boat, swim, or hike along multiple rivers and streams in Oregon, the majority of which are impaired for one or more pollutants and presently lack a TMDL. (*See* Anuta Decl. ¶¶ 4–17; Engelmeyer Decl. ¶¶ 4–14; Marlett Decl. ¶¶ 3–12; Moskowitz Decl. ¶¶ 5–13.) These members use and enjoy rivers, lakes and streams from around Oregon, including the mainstem and tributaries of the Columbia and Willamette Rivers; major rivers of Southern Oregon like the Klamath and Umpqua; waters of central Oregon such as the Deschutes and John Day Rivers; coastal rivers including the Nehalem and Nestucca; and rivers in northeastern Oregon like the Grande Ronde and Wallowa Rivers. *Id*. These members aver their use and enjoyment of these rivers is

diminished by their degraded condition resulting from their 303(d)-listed impairments. *Id*. This is all that is required to satisfy the injury-in-fact prong of the standing analysis.

Second, these members' injuries are traceable to EPA's failure to develop TMDLs and a schedule for Oregon's TMDL submissions. Plaintiffs need not establish causation "to a scientific certainty," *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000), but only show a causal link that is "not tenuous or abstract." *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2005). Causation is readily established for EPA's failures to issue TMDLs in the face of prolonged state inaction. *See Alaska Ctr. for the Envt.*, 20 F.3d at 985 (members' injury "is the result of EPA's failure to comply with the CWA to establish TMDLs"); *Sierra Club, N. Star Chapter v. Browner*, 843 F. Supp. 1304, 1311 (D. Minn. 1993) (plaintiff's injury linked to the EPA's "failure to . . . oversee a comprehensive evaluation of each State's waters and development of TMDLs to improve water quality[.]").

Finally, a favorable decision from this Court would redress the injuries of NWEA's members by ensuring a robust schedule for TMDLs for Oregon's WQLSs, which once issued would reduce the pollution to those waters and help reduce the water quality impairments. As the Ninth Circuit held in *Alaska Center for the Environment*, Congress has "already determined that establishing TMDLs is an effective tool for achieving water quality standards in waters impacted by non-point source pollution" and thus found redressability based upon TMDL issuance was not "completely speculative" although their implementation may fall to the state. 20 F.3d at 985–86.

## II.    EPA violated the Clean Water Act by failing to issue TMDLs for Oregon following DEQ's constructive submission of TMDLs (Claim One).

As described, where a state has (1) "failed to develop and issue a particular TMDL for a prolonged period of time," and (2) "has failed to develop a schedule and credible plan for

producing that TMDL," it has constructively submitted that TMDL under 33 U.S.C. § 1313(d)(2), "which triggers the EPA's mandatory duty to act." *Columbia Riverkeeper*, 944 F.3d at 1211. Here, DEQ has failed to develop and submit over 2,300 TMDLs to EPA—including for several hundred WQLSs that have languished on Oregon's 303(d) list for more than 20 years— and indeed has submitted entirely new TMDLs for only four WQLSs since the expiration of the last consent decree in 2010. DEQ also lacks a schedule and credible plan for completing most of those TMDLs, and its repeated delays of even its ongoing TMDL projects show that any purported schedule is illusory and unreliable. EPA is liable for its failure to disapprove these constructively submitted TMDLs and issue its own, as required by 33 U.S.C. § 1313(d)(2).

### A. DEQ has failed to submit thousands of TMDLs to EPA for a prolonged period of time, and in some cases for more than two decades.

The Ninth Circuit has not set a bright-line rule for what constitutes a "prolonged period of time" in the constructive submission context, but it has held that the "the failure of the EPA to take any steps to establish the TMDLs mandated by Congress for more than a decade" violates the Clean Water Act. *Alaska Ctr. for Env't*, 20 F.3d at 986.[17] As one district court has explained, "the passage of time functions in some cases as a proxy for a state's unexpressed, but nevertheless clear and unambiguous, decision to submit no TMDL for a given body of water." *Envtl. Law & Policy Ctr. v. U.S. Envtl. Prot. Agency*, 415 F. Supp. 3d 775, 792 (N.D. Ohio

---

[17] In *Browner*, the Ninth Circuit upheld the district court's remedy order requiring "EPA to work with the State of Alaska to establish a reasonable schedule for the development of TMDLs for all waterbodies designated as water quality limited segments." *Alaska Ctr. for the Env't v. Reilly*, 796 F. Supp. 1374, 1380 (W.D. Wash. 1992). The district court remarked in its order granting summary judgment to the plaintiff that "there could hardly be a more compelling case for finding a 'constructive submission'" than under the facts of that case, where the State of Alaska had failed to produce any TMDLs "over the past eleven years." *Alaska Ctr. for the Env't v. Reilly*, 762 F. Supp. 1422, 1429 (W.D. Wash. 1991).

2019). In *Columbia Riverkeeper*, the Ninth Circuit recognized the CWA's water quality goals are "dramatically undermined" if TMDLs are not produced swiftly, and thus found approximately 20 years to be a "prolonged failure" to submit a Columbia River TMDL and thus be a constructive submission that triggered EPA's mandatory duty to act. 944 F.3d at 1210–11.

EPA guidance and other district court decisions suggest that a period of time on the order of 10 to 15 years without a required TMDL is "prolonged" enough to constitute a constructive submission. In its 1997 TMDL Guidance, EPA explains that state schedules for "the establishment of TMDLs for all waters on the most recent section 303(d) list . . . should be expeditious and normally extend from eight to thirteen years in length[.]" EPA TMDL Guidance at 3.[18] Several years later, EPA explained that states "should generally schedule all TMDLs no later than 10 years (with a possible 5 year extension) from the later of July 11, 2000 or the date of initial listing of the waterbody/pollutant combination on a section 303(d) list[.]" 65 Fed. Reg. at 43,613 (July 13, 2000).[19] EPA's pronouncements make clear its view that a lawful TMDL schedule leads to the completion of all required TMDLs within fifteen years at the most.

Orders issued in other cases confirm that a delay beyond 10 to 15 years is a "prolonged failure" to produce TMDLs, even accounting for the fact that some TMDLs are complex. Several courts have recognized that TMDLs' statutorily-required "margin of safety" to account for

---

[18] The Fourth Circuit in *Ohio Valley Environmental Council* found that West Virginia had not constructively submitted TMDLs in part because it had a TMDL schedule that was "not completely out of line with this EPA guidance." 893 F.3d at 231. A Memorandum of Agreement with EPA committed the state to producing "all of the TMDLs at issue" in that case by June 30, 2026, about eight years after the court's 2018 opinion. *Id*.

[19] EPA explained in the preamble that, as of July 2000, "46 States are developing TMDLs based on schedules of 13 years or less," with 20 of those 46 states developing TMDLs based on a 10-year schedule." 65 Fed. Reg. at 43,613. The rule itself was later rescinded, but as EPA noted "a ten year schedule is consistent with current EPA policy" as set forth in its TMDL Guidance, which remains in effect today. 65 Fed. Reg. at 43,613.

uncertainty precludes delays based upon imperfect or incomplete data. *Idaho Sportsmen's Coalition*, 951 F. Supp. At 966 ("Although these tight deadlines might mean that initially established TMDLs would be based on less than ideal data, that fact was considered and addressed by Congress[.]"); *Alaska Center for the Envt.*, 762 F. Supp. at 1429, fn.8 (quoting a senior EPA official as stating, "Congress says ignorance is no excuse for inaction. Just add a margin of safety to compensate for the lack of knowledge and keep moving. No other program has such a strong statutory endorsement for action in the face of an incomplete database.").

Understandably frustrated by the slow pace of TMDL development, courts have recognized that a failure to expeditiously produce TMDLs fatally undermines the goals of the CWA. In *Sierra Club v. Hankinson*, the court found that EPA arbitrarily approved Georgia's TMDL submissions despite the state's promise to "develop approximately 25 complex TMDLs for its major river basins within the next eight years[,]" remarking that at that pace, "Georgia will take over a hundred years to complete TMDLs for the approximately 340 WQLSs identified on the 1994 WQLS list." 939 F. Supp. 865, 871 (N.D. Ga. 1996). And in *Idaho Sportsmen's Coalition*, the court rejected EPA's proposed 25-year schedule for completing all Idaho TMDLs. 951 F. Supp. at 967. Citing its "extreme slowness," the latter court lamented that

> The net result would be to **put off for another generation** a step that Congress required be taken years ago. . . . at Idaho's proposed submission rate the twenty-five years could easily turn into fifty or seventy-five. Although courts have allowed additional time when CWA deadlines are missed, **nothing in the law could justify so glacial a pace**.

*Id*. (emphasis added). *See also Nat. Res. Def. Council v. Fox*, 30 F. Supp. 2d 369, 378–79 (S.D.N.Y. 1998) ("TMDLs are to be established promptly by the states or, if they are dilatory, by EPA. Promptly, in this context, means within months or, perhaps, within a very few years. Promptly does not mean over the span of decades."); *Anacostia Riverkeeper, Inc. v. Jackson*, 713

F. Supp. 2d 50, 55 (D.D.C. 2010) (entering a schedule for completion of District of Columbia

TMDLs from four to seven years); *Nat. Res. Def. Council, Inc. v. U.S. Envtl. Protection Agency*,

490 F. Supp. 3d 190, 196 (D.D.C. 2020) (remarking "the development of a TMDL sometimes

takes several years, or even a decade in extreme cases"); *Am. Canoe Ass'n, Inc. v. U.S. Envtl.

Protection Agency*, 54 F. Supp. 2d 621, 624 (E.D. Va. 1999) (approving an 11-year consent

decree "for several hundred enumerated waters in Virginia"); *cf. Sierra Club v. U.S. Envtl.

Protection Agency*, 162 F. Supp. 2d 406, 419 (D. Md. 2001) (holding that EPA's approval of

Maryland's schedule calling for "TMDLs to be developed for all waters but the Chesapeake Bay

by 2008 and for the Chesapeake Bay by 2011"—that is, within 10 years—was not an abuse of

discretion).[20]

Even the two prior consent decrees resulting from lawsuits brought by NWEA and others

required DEQ to develop and issue TMDLs at a rapid pace. The most recent consent decree,

lodged in 2000, required the completion of 1,153 TMDLs by the end of 2010. (EPA_0014933–

34.) The prior consent decree, lodged in 1987, required TMDLs for 11 specific waters within a

year and TMDLs for subsequently listed waters at a rate of 20 percent annually or not less than

two each year. (Bell Decl. Ex. 7 at NWEA-000133.) As shown in Table 1, *supra* at 13, however,

DEQ has now failed to submit *thousands* of TMDLs to EPA for a prolonged period.

---

[20] Several of these cases found that the constructive submission doctrine did not apply
under their circuit's then-applicable formulation of the doctrine because the state had submitted
one or more TMDLs, and yet they still held EPA liable for its failure to ensure the TMDL
program was properly and expeditiously implemented. *See, e.g.*, Saul Decl. Ex. 5 at 11 (holding
in the *Idaho Sportsmen's Coalition* case that "[o]n the present record, no constructive submission
has yet occurred. What has occurred is a failure by EPA and the state to adopt a schedule for the
development of TMDLs *for all WQLS*.") (emphasis added); *Hankinson*, 939 F. Supp. at 872
(finding no constructive submission yet concluding that "EPA's failure to disapprove of
Georgia's inadequate TMDL submissions was arbitrary and capricious" under the APA).

EPA admits that Oregon's TMDL program is deficient and that it "continues to face several limitations on its ability to produce TMDLs more rapidly[,]" citing various excuses like data shortages and technical complexity. (EPA_0000003.) But these excuses have no legal relevance. Because Congress required TMDLs to include a "margin of safety," 33 U.S.C. § 1313(d)(1)(C), purported complexity or imperfect data cannot justify a failure to produce TMDLs. *Idaho Sportsmen's Coalition*, 951 F. Supp. at 966; *Fox*, 909 F. Supp. at 157–58.

EPA also suggests that Oregon's rate of TMDL development "in the ten-year period ending in 2010"—when Oregon was subject to the prior consent decree—"was not sustainable" for various reasons, including the "the court-ordered schedule for replacing the temperature TMDLs" issued by this Court. (EPA_0000012, EPA_0000020.)[21] NWEA is not aware of any cases holding that court-ordered obligations, insufficient funding, competing workload demands, or similar excuses can justify a state's "prolonged failure" to complete TMDLs as required.

### B.    DEQ lacks a schedule and credible plan for completing remaining TMDLs.

The second element for finding a constructive submission under *San Francisco Baykeeper* and *Columbia Riverkeeper*—whether a state has a schedule and a credible plan for completing the required TMDLs—is readily established here because DEQ lacks a schedule or

---

[21] It is ironic, and not a little troubling, that EPA chose to highlight various "court-ordered obligation to re-do TMDL projects" as the primary excuse for Oregon's deficient TMDL program. (EPA_0000012.) Unfortunately—as shown by the very litigation it points to—EPA and DEQ have a history of CWA violations that reflect their inability or unwillingness to implement the TMDL program faithfully. This is a problem entirely of the agencies' own making. *See, e.g., Nw. Envtl. Advocates. v. U.S. Envtl. Protection Agency*, 2017 WL 1370713, at *11 (D. Or. Apr. 11, 2017) (recognizing that "from 2004 to 2010, Oregon continued to submit temperature TMDLs, based on the [natural conditions criteria (NCC) for temperature], and the EPA approved the TMDLs" even though NWEA had filed suit in 2005 challenging EPA's approval of the NCC). The solution is rather simple: Oregon should only issue, and EPA should only approve, *lawful* TMDLs that comply with the CWA and its implementing regulations.

any plan for completing TMDLs for the vast majority of its WQLSs, and has a long history of delayed TMDL development even for those few impaired waters appearing on its priority ranking and schedule and its PPAs developed with EPA.

      **1.   Thousands of impaired water segments are not and have never appeared on any DEQ schedule or priority list for the development of a TMDL.**

The ongoing and repeated failure of a state to include impaired waters on its priority ranking or any other schedule for TMDL development shows the state lacks a schedule and credible plan for completing those TMDLs. In *Columbia Riverkeeper*, for example, the court found that a Columbia River Temperature TMDL was "conspicuously absent from the priority rankings" submitted by Oregon and Washington to EPA as part of their section 303(d) lists even though the states had recognized the need for that TMDL "[s]ince at least the late-1990s," 944 F.3d at 1211, leading the court to find that the TMDL had been constructively submitted to EPA.

As EPA's guidance recognizes, states should have "an overall plan for completing and approving TMDLs for *all listed waters*." TMDL Guidance at 3 (emphasis added). While states have the discretion to prioritize the development of certain TMDLs, that discretion cannot justify the continued long-term failure of a state to develop its required TMDLs, including those deemed a lower priority. As the Ninth Circuit explained in *Columbia Riverkeeper*,

> Reading the constructive submission doctrine in this way does not rob states of this ability to prioritize particular TMDLs. Rather, it recognizes a meaningful difference between affording less priority to a particular TMDL and declining to develop and issue that TMDL at all. Where a state has failed to develop and issue a particular TMDL for a prolonged period of time, and has failed to develop a schedule and credible plan for producing that TMDL, **it has no longer simply failed to prioritize this obligation**. Instead, there has been a constructive submission of no TMDL, which triggers the EPA's mandatory duty to act.

944 F.3d at 1211 (emphasis added). *See also Sierra Club v. McLerran*, 2015 WL 1188522, at *7 (W.D. Wash. Mar. 16, 2015) (noting that "it would be absurd for the Court to hold that a state

could perpetually avoid" producing TMDLs "under the guise of prioritization; such an administrative purgatory clearly contravenes the goal and purpose of the CWA."). As one district court has held, the constructive submission doctrine is an appropriate means to address a state's repeated and ongoing assignment of certain TMDLs as "low priority" because, for those impaired waters, the "hands of the TMDL clock are . . . stuck, and likely to remain stuck for the indefinite future." *Envtl. Law & Policy Ctr.*, 415 F. Supp. 3d at 792. Accordingly, EPA has advised that while states should incorporate their own "priority ranking of the listed waters" in their TMDL schedules, ultimately those schedules must provide for "the establishment of TMDLs for *all waters* on the most recent section 303(d) list[.]" TMDL Guidance at 3 (emphasis added). At bottom, any credible TMDL schedule and plan must include all impaired waters for which a TMDL is required—not merely the "high" and "medium" priority TMDLs.

As discussed above, DEQ's past and current TMDL schedules—found in its three TMDL schedules submitted to EPA since 2010 as well as the PPAs in that same period—make clear that for the past 13 years DEQ has ignored the vast majority of Oregon's impaired waters still needing a TMDL. No document resembling a DEQ or EPA TMDL schedule includes TMDL completion dates for **2,014 purportedly "low" priority WQLSs** that include the following:

- 593 WQLSs listed between 1998 and 2004, which are thus between 19 and 25 years overdue for a TMDL;

- *All* 490 WQLSs that are impaired for toxic pollutants;

- *All* 491 WQLSs in the Willamette River Basin;

- *All* WQLSs in John Day (81), Klamath (38), Lower Columbia (127), Lower Snake (42), Middle Columbia (141), Middle Snake-Boise (78), and Oregon Closed (36) basins; and

- *Most* WQLSs in the Southern Oregon Coastal (418 WQLSs); Northern Oregon Coastal (436 WQLSs); Middle Snake-Powder (93 WQLSs); and Deschutes (59 WQLSs) basins.

*See supra* at 12–14. (EPA_0049618; Saul Decl. Exs. 1–3; Bell Decl. ¶¶ 16–22.)

DEQ's 2022 TMDL Schedule includes only a small fraction of Oregon's WQLSs. As to all other impaired waters in Oregon, DEQ lacks both a schedule and a credible plan for the completion of the required TMDLs, thus satisfying the second element required to find a constructive submission under *Columbia Riverkeeper* and *San Francisco Baykeeper*.

> ### 2. Even for those impaired waters appearing on a TMDL schedule, DEQ's track record of delays demonstrates that its schedules are not reliable or credible.

DEQ's 2022 TMDL Schedule is dominated by TMDLs already subject to a court order. (EPA_0000129; EPA_0052806.) Excluding those, the schedule includes only three purportedly "high" priority TMDL projects slated for potential completion in 2024: the Upper Yaquina Watershed, Coquille Subbasin, and Powder Subbasins TMDLs. Each of these three projects has been in development for at least a decade, and each has been repeatedly delayed and narrowed in scope, belying their "high" priority status. (Saul Decl. Ex. 3.) While DEQ finally completed TMDLs for four Upper Yaquina Watershed WQLSs, there is no explanation for DEQ's having downgraded the remaining WQLS in the Siletz-Yaquina Subbasin—previously under development—to "medium" (2 WQLSs) and "low" (103 WQLSs) priority. (EPA_0000129–133; EPA_0049618.) The two other "high" priority TMDL projects—for the Coquille and Powder— remain incomplete.

Excluding the replacement TMDLs, DEQ's 2022 Schedule includes six "medium" priority TMDL projects for 146 WQLSs, all purportedly scheduled for potential completion in 2030. (EPA_0052806; EPA_0054014.) Again, most have been in development for over a decade—the Deschutes since at least 2000—and have been repeatedly delayed and narrowed in scope. (Saul Decl. Ex. 3.) Should these six TMDL projects be completed in 2030, they will have

been in development for *twenty to thirty years*. Two of these, the Schooner Creek and Siletz

River turbidity TMDLs—each of which covers a single WQLS—are all that remain of DEQ's

once-ambitious Mid-Coast Basin TMDL Project that originally included seven major coastal

subbasins and multiple pollutants. (*Id.*) The record shows that any DEQ TMDL schedule for a

"medium" priority TMDL is meaningless. (*See supra* at 8–12; Saul Decl. Ex. 3.)

DEQ's largely abandoned Mid-Coast Basin TMDLs Project illustrates how "high"

priorities become "medium" priorities and then melt away.[22] Begun in 2005, DEQ committed in

2010 to complete TMDLs for the entire basin by June 2012. (EPA_0030548.) After missing that

and subsequent dates, DEQ curtailed the project to only "selected" watersheds and "selected"

parameters," with a new issuance date of December 2017. (EPA_0021761.) After missing *that*

date, by 2022 DEQ had abandoned or again postponed (to 2030) all but four TMDLs for "high"

priority and two "medium" priority WQLS in the Mid-Coast. (EPA_0052806.) The Mid-Coast

TMDL Project was one of DEQ's most expansive projects since the expiration of the prior

consent decree in 2010 and appeared on every TMDL schedule since then; DEQ's failure to

meaningfully produce Mid-Coast TMDLs speaks volumes about the state of its TMDL program.

---

[22] Among TMDLs entirely abandoned are: Devils Lake Watershed Devils Lake-Frontal Subwatershed (*compare* EPA_0032382 (issuance 2028) *with* EPA_0052806 (absent)); Indian Creek Watershed (same); Mid-Coast Beaches (*compare* EPA_0032538 (in development for 2016 completion) *with* EPA_0011033 (absent)); Big Elk Creek (*compare* EPA_0034181 (issuance 2018) *with* EPA_0052806 (absent)); Indian Creek (*compare* EPA_0034181 (issuance 2019) *with* EPA_0011033 (strike through)); Salmon River (*compare* EPA_0024940 (issuance 2020) *with* EPA_0052806 (absent); Salmon River (*compare* EPA_0034181 (issuance 2019) *with* EPA_11033 (strike through) *with* EPA_0052806 (no longer on the list)); Yachats (*compare* EPA_0024940 and EPA_0034181 (completion 2019-2020) *with* EPA_0032382 (completion end of 2024) *with* EPA_0052806 (absent)); Alsea (*compare* EPA_0032538 ("in development" for completion 2016) *with* EPA_0052806 (absent)); Siuslaw and Siltcoos (*compare* EPA_0032538 (completion 2016) *with* EPA_0052806 (absent)).

Since expiration of the last consent decree in 2010, DEQ's TMDL program has been marked by delay and abandonment, to the point that the agency's TMDL schedules are unreliable. DEQ's 2022 Schedule lacks the credibility required to satisfy the *Columbia Riverkeeper* standard, especially for the "medium" priority WQLSs, and those TMDLs have therefore been constructively submitted to EPA. EPA's failure to disapprove them and to issue its own TMDLs is a violation of its mandatory duty under 33 U.S.C. § 1313(d)(2).

## III.    EPA's approval of Oregon's 2020 TMDL priority ranking and schedule was arbitrary and capricious under the APA (Claim Two).

Along with its 303(d) list, the CWA requires states to "establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters." 33 U.S.C. § 1313(d)(1)(A). The priority ranking must "specifically include the identification of waters targeted for TMDL development in the next two years." 40 C.F.R. § 130.7(b)(4). States must submit their priority ranking to EPA for approval along with the 303(d) list. *Id*. §§ 130.7(d)(1)–(2). Here, EPA's approval of DEQ's 2020 TMDL priority ranking and schedule was arbitrary and capricious under the APA.

### A.    EPA's determination that DEQ considered the severity of the pollution and the uses to be made of Oregon's waters in determining its priority ranking for TMDLs is unsupported by the record.

It is black-letter administrative law that agency decisions must be supported by evidence in the administrative record. Without such record support, courts are "unable to rely on [their] usual assumption that the EPA has rationally exercised the duties delegated to it by Congress" and the resulting decision is arbitrary and capricious under the APA. *Nat. Res. Def. Council, Inc. v. U.S. Envtl. Protection Agency*, 966 F.2d 1292, 1305 (9th Cir. 1992). Even under the arbitrary and capricious standard, "the agency must, at a minimum, support its conclusions with

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 28

[information] that the agency deems reliable." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011). EPA's determination that a state adequately considered the severity of the pollution and the uses to be made of the state's impaired waters must likewise be "supported by evidence in the administrative record[,]" *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 918 (11th Cir. 2007), and if EPA approves a state's priority ranking and schedule that fails to take those requisite factors into account, that approval is arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A). *See, e.g., Envtl. Law & Policy Ctr.*, 415 F. Supp. 3d at 784-88 (setting aside EPA's approval of Ohio's priority ranking because Ohio designated polluted Lake Erie as a "low priority" for a TMDL).

Here, EPA's November 2020 approval (EPA_0032214) of Oregon's 2020 priority ranking (EPA_0006734, EPA_0032236) was arbitrary and capricious for several reasons. First, nothing in the administrative record supports EPA's conclusory finding that Oregon "took into account the severity of pollution and the uses to be made of" Oregon's waters, as EPA stated in its November 12, 2020 approval letter. (EPA_0032221.) DEQ stated that its priority ranking was

> based on a number of factors including number of listed waters in a watershed, listing parameter, the impaired beneficial uses, if a watershed has other TMDLs, severity of the water quality problem, input from the public, DEQ resources, and TMDLs with deadlines that have been established via court order.

(EPA_0004954.) However, nothing in DEQ's 303(d) list submittal package substantiated those conclusory statements, and nothing in the administrative record supports them. *See id*.

Second, DEQ's 2020 Schedule designates five TMDL projects as "high" priority (to be completed by "end of 2024") and another five TMDL projects as "medium" priority (to be completed by "end of 2028"). (EPA_0006734; EPA_0032236.) Yet all these repeatedly-delayed TMDL projects have been underway since at least 2010, with parameters removed or swapped in

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 29

and out for no apparent reason. (*See, e.g.*, Saul Decl. Ex. 3.) Plainly, DEQ's "high" and "medium" rankings simply reflect what DEQ has been working on in a seemingly endless fashion, without any actual consideration of the required factors under the CWA.

Moreover, the "high" and "medium" priorities fail to include any of the toxic pollutants DEQ believed in 201 were important to control through TMDLs. (NWEA_DEQ_012147.) As discussed above, *see supra* at 13–14, *all* waters impaired for toxic pollutants are assigned a "low" priority for a TMDL, without any explanation in the record and despite EPA's assigning a "top priority" to environmental justice concerns in 2020. (EPA_0009429.) Nothing in the record explains the basis for DEQ's decision to prioritize certain TMDLs over others where the potential risk to human health or aquatic life is significant.

In short, because it utterly lacks support in the administrative record, EPA's conclusion that DEQ "took into account the severity of pollution and the uses to be made of" Oregon's impaired waters as the Clean Water Act requires was arbitrary and capricious.

**B.    EPA's approval of DEQ's inadequate and incomplete TMDL schedule was arbitrary and capricious**

EPA's approval of DEQ's 2020 Schedule must also be set aside as arbitrary and capricious because it does not achieve prompt compliance with CWA deadlines. As discussed above, a lawful TMDL schedule must be both expeditious and inclusive of all impaired waters; if it fails on either point, EPA's approval violates the Act and the APA. *See Idaho Sportsmen's Coalition*, 951 F. Supp. at 966–67 (holding a "proposed schedule for TMDL development in Idaho violates the CWA because of two flaws": (1) its "extreme slowness" and (2) the fact that "makes no provision for TMDL development for the full list of Idaho WQLSs."). The Ninth Circuit has twice upheld district court orders requiring expeditious TMDL schedules for all

impaired waters in a state. *See Alaska Ctr. for Env't*, 20 F.3d at 986 (requiring EPA to "'propose a [long-term] schedule for the establishment of TMDLs' for Alaskan waters."); *Friends of Wild Swan*, 74 F. App'x 718, 720, 722 (9th Cir. 2003) (requiring "a deadline for establishment of TMDLs for all WQLSs" which was "supported by Montana's history of delay and EPA's repeated failure to require the timely development of TMDLs[.]").

EPA's approval of DEQ's 2020 Schedule[23] and its 303(d) list with no schedule for "low" priority WQLS, despite DEQ's failure to include a schedule for completing *all remaining TMDLs* for Oregon's WQLSs, ensured that Oregon's plan was neither expeditious nor inclusive. The lack altogether of a schedule for the majority of WQLSs is beyond "extreme slowness." EPA has long recognized the importance of an "an overall plan for completing and approving TMDLs for all listed waters." TMDL Guidance at 3. *See also* Saul Decl. Ex. 5 (*Idaho Sportsmen's Coalition* court faulting the "failure by EPA and the state to adopt a schedule for the development of TMDLs *for all WQLS*.") The absence of such a plan, particularly in light of repeated and extended DEQ's delays in completing TMDLs, renders EPA's approval of DEQ's 2020 Schedule arbitrary and capricious.

## IV.    EPA violated the Clean Water Act by failing to determine a schedule for the submission of TMDLs by Oregon (Claim Three).

EPA regulations explicitly require that "[s]chedules for submission of TMDLs shall be determined by the Regional Administrator and the State." 40 C.F.R. § 130.7(d)(1). In denying EPA's motion to dismiss NWEA's Third Claim, this Court recognized that the use of "shall"

---

[23] DEQ's 2020 TMDL schedule does not provide for the completion of any TMDLs within two years as required by 40 C.F.R. § 130.7(b)(4) (priority rankings "shall specifically include the identification of waters targeted for TMDL development in the next two years."). Submitted in October of 2020, the earliest completion date on that document was "by end of 2024," which was not a date within two years. (EPA_0006735.)

"indicates that Defendants are mandated to act" and accordingly held that "EPA has a nondiscretionary duty to determine "[s]chedules for submission of TMDLs." Dkt. #15 at 17–18.

To give meaning to CWA section 303(d) and effectuate Congress' goal that all waters attain water quality standards, 40 C.F.R. § 130.7(d)(1) must be construed as requiring a schedule for the completion of TMDLs for all remaining impaired waters on a state's 303(d) list. *See Alaska Ctr. for the Env't*, 796 F. Supp. at 1380 (citing 40 C.F.R. § 130.7(d)(1) and holding that "the CWA requires the EPA to work with the State of Alaska to establish a reasonable schedule for the development of TMDLs for all waterbodies designated as water quality limited segments."). As the Western District of Washington held in *Idaho Sportsmen's Coalition*, "EPA's failure to determine, with the State of Idaho, a reasonable schedule for Idaho's development of TMDLs is a violation of its duties under the CWA." Saul Decl. Ex. 5 at 11; *see also id*. at 13 (noting that at the current rate "it would take millennia for TMDLS to be established for all of Idaho's WQLSs" and that there would be "a continuing failure to develop TMDLS for *all* WQLS, as the law requires, unless an injunction is issued.") (emphasis in original); *Idaho Sportsmen's Coalition*, 951 F. Supp. 962 (ordering EPA to work with the state to prepare "a complete and . . . reasonable schedule for the development of TMDLs for all waterbodies designated as WQLSs in Idaho."). Indeed, EPA's own TMDL Guidance instructs Regional Administrators to secure with each state "an appropriate schedule for the establishment of TMDLs for all waters on for all the most recent section 303(d) list," which "should be expeditious and normally extend from eight to thirteen years in length[.]" TMDL Guidance at 3.

Even if 40 C.F.R. § 130.7(d)(1) were construed to allow partial schedules, it still requires EPA's affirmative effort to ensure a reasonable schedule consistent with the CWA—not the cursory rubber stamp EPA gave DEQ's incomplete 2020 Schedule here. *See Am. Canoe Ass'n,*

*Inc. v. U.S. Envtl. Protection Agency*, 54 F. Supp. 2d at 626 (EPA's regulation envisions "a federal-state cooperative process of TMDL development in which EPA is an active participant.") As this Court previously held, "the fact that 40 C.F.R. § 130.7(d)(1) contemplates a role for the state and EPA does not mean Defendants do not have a duty to act." Dkt. #15 at 17.

The record here makes clear that EPA played no role in developing DEQ's 2020 Schedule and the 303(d) list "low" priorities that constitute no schedule, thus failing to comply with its mandatory duty under section 303(d) and 40 C.F.R. § 130.7(d)(1). EPA explains it merely "received Oregon's long-term schedule for TMDL development for waters on the 2014-2020 Section 303(d) list" and that it did not take "any action to approve or disapprove this schedule pursuant to the CWA Section 303(d)." (EPA_0032221.) The most the record reveals about EPA's role in Oregon's schedule is its periodic checks on the status of a few ongoing TMDL projects; EPA never suggests priorities or additional TMDLs for development, never urges DEQ to accelerate its glacial pace of TMDL completion to allow for scheduling more TMDLs, and never even expresses an expectation that DEQ will stick to its schedules. (*See, e.g.*, EPA_0022547 (EPA staff commenting on a draft PPA in 2018, recognizing "TMDL completion dates are being pushed back" but still only inquiring about ongoing TMDL projects); EPA_0006339 (EPA staff requesting a meeting with DEQ simply to "confirm what TMDLs are expected to be submitted in calendar years 2021 and 2022"); EPA_0003679 (EPA staff inquiring in September 2021, in anticipation of "receiving any of the Mid-Coast TMDLs").

This lack of effort falls well short of what the law requires of EPA. There is nothing in the administrative record that could plausibly be construed as a "[s]chedule[] for submission of TMDLs" that was jointly "determined by the Regional Administrator and the State." 40 C.F.R. §

130.7(d)(1). EPA has thus failed to take its mandatory duty under the Clean Water Act and the regulation, and summary judgment is warranted on NWEA's Claim Three.

## V.   EPA's failure to determine a schedule for the submission of TMDLs for Oregon was action unlawfully withheld or unreasonably delayed under the APA (Claim Four).

If the Court finds that 40 C.F.R. § 130.7(d)(1) does not impose a mandatory duty upon EPA subject to a CWA citizen-suit claim, or alternatively finds that the regulation requires only that the Regional Administrator and DEQ need adopt a partial or short-term TMDL schedule, then it should find that EPA's failure to determine a complete TMDL schedule that covers all remining Oregon WQLSs was arbitrary, capricious, or otherwise not in accordance with the CWA or, alternatively, is action unreasonably delayed. 5 U.S.C. § 706(1), (2)(A).[24]

Even if 40 C.F.R. § 130.7(d)(1) does not impose a mandatory duty upon EPA, its failure to develop with DEQ a TMDL schedule for Oregon's WQLSs is arbitrary and capricious and plainly contrary to the CWA, 33 U.S.C. § 1313(d), or alternatively is action unreasonably delayed within the meaning of 5 U.S.C. § 706(1). EPA's guidance instructs that if a state "fails to meet its obligations under section 303(d), you"—meaning the Regional Administrators of EPA—"will need to step in." TMDL Guidance at 2. EPA's TMDL Guidance further instructs that each EPA Region "should secure a specific written agreement with each State in the Region establishing an appropriate schedule for the establishment of TMDLs for all waters on the most recent section 303(d) list, beginning with the 1998 list." Id. at 3. And, as several courts have held, only complete TMDL schedules—that is, schedules that provide for the submittal of a

---

[24] NWEA pled its Claim Four in the alternative to Claim Three—a CWA citizen suit claim—recognizing that the APA provides a cause of action only where "there is no other adequate remedy in a court." 5 U.S.C. § 704; see also W. Watersheds Project, 632 F.3d at 497. If the Court finds in favor of NWEA on Claim Three, it should dismiss Claim Four.

TMDL for each remaining WQLS on a state's 303(d) list—satisfy CWA requirements and further Congress's goals in enacting it. *See Alaska Ctr. for the Env't*, 796 F. Supp. at 1380; *Idaho Sportsmen's Coalition*, 951 F. Supp. 962. EPA's failure to ensure a schedule for Oregon WQLSs violates the APA, and the Court should grant summary judgment in favor of NWEA on Claim Four.

## CONCLUSION

For the foregoing reasons, the Court should grant NWEA's motion for summary judgment as to Claims One, Two, and Three, and dismiss Claim Four. Alternatively, if the Court denies NWEA summary judgment on Claim Three, it should grant summary judgment to NWEA on Claim Four.

Dated: December 1, 2023.

Respectfully submitted,

*s/ James N. Saul*

James N. Saul
Earthrise Law Center at
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland, OR 97212
(503) 768-6929
jsaul@lclark.edu

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – Page 35