IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NORTHWEST ENVIRONMENTAL
ADVOCATES, a nonprofit
organization,

No. 3:21-cv-01136-HZ

OPINION & ORDER

   Plaintiff,

 v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; MICHAEL
REGAN, in his official capacity as
Administrator of the Environmental
Protection Agency; and MICHELLE
PIRZADEH, in her official capacity as Acting
Regional Administrator Environmental
Protection Agency Region 10,

   Defendants,

 and

STATE OF OREGON, by and through the
OREGON DEPARTMENT OF
ENVIRONMENTAL QUALITY,

   Intervenor-Defendant.

James Neville Saul
Wild & Scenic Law Center
3519 NE 15th Ave #207
Portland, OR 97212

      Attorney for Plaintiff

Gus Maxwell
Albert Lin
Sarah A. Buckley
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044

      Attorneys for Defendants Environmental Protection Agency, Michael Regan, and
      Michelle Pirzadeh

Sadie Forzley
Nina Englander
Oregon Department of Justice
100 SW Market St
Portland, OR 97201

      Attorneys for Defendant State of Oregon

HERNÁNDEZ, District Judge:

      Plaintiff Northwest Environmental Advocates ("NWEA") sued the Environmental

Protection Agency ("EPA"), Administrator Michael Regan, and Regional Administrator

Michelle Pirzadeh for violating the Clean Water Act ("CWA" or "the Act") and the

Administrative Procedure Act ("APA"). Compl., ECF 1. The State of Oregon, acting through its

Department of Environmental Quality ("DEQ") intervened as a defendant. The parties have filed

cross-motions for summary judgment on Plaintiff's claims.[1] For the following reasons, the Court

grants Plaintiff's Motion in part and grants Defendants' Motions in part.

---

[1] The parties submitted initial briefs according to a court-ordered schedule, and resubmitted those
briefs with citations to the Joint Appendix. The Court cites the resubmitted briefs in its opinion.

# BACKGROUND

## I.      Legal Background

In 1972, Congress enacted the Clean Water Act, 33 U.S.C. §§ 1251-1389, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," *id.* § 1251(a). The Act set a "national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." *Id.* § 1251(a)(1). To achieve this goal and the other goals of the Act, Congress declared that "it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, waters of the contiguous zone, and the oceans." *Id.* § 1251(a)(6). Congress also declared that "it is the national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner so as to enable the goals of this chapter to be met through the control of both point and nonpoint sources of pollution." *Id.* § 1251(a)(7).

The Act contemplates that states will take a leading role in achieving its policies and goals. *Id.* § 1251(b) ("It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator [of the EPA] in the exercise of his authority under this chapter.").

The Act requires certain effluent limitations to be set. *See* 33 U.S.C. § 1311(a). An "effluent limitation" is "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." *Id.* § 1362(11). A "point source" is "any

discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." *Id.* § 1362(14). The National Pollution Discharge Elimination System ("NPDES") regulates point source pollution through the permit process. 33 U.S.C. § 1342. Other sources of pollution are referred to as nonpoint sources, although the CWA does not define the term. *See, e.g.*, *id.* § 1362(14) (excluding agricultural stormwater discharges and return flows from irrigated agriculture from the definition of point sources); *Oregon Nat. Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1095 (9th Cir. 1998).

The Act requires states to review and adopt water quality standards every three years. 33 U.S.C. § 1313(c)(1). New and revised water quality standards must be sent to the Administrator for review. *Id.* § 1313(c)(2)(A). When a state reviews water quality standards, it must "adopt criteria for all toxic pollutants listed pursuant to" the CWA. *Id.* § 1313(c)(2)(B).

The Act also requires each state to make a list—referred to as a "303(d) list"—of waters for which the Act's effluent limitations "are not stringent enough to implement any water quality standard applicable to such waters." *Id.* § 1313(d)(1)(A). The Ninth Circuit has held that such waters include "both [those] waters as to which effluent limitations apply but do not suffice to attain water quality standards and [those] waters as to which effluent limitations do not apply at all to the pollution sources impairing the water." *Pronsolino v. Nastri*, 291 F.3d 1123, 1126 (9th Cir. 2002). These waters are referred to as "water quality limited segments," or "WQLS" for short. 40 C.F.R. § 130.2(j). "The State shall establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters." 33 U.S.C. § 1313(d)(1)(A). *See also* 40 C.F.R. § 130.7(b)(4).

For the identified waters, "[e]ach State shall establish . . . in accordance with the priority ranking, the total maximum daily load ['TMDL'], for those pollutants which the Administrator

identifies under section 1314(a)(2) of this title as suitable for such calculation." 33 U.S.C. § 1313(d)(1)(C). "Such load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." *Id.* In other words, a TMDL is an upper limit on the amount of a particular pollutant that can be discharged into a given body of water. *See City of Arcadia v. U.S. Env't Prot. Agency*, 411 F.3d 1103, 1105 (9th Cir. 2005). "A TMDL is not self-enforcing, but serves as an informational tool or goal for the establishment of further pollution controls." *Id.*

As for when TMDLs must be submitted to EPA, the CWA provides:

> Each State shall submit to the Administrator from time to time, with the first such submission not later than one hundred and eighty days after the date of publication of the first identification of pollutants under section 1314(a)(2)(D) of this title, for his approval the waters identified and the loads established[.]

33 U.S.C. § 1313(d)(2). EPA has thirty days to either approve or disapprove the submission; if EPA disapproves the submission, it must identify the waters and establish loads within thirty days after disapproval. *Id.* Once the loads have been established, either through EPA approval of a state's submission or EPA's setting of the loads, the loads "shall" be incorporated into the state's plan for all navigable waters as part of the state's required continuing planning process. *Id.* §§ 1313(d)(2), (e).

EPA regulations require states to submit their lists of impaired waters with priority ranking every two years on even-numbered years. 40 C.F.R. § 130.7(d)(1). The list with priority ranking must "includ[e] waters targeted for TMDL development within the next two years." *Id.* "All . . . TMDLs established . . . for water quality limited segments shall continue to be submitted to EPA for review and approval. Schedules for submission of TMDLs shall be determined by the Regional Administrator and the State." *Id.*

The CWA has a citizen-suit provision that allows "any citizen" to bring suit "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 33 U.S.C. § 1365(a)(2).

## II.    Factual Background

### A.    Oregon's Recent TMDL Submissions

In 2000, as a result of litigation, Plaintiff, the Northwest Environmental Defense Center ("NEDC"), and EPA entered into a settlement that established a target of developing 1,153 individual TMDLs in Oregon by December 31, 2010. Joint Appendix ("JA") 0011, ECF 66.[2] Between 2000 and 2010, Oregon produced 1,206 TMDLs. *Id.* Oregon generally groups its TMDLs into projects by waterbody. Since late 2010, DEQ submitted five subbasin TMDL projects and two modifications to TMDL projects to EPA, and EPA approved these projects. JA0011-12. Oregon changed its waterbody segmentation system after 2012. JA0011-12.

In 2017, this Court invalidated many temperature TMDLs Oregon had submitted and EPA had approved because they did not comply with the applicable standards. Order, ECF No. 149, *Nw. Env't Advocates v. U.S. Env. Prot. Agency et al.*, No. 3:12-cv-01751-AC (Apr. 11, 2017). In December 2018, the Court ordered the parties to confer and develop a schedule for replacing the defective TMDLs. Op. & Ord., ECF No. 190, *Nw. Env't Advocates v. U.S. Env. Prot. Agency et al.*, No. 3:12-cv-01751-HZ (Dec. 12, 2018). Replacement of these TMDLs is ongoing. In October 2023, the Court entered an amended judgment requiring completion of the remaining temperature TMDLs by May 2028. JA3287-89.

---

[2] Plaintiff challenges the admissibility of portions of EPA's 2022 Synopsis Memo, JA0001-0029, and argues that it should not be included in the administrative record. Pl. Reply 33-34, ECF 68. The Court addresses the parties' evidentiary challenges below.

Oregon has developed and completed some TMDLs other than the replacement temperature TMDLs in recent years, including the following. In January 2019, Oregon completed nutrient TMDLs for the Upper Klamath and Lost River Subbasins. JA1428-1590. In June 2023, Oregon completed a draft bacteria TMDL for the Powder River Basin. JA2729-54. In September 2023, Oregon completed TMDLs for bacteria and dissolved oxygen for the Upper Yaquina River Watershed. JA2882-2911.

B.    Oregon's 2020 Priority Ranking & Schedule

Oregon's 2020 priority ranking sorted TMDL projects into high, medium, and low priorities. JA2485. When submitting its priority ranking and schedule to EPA, the State explained:

> The priority and schedule for these TMDLs is based on a number of factors including number of listed waters in a watershed, listing parameter, the impaired beneficial uses, if a watershed has other TMDLs, severity of the water quality problem, input from the public, DEQ resources, and TMDLs with deadlines that have been established via court order.

JA2486. "High priority listings are listings where DEQ is currently working on a TMDL or DEQ anticipates the TMDL to be worked on sometime before the end of 2022." JA2486. The State wrote that it expected to complete high priority TMDLs before the end of 2024. JA2486. "Medium priority listings are listings that DEQ has identified to be addressed with TMDLs within the next eight years." JA2486. Oregon explained: "Work on these TMDLs is in the early stages and may include TMDL planning, TMDL data collection, or was previously a high priority but has been delayed so that TMDLs with court ordered deadlines can be completed." JA2486. Finally, "[l]ow priority listings are all other category 5 listings not identified as High or Medium priority. TMDL development for low priority listings will be scheduled at a future date

as TMDLs for high and medium priority category 5 listings are completed." JA2486. Most

TMDLs were ranked as low priority.

The high-priority TMDLs "included several TMDLs for coastal areas that DEQ

prioritized and worked on from approximately 2012-2019." DEQ Mot. 9, ECF 72 (citing

JA0014, JA2487). They also included replacement temperature TMDLs that were due the

soonest. *Id.* (citing Order Amending Final Order and Judgment at 2-3, *Nw. Env't Advocates v.*

*U.S. Env. Prot. Agency et al.*, No. 3:12-cv-01751-HZ (D. Or. Oct. 12, 2023), JA3287-89).

Finally, TMDLs for Snake River tributaries in Eastern Oregon were ranked as high priority. *Id.*

at 10. The medium-priority TMDLs "also consisted largely of coastal and replacement

temperature TMDLs." *Id.* (citing JA2488). Oregon also ranked the Upper Deschutes and Little

Deschutes Subbasins as medium priority. *Id.* at 11 (citing JA2488-89).

The State also submitted a schedule, about which it wrote:

> The TMDL schedule represents scheduled milestones when all TMDLs within the
> high or medium priority category are estimated to be completed. It is expected that
> many of these TMDLs will be completed and issued to EPA before the milestone
> date; especially those with deadlines that have been established via court order.

JA2486. The schedule shows ten high priority projects, each including between one and four

TMDLs. JA2487. The schedule lists fifteen medium priority projects, each including between

one and four TMDLs. JA2488-89. The schedule does not list target completion dates for low

priority TMDLs.

On November 12, 2020, EPA approved Oregon's 2014-2020 Integrated Report. JA2476.

Before approving the State's priority ranking and list, "EPA requested additional information

pertaining to microplastic data, placement of marine waters in Category 3b for hypoxia, and

delisting of the mainstem Coquille for dissolved oxygen." JA2476. DEQ submitted further

information and corrected errors. JA2476. EPA then "determined that Oregon's list of water

quality limited segments (WQLSs) still requiring a TMDL meets the requirements of Section

303(d) of the CWA and EPA's implementing regulations. Therefore, EPA approves Oregon's

2014-2020 Section 303(d) list." JA2476. EPA noted that although DEQ presented its submission

as covering 2018-2020, the document included a 10-year data review with data going back to the

2014 listing cycle, and thus was approved going back to 2014. JA2476.

  With respect to Oregon's schedule for development of TMDLs, EPA approved the

State's identification of WQLSs targeted for TMDL development in the next two years. JA2483.

As for the long-term schedule, EPA wrote that it requested the schedule "[a]s a policy matter"

and that "EPA is not taking any action to approve or disapprove this schedule pursuant to the

CWA Section 303(d)." JA2483.

  C. Oregon's 2022 Priority Ranking & Schedule

  Oregon's 2022 priority ranking again sorted its projects into high, medium, and low

priority. JA2567. DEQ attached a separate table for delistings. JA2568. In an accompanying

letter sent in May 2022, DEQ explained that it "developed this list by incorporating more

continuous datasets for an expanded set of parameters, adding expanded rationale for support of

assessment conclusions, and providing more localized impairment information for watershed

units." JA2565. DEQ also submitted a report describing its methodology in developing the list of

impaired waters. JA2569-2679.

  DEQ wrote that it "[took] into account the severity of the pollution and the uses to be

made of such waters" in making its priority rankings. JA2716. DEQ explained its process for

ranking as follows:

> DEQ first considered water quality-specific factors, including: number of Category
> 5 AUs [assessment units] in a watershed; significance of impairment; whether there
> are multiple listed pollutants; the impaired beneficial uses (especially public health
> impacts); if a watershed has other TMDLs; and scale of point and nonpoint source

discharge. Next, DEQ considered additional factors, including: input from tribes and the public; level of DEQ TMDL resources; cross-program and cross-agency funding priorities; TMDL projects with deadlines established via court order; size and complexity of geographic area and size and participation of affected public.

JA2716.

"High priority for development was assigned to TMDL projects with multiple, overlapping water quality-specific factors and that were further constrained by consideration of multiple additional factors. TMDL projects identified as High priority are targeted for development in the next two years, or by April 2024." JA2716. "Medium priority for development was assigned to TMDL projects with fewer, overlapping water quality-related factors and constraints due to additional factors." JA2716. "Low priority for development was assigned to TMDL projects that were not ranked High or Medium." JA2716. Most TMDLs were ranked as low priority.

In 2022, DEQ listed several of the same TMDLs as high priority that it had in 2020. DEQ Mot. 10. "However, DEQ reprioritized as low priority several coastal TMDLs previously designated as high priority[.]" *Id.* The Snake River tributary TMDLs that had been listed as high priority in 2020 were relisted as medium priority. *Id.* (citing JA2718, JA2720, JA2487). Several replacement temperature TMDLs were also designated as medium priority, as were the Upper Deschutes and Little Deschutes Subbasins. *Id.* at 11 (citing JA2719). DEQ upgraded from low to medium priority the TMDLs for the following WQLSs: Lower Deschutes; Crooked, Beaver – South Fork, and Trout Subbasins; Rogue River Basin; Schooner Creek; Siletz River; and Snake River – Hells Canyon. *Id.* (citing JA2719-20).

In terms of the schedule, DEQ's submission explained:

DEQ intends to have all High priority TMDL projects in development within the next two years, or by April 2024, and all Medium priority TMDL projects in development by April 2030. DEQ expects that several High and Medium priority

TMDL projects will be completed and submitted for EPA action before those milestone dates, particularly those with court-ordered timelines. As High and Medium priority TMDL projects are completed, Medium and Low priority TMDL projects will begin to move up in priority and into development.

JA2717. The accompanying table lists seven high-priority projects and eighteen medium-priority projects. JA2718-21. In August 2022, DEQ submitted an updated schedule to clarify when it expected to complete all high- and medium-priority TMDLs. JA2722-25. Target dates ranged from January 2024 to April 2030. JA2722-25. No target dates were provided for any low-priority TMDLs.

On September 1, 2022, EPA approved Oregon's section 303(d) list. Saul Decl. Ex. 11 at 1, ECF 49.[3] With respect to Oregon's TMDL submission schedule, EPA wrote:

EPA has also reviewed the TMDL submission schedule Oregon submitted with its 2022 IR [Integrated Report]. Consistent with 40 C.F.R. § 130.7(d)(1), the TMDL submission schedule identifies dates by which Oregon anticipates submitting TMDLs to EPA. As recognized in EPA guidance, TMDL submission schedules are intended to help the public and EPA understand the State's priorities and assist in work planning. EPA acknowledges Oregon's TMDL submission schedule and finds it satisfies these purposes, and notes Oregon's intention to coordinate with EPA to update this schedule in the future, including during preparation of its next IR.

*Id.* at 1-2.

D.    Performance Partnership between EPA and Oregon

For many years, Oregon and EPA have entered into biennial performance partnership agreements ("PPAs"). JA2301 (2010-2012 PPA); JA2195 (2012-2014 PPA); JA2123 (2014-2016 PPA); JA1653 (2016-2018 PPA); JA1707 (2018-2020 PPA); JA0715 (2020-2022 PPA);

---

[3] Defendants object to some of the exhibits attached to the Saul Declaration. EPA Mot. 34-36; DEQ Mot. 33-34. In its Motion, EPA cites its approval of Oregon's 2022 priority rankings. EPA Mot. 8. Exhibit 11 to the Saul Declaration is a copy of that approval and is appropriate to consider.

Saul Decl. Ex. 6 (2022-2024 PPA).[4] "The PPA is an agreement documenting the commitments of EPA and DEQ regarding implementation of federally-delegated or authorized environmental programs[.]" JA0718. According to the PPA entered into in 2020, "PPAs are intended to enhance protection of the environment by focusing attention on overall environmental protection goals and the actual results of efforts to achieve these goals, not on government programs and the number of actions taken." JA0718. The PPA also provides that "EPA's senior managers will use this Plan routinely as a management tool to guide the Agency's path forward, tracking progress, and assessing and addressing risks and challenges that could potentially interfere with EPA's ability to accomplish its goals." JA0719.

E.    Development of this Case

On April 13, 2021, Plaintiff sent the EPA Defendants a notice of intent to sue. Compl. Ex. A. Plaintiff sued EPA on August 3, 2021, bringing four claims. Claim One alleges that EPA failed to review and disapprove approximately 2,467 TMDLs constructively submitted to EPA as required by the CWA. Compl. ¶¶ 72-79. Claim Two alleges that EPA's approval of Oregon's 2020 priority ranking and prioritization schedule was arbitrary and capricious in violation of § 706(2)(A) of the APA. *Id.* ¶¶ 80-84. Claim Three alleges that EPA failed to determine Oregon's schedule for submitting TMDLs as required by the CWA. *Id.* ¶¶ 85-90. Claim Four alleges in the alternative that EPA's failure to develop a schedule for Oregon's submission of TMDLs was arbitrary and capricious under § 706(2)(A) of the APA, or an unreasonable delay of agency action under § 706(1) of the APA. *Id.* ¶¶ 91-94.

---

[4] The Court concludes that Exhibit 6 to the Saul Declaration is appropriate to consider notwithstanding EPA's objections to the Saul Declaration, to the extent they apply to this exhibit.

On April 4, 2022, the Court denied EPA's motion to dismiss Claims Two, Three, and Four. Op. & Ord., ECF 15. On May 6, 2022, the Court granted DEQ's unopposed motion to intervene as a defendant. ECF 21. EPA lodged the administrative record on May 27, 2022. ECF 23. On July 15, 2022, Plaintiff moved to clarify the scope of review and asked for leave to take discovery on claims One, Three, and Four. ECF 24. The Court granted the motion in part and denied it in part. Op. & Ord., ECF 32. Written discovery ensued. On September 1, 2023, the Court adopted the parties' proposed briefing schedule. ECF 46. The first motion under that schedule was submitted on December 1, 2023, and the parties filed final versions of their briefs on May 6, 2024. The Court held oral argument on August 2, 2024.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

The Court first addresses the parties' evidentiary objections. Next, the Court concludes that Defendants are entitled to summary judgment on Claim One. Plaintiff is entitled to summary judgment on Claim Two. Plaintiff and Defendants are each entitled to partial summary judgment on Claim Three. Defendants are entitled to summary judgment on Claim Four.

## I.    Evidentiary Issues

All parties raise evidentiary objections. Plaintiff objects to a memorandum Defendants rely on that was submitted as part of the administrative record. Pl. Reply 33, ECF 68. Defendants object to most of the extra-record evidence Plaintiff attached to its Motion. EPA Mot. 32, ECF 69; DEQ Mot 33. In response to Plaintiff's motion for leave to take discovery, the Court held that the record was open as to Claims One, Three, and Four because they alleged agency inaction, and thus there was no final decision from EPA to close the record. Op. & Ord. 8, ECF 32. The Court also held that any party could supplement the record, but that the party seeking to supplement the record "must adequately justify inclusion of the documents in the record." *Id.*

Plaintiff objects to Defendants' reliance on EPA's May 2022 memorandum that provides a synopsis of DEQ's TMDL program. JA0001 ("Synopsis Memo"). Plaintiff describes the

Synopsis Memo as "a post-complaint, extra-record document that EPA employees prepared in direct response to this litigation" and argues that it should not have been included in the administrative record. Pl. Reply 33-34. Plaintiff also argues that specific portions of the Synopsis Memo are inadmissible. *Id.* at 34-35. Plaintiff asserts that "the Memo includes repeated, unsubstantiated statements about the purported role litigation has played in allegedly slowing Oregon's rate of TMDL production, all of which are inadmissible opinion testimony, lack evidentiary support, are wholly speculative, or are hearsay because they are based upon statements by DEQ employees." *Id.* Plaintiff also objects to other statements in the Memo as "speculative, hearsay, improper opinion testimony, and offered without foundation or explanation." *Id.* at 35.

EPA argues that Plaintiff is judicially estopped from challenging the admissibility of the Synopsis Memo. EPA Reply 24, ECF 70. The Court need not address that argument because even if judicial estoppel does not apply, the Court can consider the Synopsis Memo. Plaintiff successfully argued that the record was open on claims One, Three, and Four because there was no final decision. Op. & Ord. 8, ECF 32. Therefore, the Synopsis Memo may be included in the record even if it was prepared in response to litigation. The Ninth Circuit has approved consideration of similar documents under these circumstances. *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002) ("*BayKeeper*"). Plaintiff's specific objections to portions of the Synopsis Memo are immaterial to the outcome of this case. As to the portions of the document that address the role of litigation in Oregon's TMDL production, other evidence in the record indicates that Oregon's priority ranking was altered based on litigation. *E.g.*, JA2486 (Oregon's explanation of its 2020 priority ranking, which stated that the ranking and schedule were based on, among other factors, "TMDLs with deadlines that have been established via court

order."). To the extent the role of litigation in Oregon's priority rankings and schedule is relevant, the Court need not rely on the Synopsis Memo. As to the other three specific passages from the Synopsis Memo to which Plaintiff objects, Pl. Reply 35, the Court likewise did not need to rely on any of those passages in reaching its decision. The Court now turns to Defendants' evidentiary objections.

Along with its Motion for Summary Judgment, Plaintiff filed a declaration from counsel attaching eleven exhibits. Saul Decl. Plaintiff also filed a declaration from Nina Bell, Plaintiff's executive director. ECF 50. The Bell Declaration discusses the history of Oregon's TMDL program and attaches eight exhibits. EPA argues that both declarations and their attached exhibits should be stricken because Plaintiff did not notify Defendants of the exhibits in advance and did not demonstrate that supplementation of the record is necessary. EPA Mot. 33-34. The Court concludes that Plaintiff did not violate the disclosure requirements. *See* Saul Second Decl. Ex. 1, ECF 63 (Plaintiff's Index of Discovery Documents). The Court therefore considers whether supplementation is appropriate and whether the exhibits are admissible. *See* EPA Mot. 34-36.

The Saul Declaration attaches the following exhibits: demonstratives created by Plaintiff representing Oregon's TMDL production and listings of impaired waters (Exs. 1-3); a 1997 Guidance Memorandum from EPA about TMDL development (Ex. 4); an order in a case from the Western District of Washington (Ex. 5); the 2022-2024 performance partnership agreement between EPA and DEQ (Ex. 6); several documents from DEQ and EPA related to TMDL production (Exs. 7-10); and EPA's approval of Oregon's 2022 priority ranking (Ex. 11). Exhibits 4 and 5 are sources of law that may be considered regardless of whether they were submitted by any party. Exhibits 6 and 11 are relevant to Plaintiff's claims and may properly be considered as

part of the record. Plaintiff has not justified the inclusion of Exhibits 7-10, and the Court did not

rely on them; nor would doing so have changed the outcome. They are not part of the record.

Exhibits 1-3, the demonstrative exhibits, are the main source of the parties' disagreement.

EPA argues that the demonstratives do not qualify as summaries under Federal Rule of Evidence

1006 and that they are not accurate summaries or charts. EPA Mot. 35. EPA points out that the

demonstratives exclude revisions of older TMDLs from the TMDL count and label certain

TMDLs as "abandoned" or "reduced" despite the absence of such labels in the record. *Id.* DEQ

makes similar arguments. DEQ Mot. 33-34. Plaintiff argues that its demonstratives are

admissible because "each of those exhibits presents, in a convenient graphical form, data and

information found in the administrative record or other publicly available and admissible agency

documents pertaining to Oregon's TMDL program[.]" Pl. Reply 30. The Court concludes that

Plaintiff's demonstrative exhibits should not be considered part of the administrative record.

They are not merely summaries of information contained in the record. They represent Plaintiff's

interpretation of the evidence and are thus part of Plaintiff's argument on the merits.

The Bell Declaration attaches various documents dated between 1987 and 2013 regarding

Oregon's TMDL program. Exhibits 1-4 are memoranda, Exhibit 5 is an email, Exhibit 6 is part

of an assessment report, Exhibit 7 is a consent decree, and Exhibit 8 is a copy of a settlement

agreement. EPA argues that the Court should disregard these documents because "[t]he distant

history of Oregon's TMDL program, such as that referenced in the Bell exhibits, is not relevant

to Claim One or the Court's determination of whether a constructive submission has occurred

*now.*" EPA Mot. 34. EPA states, "The Ninth Circuit has explained in this context that courts

'must look only at EPA's present duty and whether it has been breached.'" *Id.* (citing

*BayKeeper*, 297 F.3d at 883). Plaintiff argues that Bell's testimony is admissible. Pl. Reply 32-

33. Plaintiff does not explain how most of the contents of the Bell Declaration or the exhibits attached are relevant to its claims. Plaintiff presents the history of Oregon's TMDL program as part of the factual background to support its argument that certain TMDLs have been constructively submitted. *See* Pl. Mot. 7-12, ECF 67. Because the length of time a TMDL has been pending is relevant to the analysis on constructive submission, the Court concludes that some of the exhibits in the Bell Declaration are relevant. Exhibits 4-6 and 8, which date from 2010 and later, are relevant because they address TMDLs at issue in this case. Exhibits 1-3 and 7, which date from 1987 to 1992, are not relevant. Plaintiff alleges a constructive submission of TMDLs that were listed in 1998 and later. Pl. Mot. 13.

As for the Bell Declaration itself, the Court considered the Bell Declaration to the extent Plaintiff relied on it to establish standing. *See* Pl. Mot. 16 (citing Bell Decl. ¶¶ 3-15). In addressing Claim One, the Court considered the tables Bell created showing outstanding TMDLs not covered by court order. *See* Bell Decl. ¶¶ 20-23. This portion of the Bell Declaration lays out the contours of Plaintiff's constructive submission claim and therefore is properly considered as part of Plaintiff's argument, but not part of the record. The Court did not otherwise consider the Bell Declaration because it was not necessary to resolve Plaintiff's claims. Having resolved the parties' evidentiary objections, the Court proceeds to the merits of Plaintiff's claims.

## II.    Claim One: Constructive Submission of TMDLs

Plaintiff argues that Oregon has constructively submitted no TMDLs within certain categories Plaintiff identifies. Pl. Mot. 18-28. Defendants assert that Plaintiff's category-based constructive submission claim is not viable as pleaded and that it also fails on the merits. EPA Mot. 9-25; DEQ Mot. The Court concludes that Defendants are entitled to summary judgment on this claim.

A.    Legal Standard

Other than a 180-day deadline for initial submissions of TMDLs, the CWA does not

impose a specific timeline for states to submit TMDLs to EPA, requiring only that they be

submitted "from time to time." 33 U.S.C. § 1313(d)(2). EPA's regulations do not impose a

timeline either. And neither the statute nor the regulations address what is to be done if a state

submits no TMDLs to begin with. Courts adopted the constructive submission doctrine to fill the

gap. The Ninth Circuit first adopted the doctrine in a case involving a state's alleged wholesale

failure to submit any TMDLs. *BayKeeper*, 297 F.3d at 881. "Under this doctrine, a complete

failure by a state to submit TMDLs will be construed as a constructive submission of no TMDLs,

which in turn triggers the EPA's nondiscretionary duty to act." *Id.* The state must "clearly and

unambiguously" decide not to submit any TMDLs. *Id.* at 883 (quoting *Hayes v. Whitman*, 264

F.3d 1017, 1024 (10th Cir. 2001)).

In *BayKeeper*, California did not submit any TMDLs to EPA until 1994, more than

fifteen years beyond the initial deadline. *Id.* at 880. After that, California dedicated funding to its

TMDL program, completed around 46 TMDLs, and established a schedule to complete all

remaining TMDLs within twelve years. *Id.* The Ninth Circuit held that because California had

completed some TMDLs and established a schedule for completing the rest, the state had not

"clearly and unambiguously decided not to submit any TMDL[s]." *Id.* at 883 (internal quotations

omitted).

The Ninth Circuit later held that the constructive submission doctrine also applies to a

failure to submit an individual TMDL. "[A] constructive submission will be found where a state

has "fail[ed] over a long period of time to submit a TMDL," and "clearly and unambiguously

decided not to submit any TMDL[s]." *Columbia Riverkeeper v. Wheeler*, 944 F.3d 1204, 1209

(9th Cir. 2019) ("*Riverkeeper*") (citations omitted). In *Riverkeeper*, the plaintiffs challenged

Washington and Oregon's failure to develop a temperature TMDL for the Columbia and Snake

Rivers. *Id.* at 1205. The Ninth Circuit applied the constructive submission doctrine, stating,

"'[t]he EPA is also under a mandatory duty to establish a TMDL when a State fails over a long

period of time to submit a TMDL; this prolonged failure can amount to the constructive

submission of an inadequate TMDL, thus triggering the EPA's duty to issue its own.'" *Id.* at

1208 (quoting *City of Arcadia*, 411 F.3d at 1105). The Ninth Circuit rejected EPA's argument

that the constructive submission doctrine applied only if the state failed to submit *any* TMDLs.

*Id.* at 1209. *City of Arcadia* indicated that "a state could constructively submit a single, specific

TMDL for a body of water or waterway." *Id.* at 1210. The Ninth Circuit found that Washington

and Oregon had constructively submitted the temperature TMDL because in 2001, the states

asked EPA to produce it on their behalf and EPA agreed to do so, the TMDL was "conspicuously

absent from the priority rankings" even as both states completed other TMDLs, and the states

took no steps to complete the TMDL. *Id.* at 1211.

"To be clear, the constructive submission doctrine does not prevent a state from

prioritizing the development and issuance of a particular TMDL." *Id.* at 1210. The Ninth Circuit

has recognized, however, that there is "a meaningful difference between affording less priority to

a particular TMDL and declining to develop and issue that TMDL at all." *Id.* at 1211.

> Where a state has failed to develop and issue a particular TMDL for a prolonged
> period of time, and has failed to develop a schedule and credible plan for producing
> that TMDL, it has no longer simply failed to prioritize this obligation. Instead, there
> has been a constructive submission of no TMDL, which triggers the EPA's
> mandatory duty to act.

*Id.*

B.    Plaintiff's Category-Based Claim

Plaintiff's constructive submission claim does not allege that Oregon has failed to submit any TMDLs, as in *BayKeeper*. Nor does Plaintiff allege failure to submit a single TMDL, as in *Riverkeeper*. Rather, Plaintiff argues that Oregon has delayed in submitting TMDLs in certain categories for long enough that it has constructively submitted no TMDLs in those categories. Pl. Mot. 12-14. In its Motion, Plaintiff identifies four categories. *Id.* "The first category includes all waters for which DEQ has assigned a *low priority* for a TMDL." *Id.* at 12. Plaintiff correctly points out that Oregon's TMDL schedule does not include any specific dates for completing low-priority TMDLs. *Id.* The State says only that it will move those TMDLs up in priority as higher-priority TMDLs are finished. JA2486 (explanation of 2020 priority ranking and schedule); JA2717 (explanation of 2022 priority ranking and schedule). "The second category is *long overdue* TMDLs for waters that have been impaired for a decade or more." Pl. Mot. 12. Plaintiff explains:

> DEQ's 2022 List includes a total of 1,891 WQLSs that, regardless of the purported TMDL priority, were first listed in 2012 or earlier—in other words, have been on the list and requiring a TMDL for eleven years or more. Of these, 451 WQLSs have been on the list for **more than two decades**, including the 337 WQLSs first listed in 1998.

*Id.* (emphasis in original).

"A third category includes TMDLs for *specific pollutants or parameters* that DEQ routinely ignores for TMDL development." *Id.* at 13. Plaintiff gives examples, including assigning a low priority ranking for toxic pollutant TMDLs, most sedimentation and turbidity TMDLs, and biocriteria TMDLs. *Id.* at 13-14. Finally, "[a] fourth category includes *all* impaired waters in the Willamette River Basin." *Id.* at 14. Plaintiff states that all 491 impaired waters in

the Willamette River Basin are listed as low priority despite the high-population, high industry nature of the area. *Id.*

Responding to Plaintiff's Motion, Defendants generally do not dispute the accuracy of Plaintiff's recitation of which TMDLs are listed as low-priority. Rather, they argue that Plaintiff's constructive submission claim is legally defective because it does not fit within existing caselaw and is factually defective because it ignores the progress Oregon has made and the realities of TMDL development. EPA Mot. 9-10; *see generally* DEQ Mot. The Court addresses the legal challenge first.

EPA argues that Plaintiff's constructive submission claim is improper because it does not allege either a wholesale failure to submit TMDLs—which EPA terms a programmatic claim— or a failure to submit a particular TMDL. EPA Mot. 10. Plaintiff states that its "claim is not 'one of programmatic constructive submission' . . . if there is such a distinction in the caselaw." Pl. Reply 4. Plaintiff states that it "is not aware of any cases using the phrase 'programmatic constructive submission.'" *Id.* at n.3. The parties approach *BayKeeper* and *Riverkeeper* from different directions, with Defendants focusing on the scope of the claim, and Plaintiff focusing on the type of action or inaction required to show a constructive submission. *Compare* EPA Mot. 11-23 *with* Pl. Reply 4-6. Both of these considerations are relevant.

As discussed above, *BayKeeper* involved a claim that the State of California failed to submit *any* TMDLs. Whether or not cases use the term "programmatic constructive submission," the nature of such a claim is apparent: if a state submits no TMDLs and fails to develop its TMDL program as required by the CWA, it can be found to have constructively submitted no TMDLs to EPA. *See* 297 F.3d at 883.

Plaintiff correctly points out that in finding no constructive submission, the Ninth Circuit in *BayKeeper* noted that (1) California submitted "at least 18 TMDLs" to EPA and (2) California developed a schedule for submitting its remaining TMDLs. Pl. Reply 4 (citing 297 F.3d at 883). The undisputed evidence shows that Oregon has submitted hundreds of TMDLs since it initiated its TMDL program, and that it has submitted TMDLs in recent years, including both replacement temperature TMDLs and new TMDLs. Oregon also has plans to finish its high- and medium-priority TMDLs by 2030. JA2722-25. However, Oregon has not set a schedule to develop all of its remaining TMDLs. Oregon's schedule does not include low-priority TMDLs—which constitute the majority of outstanding TMDLs—other than a brief statement that they will be moved up in priority as higher-priority TMDLs are completed. The lack of any estimate of when these TMDLs might be completed is concerning to the Court. But the Court concludes that Plaintiff's claim does not fit with cases like *BayKeeper* because Plaintiff does not allege a wholesale failure to produce any TMDLs, the situation *BayKeeper* and its ilk addressed.

Nor does Plaintiff's claim fit with cases like *Riverkeeper*, which challenged a failure to submit a single TMDL for a particular waterbody. Plaintiff disclaims bringing individual constructive submission claims. Pl. Reply 2 n.2. As EPA points out, *Riverkeeper* did not hold or suggest that the constructive submission theory could apply to broad categories of TMDLs. EPA Reply 4. Reviewing constructive submission caselaw from around the country, EPA asserts that only one district court has entertained a category-based theory, and it was reversed on appeal. *Id.* at 10-11 (listing cases).

The lone category-based case Plaintiff identifies is *Ohio Valley Environmental Coalition v. Pruitt*, 893 F.3d 225 (4th Cir. 2018). Pl. Reply 5-6. In *Ohio Valley*, the plaintiffs challenged West Virginia's failure to establish TMDLs for biologically impaired waters after the state

legislature enacted a statute in 2012 directing the relevant state agency to develop a new method to measure biological impairment, and the agency neither established a new method nor issued any TMDLs. 893 F.3d at 228. The district court granted summary judgment to the plaintiffs. *Id.* at 227. The Fourth Circuit reversed because West Virginia had established some TMDLs addressing biological impairments and entered into a memorandum of understanding with EPA setting a schedule for developing the rest. *Id.* at 230-31. The Fourth Circuit expressly declined to address whether the constructive submission doctrine applied, holding only that if it did apply, it was not satisfied under the facts of the case. *Id.* at 231. Plaintiff is thus incorrect in asserting that the Fourth Circuit has recognized that the constructive submission doctrine applies to categories of impaired waters.

While there may be a situation in which a category-based constructive submission claim is appropriate, Plaintiff's claim is not it. DEQ argues that Plaintiff's claim amounts to a challenge to Oregon's prioritization. DEQ Mot. 17-19. The Court agrees. EPA correctly asserts that "Congress recognized that states have authority and responsibility to 'establish a priority ranking' for impaired waters." EPA Mot. 15 (citing 33 U.S.C. § 1313(d)(1)(A)). States must establish TMDLs "in accordance with the priority ranking." 33 U.S.C. § 1313(d)(1)(C). As another district court in the Ninth Circuit pointed out, "the CWA provides no specific mechanism for reviewing this prioritization." *Sierra Club v. McLerran*, No. 11-CV-1759-BJR, 2015 WL 1188522, at *6 (W.D. Wash. Mar. 16, 2015). And the Ninth Circuit has emphasized that "the constructive submission doctrine does not prevent a state from prioritizing the development and issuance of a particular TMDL." *Riverkeeper*, 944 F.3d at 1210.

If the Court were to recognize category-based constructive submission claims like the one here, entities such as Plaintiff would be permitted to effectively dictate a state's TMDL

development priorities through litigation. The four categories Plaintiff identified illustrate this. Plaintiff's first category consists of all TMDLs designated as low-priority. This is a direct challenge to Oregon's prioritization system, which the CWA has given the State the right to develop. As for the second category, Plaintiff's designation of "long overdue" TMDLs is a somewhat vague and amorphous category. EPA also points out that under Plaintiff's use of "overdue," a TMDL for an impaired segment listed in 2022 is already overdue. EPA Mot. 19; *see* Pl. Mot. 13. Plaintiff's use of the term "overdue" is problematic because a TMDL is not "due" the moment a state identifies a WQLS. *BayKeeper*, 297 F.3d at 885 (noting that requiring submission of a TMDL at the same time as the priority rankings would render those rankings meaningless). However, Plaintiff's chart also shows that some WQLSs have been listed since 1998. Pl. Mot. 13. Defendants do not dispute this. Some TMDLs have been needed for a long time with little to no apparent action taken.

Plaintiff's third category is also problematic, as it purports to cover "*specific pollutants or parameters* that DEQ routinely ignores for TMDL development." Pl. Mot. 13 (emphasis in original). Plaintiff does not explain how to determine which pollutants or parameters DEQ "routinely ignores." The subjective, amorphous nature of this category invites either the Court or Plaintiff to replace the State's priorities with its own.

Finally, Plaintiff's challenge to "*all* impaired waters in the Willamette River Basin," *id.* at 14, at first appears more appropriate. But Plaintiff's own arguments underscore that this represents a challenge to the State's priority ranking. Plaintiff notes that the Willamette River Basin is listed as low priority "even though it is the most populated and industrialized of Oregon's basins... . Given the concentration of municipal and industrial pollution sources in this basin, TMDLs are critical for the development of effective NPDES permits for these pollutants;

yet DEQ has seemingly abandoned all efforts to develop non-temperature TMDLs in the Willamette Basin." *Id.* Plaintiff's arguments may be reasonable, but the constructive submission doctrine does not ask courts to look at the relative importance of some TMDLs compared to others. Plaintiff's constructive submission claim is fundamentally a challenge to Oregon's priority rankings. In addition, the vague and amorphous nature of the categories leaves the Court uncertain as to which TMDLs are covered by the claim. EPA stated at oral argument that it still did not know exactly which TMDLs were alleged to be constructively submitted. This uncertainty is another reason to reject Plaintiff's category-based claim as not viable.

In contrast to Plaintiff's claim, the category-based constructive submission claim in *Ohio Valley*, which the district court found cognizable before being reversed on appeal, was tied to a particular type of TMDL for which the West Virginia legislature had ordered action. The state agency responsible for establishing TMDLs failed to take that action. The plaintiff's claim in *Ohio Valley* was thus tied to specific actions taken—or not taken—by various state decisionmaking bodies with respect to a clearly identified, cognizable group of TMDLs. In that respect the claim was similar to *Riverkeeper*, in which the plaintiffs challenged the failure to submit a particular TMDL that Oregon and Washington had asked EPA to develop. That claim, too, was tied to specific state actions with respect to the TMDL. Here, in contrast, Plaintiff points to general delays and questions Oregon's priority rankings. As DEQ points out, if the Court were to approve Plaintiff's claim, "it would require EPA to direct federal resources to complete TMDLs that Oregon categorized as low priority ahead of the high and medium priority TMDLs the state is developing." DEQ Reply 6, ECF 73. The Court concludes that Plaintiff's claim does not present appropriate circumstances for recognizing a category-based constructive submission

claim. That is one basis on which to deny Plaintiff's Motion and grant EPA and DEQ's Motions on Claim One.

C.      Standing

EPA challenges Plaintiff's standing as to a claim of constructive submission of multiple individual TMDLs. EPA Mot. 23. Plaintiff has stated that it is not bringing individual constructive submission claims. The Court will still address standing to confirm that it has jurisdiction over this claim. Article III of the Constitution limits the subject matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must show three elements to establish standing. First is "an injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (quotation marks and citations omitted). Second, that injury must be "fairly traceable to the challenged action of the defendant," and not "the result of the independent action of some third party not before the court." *Id.* (quotation marks and alternations omitted). Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* (citations omitted).

"An association or organization can sue based on injuries to itself or to its members." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021).

> The Supreme Court has recognized that an organization may have associational standing to sue on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Plaintiff argues that it has standing to bring its claim. Pl. Mot. 16. Plaintiff states that "The efficacy of Oregon's TMDL program—and EPA's supervision of it—is germane to NWEA's mission to protect and restore water quality in the region." *Id.* (citing Bell Decl. ¶¶ 3-15). Defendants do not challenge this, and the Court finds that this requirement is met. And it is undisputed that this lawsuit may proceed without the participation of Plaintiff's individual members. Plaintiff also asserts that its members would have standing to sue in their own right. *Id.* at 16-17. This element is partially disputed.

Plaintiff submits declarations from several members who state that they use various bodies of water lacking TMDLs for activities such as fishing, boating, hiking, and swimming; and that these activities have been affected by ongoing impairment of water quality. Anuta Decl. ¶¶ 4-17, ECF 51; Engelmeyer Decl. ¶¶ 4-14, ECF 52; Marlett Decl. ¶¶ 3-12, ECF 53; Moskowitz Decl. ¶¶ 5-13, ECF 54. The Supreme Court has held that plaintiffs in environmental cases "adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (internal quotations omitted).

As for causation, Plaintiff argues that its "members' injuries are traceable to EPA's failure to develop TMDLs and a schedule for Oregon's TMDL submissions." Pl. Mot. 18. Finally, Plaintiff argues that relief in this case would redress its members' injuries "by ensuring a robust schedule for TMDLs for Oregon's WQLSs, which once issued would reduce the pollution to those waters and help reduce the water quality impairments." *Id.*

EPA argues that the members' declarations do not show injury as to all of the waterbodies for which Plaintiff brings its constructive submission claim. EPA Mot. 23-24. EPA argues that because Plaintiff's constructive submission claim does not allege a wholesale failure to submit any TMDLs, Plaintiffs must establish standing for each waterbody. *Id.* EPA states that Plaintiff lacks standing for approximately 950 of the TMDLs covered by Claim One. *Id.* at 24. Plaintiff counters that alleging injury for a representative sample of the waters is sufficient. Pl. Reply 2 (citing *Alaska Ctr. for the Environment v. Browner*, 20 F.3d 981, 985 (9th Cir. 1994)). Plaintiff also argues that it seeks a single remedy: for a single EPA office to establish TMDLs for Oregon. *Id.* at 3.

EPA's challenge to Plaintiff's standing is similar to the argument EPA makes on the merits: that Plaintiff's constructive submission claim fails because it is neither a challenge to Oregon's TMDL program as a whole nor a challenge to an individual TMDL. Plaintiff alleges a constructive submission of "over 2,300 TMDLs," including all TMDLs that DEQ has ranked as low priority. EPA Mot. 16; Pl. Mot. 12. As most TMDLs are ranked low priority, the TMDLs covered by Claim One constitute the majority of the outstanding TMDLs in Oregon, but not all of them.

In *Alaska Center for the Environment*, the plaintiffs challenged Alaska's failure to submit any TMDLs. 20 F.3d at 983. The Ninth Circuit held that the plaintiffs had standing where they "established that they were adversely affected by the inadequate water quality of a representative number of waters throughout the state of Alaska." *Id.* at 985. The Ninth Circuit reasoned, "[t]heir injury is the result of EPA's failure to comply with the CWA to establish TMDLs for the State of Alaska; the CWA imposes no narrower obligation." *Id.* In addition, "for CWA regulatory purposes, all waters within a state are interrelated." *Id.* Plaintiffs do not allege a wholesale failure

to establish any TMDLs in Oregon, but they do challenge widespread failures throughout the state. In a case like *Riverkeeper*, where the plaintiffs alleged failure to submit a single TMDL, the Court agrees that the plaintiff would have to establish injury as to the particular WQLS at issue. But Plaintiffs' claim is pled and argued as a single claim covering most of the outstanding TMDLs in the state, not a large number of individual claims, and the Court will evaluate it as such for standing purposes and on the merits. The Court rejects EPA's argument that Plaintiff must allege standing as to each of the individual waters. The principles of *Alaska Center* apply here, and Plaintiff has alleged injury as to a representative sample of the waters at issue in Claim One. Plaintiff has standing on Claim One.

       D.     Adequacy of Notice

EPA also argues that Plaintiff's intent-to-sue letter did not give the agency adequate notice of the claims if they are viewed as individual constructive submission claims.[5] EPA Mot. 21. Although Plaintiff disclaims bringing individual claims, the Court will assess EPA's arguments because notice must be adequate regardless of the precise contours of the claim. The CWA requires the plaintiff in a citizen suit alleging inaction by the Administrator to give EPA sixty days' notice before filing suit. 33 U.S.C. § 1365(b)(2). EPA's regulations provide that the plaintiff's notice "shall describe with reasonable specificity the action taken or not taken by the Administrator which is alleged to constitute a failure to perform such act or duty[.]" 40 C.F.R. § 135.3(b). "A citizen 'is not required to list every specific aspect or detail of every alleged violation. Nor is the citizen required to describe every ramification of a violation.'" *Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645, 651 (9th Cir. 2015) (quoting

---

[5] In its motion to dismiss, EPA challenged the adequacy of the notice as to Claim Three. The Court held that the notice was sufficient as to Claim Three. Op. & Ord. 10-14, ECF 15.

*Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy* (*Bosma Dairy*), 305 F.3d 943, 951 (9th Cir. 2002)). Instead, courts look to the "overall sufficiency" of the notice. *Id.* (citations omitted). When a plaintiff does not fulfill the notice requirement, "the district court must dismiss the action as barred by the terms of the statute." *Ctr. For Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 800 (9th Cir. 2009).

The Supreme Court has recognized two purposes for the notice requirement. "First, the notice requirement 'allows Government agencies to take responsibility for enforcing environmental regulations, thus obviating the need for citizen suits.'" *Conservation L. Found., Inc. v. United States Env't Prot. Agency*, 223 F. Supp. 3d 124, 133 (D. Mass. 2017), *aff'd sub nom. Conservation L. Found., Inc. v. Pruitt*, 881 F.3d 24 (1st Cir. 2018) (quoting *Hallstrom v. Tillamook County*, 493 U.S. 20, 29 (1989)). "Second, the notice requirement 'gives the alleged violator an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit.'" *Id.* (quoting 493 U.S. at 29).

Plaintiff gave notice to EPA in a letter dated April 13, 2021. Compl. Ex. A. Plaintiff specified that it intended to sue for failure to disapprove constructively submitted TMDLs. *Id.* at 3-4. The notice stated, "NWEA alleges that the State of Oregon has constructively submitted to EPA a TMDL for each of the approximately 2,950 WQLS that are on the current 303(d) list that date to the State's 2012 303(d) list, less the 714 that are under a separate court order for completion of replacement TMDLs." *Id.* at 4. It also stated, "Oregon has constructively submitted no TMDLs for the MidCoast and Deschutes River basins, a total of 72 'medium' priority WQLS and a total of 487 'low' priority WQLS." *Id.* It also stated, "Oregon has constructively submitted no TMDLs for 483 'low' priority WQLS in the Willamette River basin that represent impairments by all water quality parameters and pollutants other than temperature,

indicator bacteria, and mercury." *Id.* Finally, the notice stated, "Oregon has constructively submitted no TMDLs for WQLS impaired by toxics, ammonia, and nutrients." *Id.*

EPA does not dispute that Plaintiff gave adequate notice of the mandatory duty alleged not to be performed or the legal theory of the claim. Rather, EPA argues that "NWEA's reliance on categories, rather than identifying individual TMDLs, did not even allow EPA to identify the pending TMDLs at issue, much less provide EPA an opportunity to 'bring itself into complete compliance with the Act.'" EPA Mot. 21 (quoting *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 60 (1987)). At oral argument, EPA stated as an example that Plaintiff's Motion identified turbidity TMDLs, but the notice said nothing about turbidity. Plaintiff responds that it identified "specific categories of impaired waters." Pl. Reply 10 n.10. At oral argument, Plaintiff explained that its categories in the notice and the Complaint were "demonstrative," and that it would be too cumbersome to list all TMDLs. Plaintiff also stated that the overarching category was 2,200 impaired waters listed since 2012 that have never appeared on a schedule.

As the Court noted in finding Plaintiff's notice adequate as to Claim Three, the Ninth Circuit has taken a less than rigid approach to the notice requirement. Op. & Ord. 11-14. In *Bosma Dairy*, for example, the plaintiff's notice contained a list of specific violations with dates, while the complaint alleged additional violations of a similar type; the Ninth Circuit allowed the additional allegations. 305 F. 3d at 951-52. The categories Plaintiff identified in its notice letter did specify parameters such as the type of pollutant, date of listing, or the affected waterbody, which would allow Defendants to identify which TMDLs were at issue. It was adequate as to the categories of TMDLs it identified.

The problem is that Plaintiff's categories shifted between the notice, the Complaint, and the Motion for Summary judgment. The categories are framed differently, and as the Court has explained, many of the categories in Plaintiff's Motion are amorphous. In other words, it is not Plaintiff's notice that is inadequate—it is Plaintiff's Motion for Summary Judgment. The course of this litigation illustrates the dangers of a category-based constructive submission claim, including a risk of inadequate notice. Both EPA and the Court are still unsure about which specific TMDLs are alleged to be constructively submitted. Some uncertainty was reasonable at the notice and pleading stage, but after review of the record and the close of discovery, Plaintiff should have been able to provide a list of specific TMDLs it alleged have been constructively submitted. The Court does not find that Plaintiff's notice was inadequate, but the shift in categories—with no apparent connection to the results of record review or discovery—reinforces the Court's conclusion that Plaintiff's constructive submission claim does not present appropriate circumstances for approving a category-based approach.

E.      Merits

Although the flaws in the category-based approach are sufficient to grant summary judgment to Defendants on Claim One, the Court finds in the alternative that even if the claim were viable, there has been no constructive submission. EPA asserts that Oregon has produced or is producing TMDLs in each of the categories identified in the notice of intent to sue, the Complaint, and the Motion, and thus even if the category-based approach were viable, Plaintiff would not be able to prevail. EPA Reply 12-13 nn.1-3. The Court has reviewed EPA's citations to the record, and EPA is correct that Oregon has produced or has set a timeline to produce a TMDL in each of the categories Plaintiff identifies, except for low-priority TMDLs. *See id.* As EPA points out, because Oregon moves its TMDLs up in priority as higher-priority projects are

completed, "Oregon technically never issues low priority TMDLs." *Id.* at 13 n.2. In *Ohio Valley*, the Fourth Circuit rejected the plaintiff's category-based constructive submission claim in part because West Virginia had produced some TMDLs addressing biological impairments, the category the plaintiffs alleged had been abandoned. 893 F.3d at 230-31. If a category-based approach were viable, the Court agrees with the Fourth Circuit that evidence that the State had developed TMDLs within that category would generally serve to rebut allegations that the State had abandoned TMDLs within the category.

At the same time, the Court recognizes that some of Oregon's TMDLs have sat for years with little to no apparent progress. Plaintiff argues that "a period of time on the order of 10 to 15 years without a required TMDL is 'prolonged' enough to constitute a constructive submission." Pl. Mot. 20. The Ninth Circuit has not specified how long is too long to wait to develop a TMDL. Plaintiff relies on EPA guidance and district court cases. *Id.* at 20-22. In the 1990s, environmental and recreational interest groups throughout the country challenged many states' failure to submit any TMDLs and delays in submitting TMDLs, and many district courts found the states' delays excessive. *E.g.*, *Idaho Sportsmen's Coal. v. Browner*, 951 F. Supp. 962, 966 (W.D. Wash. 1996) (holding that Idaho's proposed schedule of developing most of its TMDLs in around twenty-five years was too slow); *Sierra Club v. Hankinson*, 939 F. Supp. 865, 871 (N.D. Ga. 1996) (criticizing Georgia's proposal to develop twenty-five TMDLs in eight years because "[a]t this pace, Georgia will take over a hundred years to complete TMDLs for the approximately 340 WQLSs identified on the 1994 WQLS list."); *Nat. Res. Def. Council, Inc. v. Fox*, 30 F. Supp. 2d 369, 379 (S.D.N.Y. 1998) (stating that with reference to developing TMDLs, "[p]romptly does not mean over the span of decades.").

Around the same time, EPA issued guidance setting a goal that states would establish TMDLs for the waters on their 303(d) list within eight to thirteen years. EPA, New Policies for Establishing and Implementing Total Maximum Daily Loads (TMDLs) at 3, Aug. 8, 1997 ("1997 Guidance"), https://perma.cc/BW2Y-T5FE. EPA also recognized that states could need more time depending on various factors, such as the number and relative complexity of TMDLs. *Id.* In 2000, EPA set a goal that states would complete TMDLs in ten years, with a possible five-year extension. EPA, Revisions to the Water Quality Planning and Management Regulation, 65 Fed. Reg. at 43,613 (July 13, 2000).

More recently, district courts have recognized that TMDLs often will not be developed quickly. As a court in the D.C. District stated several years ago, "It is an unfortunate reality that the development of a TMDL sometimes takes several years, or even a decade in extreme cases." *Nat. Res. Def. Council, Inc. v. Env't Prot. Agency*, 490 F. Supp. 3d 190, 196 (D.D.C. 2020) (collecting cases). TMDL development is a complex process. For example, EPA outlined the following steps required to develop certain TMDLs in another case:

> (1) secure funding; (2) develop contract proposals for contractors that will assist EPA in developing the TMDLs; (3) negotiate contracts with existing contractors; (4) develop the "sampling regimes" for bacteria; (5) monitor the waters at issue for twelve to eighteen months; (6) review the data and prepare the appropriate bacteria models; (7) "[e]valuate, select, and implement an approach for calculating daily loads"; (8) draft the TMDL and publish for comment; and (9) respond to comments, finalize the TMDL, and submit the final TMDL for approval.

*Anacostia Riverkeeper, Inc. v. Jackson*, 713 F. Supp. 2d 50, 53-54 (D.D.C. 2010).

The caselaw and EPA guidance do suggest that a period of inaction of around fifteen years can be sufficient to constitute a constructive submission of a TMDL. The Court does not interpret these materials to establish a bright line rule. As the 1997 Guidance suggested, state-specific factors will influence what timeline is reasonable. Plaintiff points to 593 low-priority

WQLSs that were listed between 1998 and 2004. Pl. Mot. 25. Those impaired waters have been listed for long enough that a constructive submission could be found. Thus, some of Oregon's WQLSs have been listed for a long time with no credible schedule to develop them. On the other hand, DEQ correctly pointed out at oral argument that age of impairment is not a required prioritization factor under the CWA or EPA's regulation. Listing a TMDL as low priority does not necessarily equate to abandoning it.

DEQ argues that Oregon has a "robust" TMDL program that is doing as well as it can given personnel and budget constraints and the complexity of TMDL development. *See* DEQ Mot. 7-14. DEQ explains that it currently has nine staff devoted solely to TMDL development. *Id.* at 7 (citing Forzley Decl. Ex. 1 (Joint Status Report #13 in Case No. 3:12-cv-01751-HZ), ECF 61). Oregon's TMDL program had a budget of $13,718,435 for 2021-2023. *Id.* at 8 (citing JA0026). DEQ states that its funding has increased in recent years after being decreased between 2011 and 2015. *Id.* DEQ argues that it "has a robust process for obtaining the data utilized for its 303(d) list." *Id.* at 13. The agency explains that it solicits data from other groups and organizations, and that it "collects data and monitors water quality statewide, including for listed waters with no active TMDL project under development." *Id.*

According to DEQ, Oregon's TMDL development can take years if the State lacks sufficient data about a particular waterbody, and "additional monitoring or modeling can add months or years to TMDL development and is necessary before a particular TMDL can be completed." *Id.* at 26 (citing JA0023-24). DEQ asserts that it must take the time to gather adequate data "due to the frequent legal challenges to Oregon's TMDLs brought by both environmental advocacy groups and regulated entities." *Id.* (citing JA0012-13).

The parties present competing narratives about the effect of litigation on Oregon's TMDL program. According to Plaintiff, litigation has been the main driver of development. Pl. Mot. 1-2, 7. According to Defendants, litigation has disrupted Oregon's plans and forced the State to put other projects on hold so that it could re-do around 700 temperature TMDLs. EPA Mot. 10. DEQ states that six of its nine dedicated TMDL analysts are currently developing replacement temperature TMDLs. DEQ Mot. 8. Plaintiff states that it "is not aware of any cases holding that court-ordered obligations, insufficient funding, competing workload demands, or similar excuses can justify a state's 'prolonged failure' to complete TMDLs as required." Pl. Mot. 23. The Court agrees with Plaintiff that limited funding is not an excuse contemplated by the Act.

As discussed above, more recent cases reflect an understanding that developing a valid TMDL is often a long process. It is reasonable for a state to wish to develop valid TMDLs to avoid having those TMDLs invalidated through litigation. The record indicates that litigation did induce Oregon to change its TMDL development priorities and lead to a downgrading in priority of some TMDLs. *See* JA0140 (DEQ's 2020 Nonpoint Source Pollution Program Annual Report submitted to EPA, noting that activities on certain TMDLs were "paused for several years due to litigation which required DEQ to shift staff resources to other TMDLs with court mandated timelines"), JA2486 (Oregon's explanation of its 2020 priority ranking, listing court-mandated timelines as a factor in ranking).

The parties disagree on how to consider Oregon's work on replacement TMDLs. Plaintiff asserts that "since 2010, DEQ has submitted to EPA *just four* entirely new TMDLs, along with a smattering of revised older TMDLs[.]" Pl. Mot. 1. *See also id.* at 8, 19. EPA counters that Plaintiff is "drawing an artificial distinction between what it calls 'new' TMDLs, and those TMDLs being developed or revised pursuant to court orders," and asserts, "NWEA provides no

basis for the implication that revised or court-ordered TMDLs do not count in the constructive-submission analysis." EPA Mot. 12. DEQ echoes these arguments. DEQ Mot. 33. The parties' dispute over Plaintiff's demonstrative exhibits, discussed above, centers in large part on Plaintiff's omission of revisions of older TMDLs from its calculations of Oregon's rate of production of TMDLs. *See* Pl. Reply 31 n.22.

DEQ's production of replacement temperature TMDLs as required by this Court is relevant in assessing Oregon's TMDL program. The Court invalidated hundreds of temperature TMDLs and set a timeline for replacing them. It is not surprising that Oregon redid its priority rankings and schedule to account for this new work. Reprioritizing TMDLs in response to court-ordered timelines does not indicate abandonment of TMDLs that are downgraded in priority in response. The record shows that DEQ was working on some of the downgraded TMDLs before it shifted its priorities. *E.g.*, JA0140 (discussing work performed on Mid-Coast watershed TMDLs through 2020).

Plaintiff also suggests that DEQ "get[s] lost in a mire of technical complexity of its own making." Pl. Reply 17. As an example, Plaintiff criticizes the Technical Support Document accompanying the Upper Yaquina River Watershed TMDLs, which mentions the number of cow-calf pairs typically present in the watershed. *Id.* at n.16. Plaintiff asserts, "[t]hat DEQ wastes time on such minutia is likely a reason it cannot produce TMDLs in a timely fashion." *Id.* The Court does not find it appropriate on this record to question DEQ's judgment about which factors are relevant in developing a TMDL. Nor has Plaintiff convinced the Court that a focus on "minutia" is the reason for DEQ's slowness. The record shows that Oregon needs many TMDLs and has only nine dedicated staff to develop them, that many of the TMDLs are complex, and that data collection alone can take months if not years. Under those circumstances, it is no

surprise that many TMDLs have sat in the queue for years. At oral argument, Plaintiff and DEQ

agreed that the State's resources are not relevant to the issue of liability, while EPA stated that

they were relevant to how quickly DEQ could submit TMDLs to EPA. Although DEQ's resource

levels provide context for this litigation, the Court agrees with Plaintiff and DEQ that they do not

determine liability. But the nature of the TMDL development process itself is relevant because it

helps inform the assessment of delay.

Plaintiff argues that DEQ should produce its TMDLs more quickly even if they are

"based upon imperfect or incomplete data" because the CWA provides for a "margin of safety."

Pl. Mot. 20. The CWA states that a TMDL "shall be established at a level necessary to

implement the applicable water quality standards with seasonal variations and a margin of safety

which takes into account any lack of knowledge concerning the relationship between effluent

limitations and water quality." 33 U.S.C. § 1313(d)(1)(C). EPA argues that a margin of safety

should not be used "to paper over broad uncertainty about background conditions." EPA Mot.

17. EPA relies on *Sierra Club v. McLerran*, No. 11-CV-1759-BJR, 2015 WL 1188522 (W.D.

Wash. Mar. 16, 2015). In *McLerran*, the district court rejected the plaintiff's argument that the

TMDL at issue should be implemented with incomplete data, concluding that "'margins of

safety' address uncertainty over the effect pollutants at certain levels will have on water quality;

they do not address a lack of knowledge regarding the *source* of the pollutants." 2015 WL

1188522, at *8 (citing *Natural Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 101-02 (2d Cir.

2001)).

The Court agrees with *McLerran*. As the Court has stated, and all parties agree, TMDLs

must account for both point and nonpoint sources of pollution. Studies and data collection must

be performed to determine all of the sources of pollution. And some level of understanding of the

relationship between effluent limitations and water quality must be established for the TMDL to have any value. A highly inaccurate TMDL will not protect humans or the environment and will be open to litigation. The temperature TMDLs are a good example. Plaintiff states that "the 2006 Umpqua River Basin Temperature TMDL that this Court vacated relied on the streams' superseding 'natural thermal potential' ranging as hot as 32.5° C, a temperature the agencies know is lethal to salmon within seconds." Pl. Reply 7 n.5. Ordering the rapid production of effluent TMDLs with inadequate data would not promote Congress's goal of cleaning up our nation's waters. The "margin of safety" in the CWA allows for some degree of speed over accuracy, but not as much as Plaintiff suggests.

In sum, the Court faces two competing principles. On the one hand, Oregon has the right to prioritize its TMDL development consistent with the CWA and its regulations. On the other hand, prioritization cannot be used to avoid developing a particular TMDL altogether. Oregon has not provided an estimate of when any of its low-priority TMDLs might be completed. As far as the Court can see, it has not even sorted the low-priority TMDLs into groups or categories to give a sense of which ones might be elevated in priority sooner.

The Court reiterates that "a constructive submission will be found where a state has 'fail[ed] over a long period of time to submit a TMDL,' and 'clearly and unambiguously decided not to submit any TMDL[s].'" *Riverkeeper*, 944 F.3d at 1209. Oregon has failed to submit certain TMDLs over a long period of time. And Oregon has not shown a concrete plan to remedy that failure for many of its TMDLs. But the Court cannot conclude that Oregon has "clearly and unambiguously" decided not to submit the TMDLs in the categories Plaintiff has identified. This case is unlike *Riverkeeper*, where Washington and Oregon had a written agreement with EPA that EPA would develop the TMDL at issue, did not list the TMDL on their priority rankings,

and took no action to develop it even as they worked on other TMDLs. Oregon has listed its low-priority TMDLs in its priority rankings. Oregon has produced TMDLs in the various categories Plaintiff has identified. The record shows active collaboration between DEQ and EPA to develop TMDLs. In addition, the Court has concluded that Plaintiff's category-based constructive submission claim is not cognizable under current law and does not present appropriate circumstances for expanding the constructive submission doctrine. The Court does not hold that DEQ has made a constructive submission of no TMDLs for the categories Plaintiff identified. Defendants are entitled to summary judgment on Claim One.

## III.    Claim Two: Approval of 2020 TMDL Priority Ranking

In Claim Two, Plaintiff alleges that EPA's approval of Oregon's 2020 priority rankings and prioritization schedule was arbitrary and capricious in violation of § 706(2)(A) of the APA. Compl. ¶¶ 80-84. EPA argues that the claim is moot because the agency approved Oregon's 2022 priority rankings on September 1, 2022, and the new list supersedes the old one. EPA Mot. 25. *See* Saul Decl. Ex. 11. Without disputing that the new list supersedes the old one, Plaintiff argues that the exception to mootness for actions capable of repetition but evading review applies. Pl. Reply 19. The Court concludes that the claim is moot, but the exception applies. The Court therefore reaches the merits and concludes that approval of the 2020 priority rankings was arbitrary and capricious.

### A.    Mootness

Under Article III of the Constitution, federal courts only have jurisdiction over "cases" and "controversies." U.S. Const. art. III, § 2. The Supreme Court has interpreted this to require "that an actual controversy … be extant at all stages of review, not merely at the time the complaint is filed." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016), *as revised* (Feb. 9,

2016) (internal quotations omitted). "[A] suit becomes moot, 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." 577 U.S. at 160-61 (internal quotations omitted). A case is only moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Id.* at 161 (internal quotations omitted).

A court may still review claims challenging agency action that are otherwise moot "if the government's actions are capable of repetition but will evade review." *Alaska Fish & Wildlife Fed'n v. Dunkle*, 829 F.2d 933, 939 (9th Cir. 1987). This exception to mootness applies if "(1) the duration of the challenged action is too short to be fully litigated before it ceases; and (2) there is a reasonable expectation that the plaintiffs will be subjected to the same action again." *Id.* (internal quotations omitted). The court should also consider the public interest in resolution of the issue. *Id.* While the defendant bears the burden on the initial mootness question, the plaintiff bears the burden under the 'capable of repetition' prong of the exception to mootness to show that there is a reasonable expectation that it will again be subjected to the challenged activity. *Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1209 (9th Cir. 2021).

EPA has met its burden to show that Claim Two is moot. It is undisputed that the 2022 list superseded the 2020 list, and the 2020 list no longer has legal effect. Declaring that approval of the 2020 list was arbitrary and capricious would not grant Plaintiff any relief. Plaintiff appears to concede as much by arguing only that an exception to mootness applies. The Court therefore turns to whether the "capable of repetition yet evading review" exception applies.

The parties dispute whether the two-year period between 303(d) list due dates is sufficient to litigate this dispute. Pl. Reply 19-20; EPA Reply 17-18. In deciding this issue, the Court must consider whether "the injury suffered [is] of a type inherently limited in duration such that it is likely always to become moot before federal court litigation is completed." *Ctr. For Biological Diversity v. Lohn*, 511 F.3d 960, 965 (9th Cir. 2007). The Court therefore focuses on completion of cases like this case, and not just this case. Completion of federal court litigation requires not only resolution of the case in the district court but also review by either the Ninth Circuit or the Supreme Court. *Hamamoto v. Ige*, 881 F.3d 719, 723 (9th Cir. 2018). The Ninth Circuit has indicated that "actions lasting more than two years are frequently considered long enough to be fully litigated prior to cessation, while actions lasting less than two years are considered too short." *Wallingford v. Bonta*, 82 F.4th 797, 801 (9th Cir. 2023).

The Court agrees with EPA that two years is sufficient for this Court to adjudicate cases like Claim Two, which is a record review claim for which no discovery is permitted. EPA Reply 17-18. The Court also agrees that Plaintiff's delay in suing is relevant. *See Bonta*, 82 F.4th at 801 (plaintiffs' two-year delay in suing weighed against finding exception to mootness). But two years is not enough time to complete both district court and Ninth Circuit review of a matter like Claim Two. While two years may be enough for smaller cases, or for certain matters of national importance that get fast-tracked review, *see Hamamoto*, 881 F.3d at 723, it is not enough time to review a standard APA claim like this one with a large record. The Court therefore holds that the first prong of the "capable of repetition but evading review" exception is met.

The second prong is also met. The priority rankings must be submitted every two years, so there is no doubt of future instances in which the same type of review must be performed. Further, the record shows that EPA did review DEQ's submission and issue a formal approval.

Nothing in the record suggests that EPA deviated from its standard practices or that review of the 2020 priority rankings was somehow unique. There is a reasonable likelihood that the same type of approval that happened here will happen again in the future. The Court therefore concludes that the exception to mootness applies and turns to the merits of the claim.

      B.      Merits

The APA authorizes courts to "set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Agency action is arbitrary and capricious if the agency 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *City of Los Angeles, California v. Fed. Aviation Admin.*, 63 F.4th 835, 842 (9th Cir. 2023) (quoting *WildEarth Guardians v. EPA.*, 759 F.3d 1064, 1069-70 (9th Cir. 2014)). The Court may not substitute its judgment for the agency's and must uphold the decision "if there is a rational connection between the facts that the agency found and its conclusions." *Id.*

Plaintiff argues that EPA's approval of Oregon's 2020 priority ranking was arbitrary and capricious because nothing in the administrative record support's EPA's finding that Oregon "took into account the severity of pollution and the uses to be made of" Oregon's waters as required by the CWA. Pl. Mot. 29 (citing JA2483). According to Plaintiff, the only evidence that DEQ considered these factors is a statement from DEQ that it considered them. *Id.* (citing JA2486). Next, Plaintiff argues that DEQ's 2020 schedule reflects high and medium priority projects that have been delayed many times, and that "[p]lainly, DEQ's 'high' and 'medium' rankings simply reflect what DEQ has been working on in a seemingly endless fashion, without

any actual consideration of the required factors under the CWA." *Id.* Plaintiff also dislikes that

toxic pollutants were excluded from the high and medium priority rankings. *Id.* at 30.

EPA responds that DEQ's assertion that it considered the required statutory factors is

sufficient because the Court "must presume regularity in Oregon's discharge of its official duties

absent clear, affirmative evidence otherwise." EPA Mot. 26-27 (citing *Gov't of Guam v.*

*Guerrero*, 11 F.4th 1052, 1058 (9th Cir. 2021)). EPA points to two district court cases supporting

its assertion that review was adequate: *Friends of the Wild Swan v. EPA*, 130 F. Supp. 2d 1184,

1194 (D. Mont. 1999) and *Ctr. for Biological Diversity v. EPA*, 90 F. Supp. 3d 1177, 1212 (W.D.

Wash. 2015). EPA rejects Plaintiff's arguments about high and medium priorities as "improperly

demand[ing] that EPA usurp Oregon's priority-setting-role at NWEA's behest." *Id.* at 27.

The Court rejects EPA's assertion that a presumption of regularity applies to Oregon's

actions. In *Guerrero*, the Ninth Circuit stated that "a public actor is entitled to the presumption of

regularity where there is some evidence that the public actor properly discharged the relevant

official duties, which an opposing party must rebut with clear, affirmative evidence to the

contrary." 11 F.4th at 1058. *Guerrero* applied the presumption to the Government of Guam's

assertion that it had timely assessed a taxpayer's taxes in accordance with established

procedures. *Id.* The Ninth Circuit has also held that "an agency's statement of what is in the

record is subject to a presumption of regularity," meaning that courts presume that an agency

properly designated the administrative record absent "clear evidence to the contrary." *Blue*

*Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 445 (9th Cir. 2024) (internal quotations

omitted). EPA does not point to a case holding that the presumption applies to acts of a state

agency when a party challenges a federal agency's approval of the state agency's acts. Applying

a presumption of regularity to Oregon's acts is difficult to square with EPA's obligation to review Oregon's decisions and approve or reject them based on evidence.

Even if Oregon could be entitled to a presumption of regularity, it is not entitled to the presumption on this record. EPA has pointed only to Oregon's assertion that it considered the statutory factors. Oregon's assertion, without more, does not create a presumption of regularity. The Court agrees with Plaintiff that *Friends of the Wild Swan* is different because in that case the district court relied not only on Montana's assertions about what it relied on but also underlying evidence supporting those assertions. *See* Pl. Reply 21-22 (citing 130 F. Supp. 2d at 1194). The other case EPA relies on, *Center for Biological Diversity*, does not help EPA either because in that case the state agency explained its reasons for excluding certain data. 90 F. Supp. 3d at 1212. Reliance on a state's assertion that it considered the impaired beneficial uses and severity of the water quality problem, without any supporting evidence or explanation, is arbitrary and capricious.

At oral argument, EPA asserted that the record showed interactions between DEQ and EPA, including meetings and emails, which showed that EPA knew what DEQ was doing. EPA did not cite any specific emails. The Court has reviewed the record for the relevant period (2018-2020). It includes emails between EPA and DEQ about various aspects of Oregon's TMDL program, including work on specific TMDLs, as well as documents showing collaboration between the agencies. *E.g.*, JA1123, JA1634, JA1651-52. However, none of the emails includes a discussion of the CWA's required factors to consider in formulating the priority rankings. The record supports EPA's assertion that there was communication and cooperation between EPA and DEQ, but it does not show that EPA had reason to conclude that Oregon considered the required factors in formulating its priority rankings.

The Court rejects Plaintiff's more specific challenges to DEQ's 2020 priority rankings. As Plaintiff noted at oral argument, it is not necessary to show that DEQ's 2020 rankings were defective, only that the record did not support EPA's approval of them. The record lacks an adequate explanation from Oregon about how it considered the CWA's required factors. The Court need not address whether Oregon's priority rankings themselves were faulty. As discussed in resolving Claim One, states have considerable discretion in formulating their priority rankings. The Court holds only that the record lacks sufficient information to support EPA's finding that Oregon considered the required factors in formulating its priority rankings. In sum, it was arbitrary and capricious to approve Oregon's 2020 priority rankings based only on Oregon's assertion that it considered the required factors.

At oral argument, Plaintiff suggested that the appropriate remedy in this situation is to vacate the priority rankings and remand them to be redone. That remedy would result in an inefficient use of agency resources to no benefit. The 2020 priority rankings have been superseded by the 2022 rankings, which are themselves soon to be superseded by the 2024 rankings. Requiring EPA to review the 2020 rankings again serves no practical purpose and would divert resources from meaningful work. The Court concludes that the appropriate relief is a declaratory judgment that EPA's approval of the 2020 priority rankings was arbitrary and capricious. That provides guidance to EPA—and DEQ—for the future without requiring the agencies to spend their time revising materials that will have no legal effect.

## IV.    Claim Three: Failure to Set TMDL Submission Schedule Under the CWA

Claim Three alleges that EPA failed to determine Oregon's schedule for submitting TMDLs as required by the CWA. Compl. ¶¶ 85-90. The CWA does not impose a firm timeline for submission of TMDLs after the initial submission, instead requiring states to submit TMDLs

"from time to time." 33 U.S.C. § 1313(d)(2). The implementing regulation, however, provides

that "[s]chedules for submission of TMDLs shall be determined by the Regional

Administrator and the State." 40 C.F.R. § 130.7(d)(1). In ruling on EPA's motion to dismiss

Claim Three, the Court held that the regulation imposed a nondiscretionary duty on EPA to act

and therefore that Plaintiff could bring suit under the CWA's citizen suit provision. Op. & Ord.

18, ECF 15. The Court adheres to that ruling.

Oregon has submitted priority rankings with a partial schedule estimating dates of

completion for high- and medium-priority TMDLs. However, for its low-priority TMDLs,

Oregon only states that it will move them up in priority as higher-priority TMDLs are completed.

The issue is whether the regulation requires EPA and Oregon to develop a schedule for TMDLs

that Oregon has designated as low-priority. Plaintiff argues that the regulation must be read to

require a complete schedule in order to give effect to the CWA's goals. Pl. Mot. 31-32. EPA

counters that the regulation does not require a complete schedule. *Id.* at 29-30. EPA also asserts

that its interpretation of the regulation is reasonable and entitled to deference. *Id.* at 30 (citing

*Kisor v. Wilkie*, 139 S. Ct. 2400, 2411 (2019)).

An agency's interpretation of its own regulations can only be entitled to deference "if

[the] regulation is genuinely ambiguous." *Kisor*, 588 U.S. at 573. A court must use "all the

standard tools of interpretation" before determining that a regulation is ambiguous. *Id.* If the

regulation is truly ambiguous, the agency's interpretation must be reasonable. *Id.* Even then, the

interpretation may still not be entitled to deference if "countervailing reasons" outweigh the

presumption that Congress intended courts to defer to the agency in interpreting its own

ambiguous rules. *Id.* Countervailing reasons include: (1) the agency's interpretation represents an

ad hoc rather than "authoritative" or "official" position; (2) the agency's interpretation does not

"implicate its substantive expertise"; and (3) the agency's interpretation does not reflect its "fair and considered judgment." *Id.* at 577-79 (internal quotations omitted).

To determine whether the regulation is ambiguous, the Court turns to the standard tools of statutory construction, which also apply to regulations. *Texaco Inc. v. United States*, 528 F.3d 703, 710 (9th Cir. 2008) ("Determining a regulation's meaning requires application of the same principles that imbue exercises in statutory construction.") (internal quotations omitted). These tools include evaluating "the plain text of the [regulation], its object and policy, the law's surrounding provisions, and the legislative history of its enactment." *Larson v. Saul*, 967 F.3d 914, 922 (9th Cir. 2020).

Reviewing the plain text of the disputed sentence of the regulation in isolation is not enlightening. It reads: "Schedules for submission of TMDLs shall be determined by the Regional Administrator and the State." 40 C.F.R. § 130.7(d)(1). EPA argues that Plaintiff is reading the word "all" into the regulation in asserting that it "requires '[s]chedules for submission of [*all*] TMDLs.'" EPA Mot. 30. Plaintiff counters that EPA "improperly inserts the word 'some' into the regulation." Pl. Reply 23. The Court turns to the context of this sentence for clarification. That context includes both the rest of the regulation and the portion of the CWA it implements.

The CWA provides in relevant part:

> Each State shall identify those waters within its boundaries for which the effluent limitations required by section 1311(b)(1)(A) and section 1311(b)(1)(B) of this title are not stringent enough to implement any water quality standard applicable to such waters. The State shall establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters.

33 U.S.C. § 1313(d)(1)(A).

> Each State shall establish for the waters identified in paragraph (1)(A) of this subsection, and in accordance with the priority ranking, the total maximum daily load, for those pollutants which the Administrator identifies under section 1314(a)(2) of this title as suitable for such calculation. Such load shall be established at a level necessary to implement the applicable water quality standards

with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality.

33 U.S.C. § 1313(d)(1)(C).

Each State shall submit to the Administrator from time to time, with the first such submission not later than one hundred and eighty days after the date of publication of the first identification of pollutants under section 1314(a)(2)(D) of this title, for his approval the waters identified and the loads established under paragraphs (1)(A), (1)(B), (1)(C), and (1)(D) of this subsection. The Administrator shall either approve or disapprove such identification and load not later than thirty days after the date of submission. If the Administrator approves such identification and load, such State shall incorporate them into its current plan under subsection (e) of this section. If the Administrator disapproves such identification and load, he shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters and upon such identification and establishment the State shall incorporate them into its current plan under subsection (e) of this section.

Id. § 1313(d)(2).

The statute also provides that "[e]ach State shall have a continuing planning process approved under paragraph (2) of this subsection which is consistent with this chapter." Id. § 1313(e). "The Administrator shall approve any continuing planning process submitted to him under this section which will result in plans for all navigable waters within such State, which include, but are not limited to, the following: . . . total maximum daily load for pollutants in accordance with subsection (d) of this section[.]" Id. § 1313(e)(3)(C).

EPA's regulation reads in relevant part:

Identification and priority setting for water quality-limited segments still requiring TMDLs.

(1) Each State shall identify those water quality-limited segments still requiring TMDLs within its boundaries for which:
(i) Technology-based effluent limitations required by sections 301(b), 306, 307, or other sections of the Act;
(ii) More stringent effluent limitations (including prohibitions) required by either State or local authority preserved by section 510 of the Act, or Federal authority (law, regulation, or treaty); and

(iii) Other pollution control requirements (e.g., best management practices) required by local, State, or Federal authority are not stringent enough to implement any water quality standards (WQS) applicable to such waters.

(2) Each State shall also identify on the same list developed under paragraph (b)(1) of this section those water quality-limited segments still requiring TMDLs or parts thereof within its boundaries for which controls on thermal discharges under section 301 or State or local requirements are not stringent enough to assure protection and propagation of a balanced indigenous population of shellfish, fish and wildlife.

[. . .]

(4) The list required under §§ 130.7(b)(1) and 130.7(b)(2) of this section shall include a priority ranking for all listed water quality-limited segments still requiring TMDLs, taking into account the severity of the pollution and the uses to be made of such waters and shall identify the pollutants causing or expected to cause violations of the applicable water quality standards. The priority ranking shall specifically include the identification of waters targeted for TMDL development in the next two years.

40 C.F.R. § 130.7(b).

"Each State shall establish TMDLs for the water quality limited segments identified in paragraph (b)(1) of this section, and in accordance with the priority ranking." *Id.* § 130.7(c)(1). And "[e]ach State shall estimate for the water quality limited segments still requiring TMDLs identified in paragraph (b)(2) of this section, the total maximum daily thermal load which cannot be exceeded in order to assure protection and propagation of a balanced, indigenous population of shellfish, fish and wildlife." *Id.* § 130.7(c)(2).

Each State shall submit biennially to the Regional Administrator beginning in 1992 the list of waters, pollutants causing impairment, and the priority ranking including waters targeted for TMDL development within the next two years as required under paragraph (b) of this section. For the 1992 biennial submission, these lists are due no later than October 22, 1992. Thereafter, each State shall submit to EPA lists required under paragraph (b) of this section on April 1 of every even-numbered year. For the year 2000 submission, a State must submit a list required under paragraph (b) of this section only if a court order or consent decree, or commitment in a settlement agreement dated prior to January 1, 2000, expressly requires EPA to take action related to that State's year 2000 list. For the year 2002 submission, a State must submit a list required under paragraph (b) of this section by October 1, 2002, unless a court order, consent decree or commitment in a

settlement agreement expressly requires EPA to take an action related to that State's 2002 list prior to October 1, 2002, in which case, the State must submit a list by April 1, 2002. The list of waters may be submitted as part of the State's biennial water quality report required by § 130.8 of this part and section 305(b) of the CWA or submitted under separate cover. All WLAs/LAs and TMDLs established under paragraph (c) for water quality limited segments shall continue to be submitted to EPA for review and approval. Schedules for submission of TMDLs shall be determined by the Regional Administrator and the State.

*Id.* § 130.7(d)(1).

As EPA and DEQ pointed out in their Motions and at oral argument, the CWA does not impose many firm deadlines. It requires an initial submission of TMDLs within 180 days "after the date of publication of the first identification of pollutants under section 1314(a)(2)(D) of" the statute. 33 U.S.C. § 1313(d)(2). Thereafter, submissions of TMDLs must be made "from time to time." *Id.* Congress chose not to impose a scheduling requirement for the submission of TMDLs after the initial submission.

EPA's regulation does impose a scheduling requirement. It requires states to submit a "priority ranking including waters targeted for TMDL development within the next two years" every two years. 40 C.F.R. § 130.7(d)(1). The priority ranking itself must include all waters that need a TMDL. *Id.* § 130.7(b)(4). After explaining the process of submission and approval of the priority ranking, the regulation states, "Schedules for submission of TMDLs shall be determined by the Regional Administrator and the State." *Id.* § 130.7(d)(1).

Looking at the text, EPA argues that the absence of the word "all" before "TMDLs" in the sentence about schedules means that the Court should presume that EPA intentionally omitted the word. EPA Reply 19. EPA points out that the preceding sentence used the word "all," suggesting that "all" was intentionally omitted from the sentence about schedules. *Id.* at 19-20 (citing *United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 983

(9th Cir. 2008)). That argument alone does not carry the day. But combined with the context in which the sentence appears, it supports EPA's reading of the sentence.

The regulation requires a priority ranking to identify TMDLs targeted for development within two years; it does not set any timeline for the remaining TMDLs. The sentence about schedules, which comes at the end of an explanation of priority rankings, must be read in that context. The priority ranking must identify TMDLs targeted for *development*, while the schedule is for the *submission* of TMDLs. To "develop" is "to create or produce especially by deliberate effort over time." Merriam-Webster Online (accessed Aug. 6, 2024). To "submit" is "to present or propose to another for review, consideration, or decision." *Id.* Thus, the regulation requires the priority rankings to specify which TMDLs a State intends to create in the next two-year period, while the schedule governs when TMDLs are expected to be presented to EPA for approval.

In this context, it is apparent that the sentence about schedules requires a schedule for submission of the TMDLs identified for development within the next two years in the priority rankings. It is not reasonable to interpret a single, brief sentence at the end of a paragraph about priority rankings to require a full and detailed schedule. The regulation does not explain the scheduling requirement further, such as what constitutes a reasonable timeline for submission of all TMDLs. Had EPA intended to require a full and detailed schedule, it would have provided more information and guidance, just as it did for the priority ranking requirement. The regulation can only be reasonably read to require a partial schedule addressing the TMDLs targeted for development in the next two years.

Plaintiff argues that the regulation must be construed to require a full schedule in order to "give meaning to CWA section 303(d) and effectuate Congress' goal that all waters attain water quality standards[.]" Pl. Mot. 32. The Court agrees with Plaintiff that the CWA reflects

Congress's goal that the nation's waters be cleaned up expeditiously. But Congress chose not to set a timeline for submission of TMDLs beyond the first submission, requiring only that they be submitted "from time to time." It may be that Congress was overly optimistic about how quickly TMDLs could and would be established without firm deadlines, but the Court cannot read requirements into the statute that are not there. Congress can amend the CWA if it wishes to set a schedule requirement.

Plaintiff points to two district court cases from the 1990s in support of its position. Pl. Mot. 32 (citing *Alaska Ctr. for the Env't v. Reilly*, 796 F. Supp. 1374, 1380 (W.D. Wash. 1992), *aff'd sub nom. Alaska Ctr. for Env't v. Browner*, 20 F.3d 981 (9th Cir. 1994) and *Idaho Sportsmen's Coalition*, 951 F. Supp. at 969). EPA counters that those cases do not support requiring "the kind of exhaustive schedule that NWEA seeks here." EPA Reply 20. The Court agrees with EPA. In *Alaska Center*, the district court addressed Alaska's failure to submit initial TMDLs as required by the CWA. 796 F. Supp. at 1379. Noting that "almost thirteen years have passed since the expiration of the statutory deadline for the first submission of a TMDL in Alaska," the district court found "that the CWA requires the EPA to work with the State of Alaska to establish a reasonable schedule for the development of TMDLs for all waterbodies designated as water quality limited segments." *Id.* at 1379-80. The district court stated that "such a schedule may provide more specific deadlines for the establishment of a few TMDLs for well-studied water quality limited segments in the short-term, and set only general planning goals for long-term development of TMDLs for water quality limited segments about which little is known." *Id.* at 1380. *Alaska Center*, unlike this case, was based on a failure to submit TMDLs by the 180-day deadline set by Congress. And even it did not require specific dates for submission of all TMDLs.

In *Idaho Sportsmen's Coalition,* Idaho had completed only three TMDLs in the last seventeen years. 951 F. Supp. at 967. Citing the relevant sentence about schedules in the regulation, the district court stated, "The EPA has authority to set, with the state, a schedule to complete the TMDL process; the CWA's enforcement history makes clear that a firm schedule is vital." *Id.* at 968. The district court did not hold that the regulation required a full schedule, only that EPA had the authority to set a full schedule. Neither case meaningfully interprets the regulation using the tools of statutory construction. And the facts of both cases are more extreme than those presented here. The Court does not find either case persuasive as to the present case.

Plaintiff also points to EPA's 1997 Guidance. Pl. Mot. 32. The 1997 Guidance stated, "Under EPA's regulations, State-submitted section 303(d) lists must identify which waters are targeted for TMDL development in the ensuing two years, and Regional Administrators and States are to determine a schedule for submission of TMDLs for these targeted waters." 1997 Guidance at 3. The Guidance went on to say that more was needed "[t]o achieve clean water everywhere," so "[e]ach EPA Region should secure a specific written agreement with each State in the Region establishing an appropriate schedule for the establishment of TMDLs for all waters on the most recent section 303(d) list, beginning with the 1998 list." *Id.* In a footnote, the memo stated that a comprehensive TMDL schedule "will not be subject to formal EPA approval pursuant to Section 303(d)(2) and 40 CFR 130.7." 1997 Guidance at 4 n.3. Thus, the 1997 Guidance interpreted the schedule requirement in the regulation to require a schedule for submission of the TMDLs for the waters targeted for TMDL development in the ensuing two years. It also concluded that a more comprehensive schedule, while not required by the regulation, would help advance the goals of the CWA. The 1997 Guidance therefore does not support Plaintiff's position.

EPA points to its 2005 Guidance. EPA Reply 21. The 2005 Guidance "recommends that states develop a schedule for establishing TMDLs as expeditiously as practicable and that the schedule (1) identifies which TMDLs will be established in each year of the upcoming integrated reporting cycle and (2) estimates the approximate number of TMDLs to be established for each year thereafter." 2005 Guidance at 63. The Guidance does not use mandatory language—it only "recommends" the development of a full schedule. EPA's guidance documents, both the 1997 and 2005 versions, reflect efforts to speed up the pace of TMDL development by encouraging states to develop schedules beyond what EPA interpreted the regulation to require.

EPA appears to partially adhere to a longstanding interpretation of the regulation. The 1997 Guidance interpreted the regulation to require a schedule for submission of the TMDLs identified for development within the next two years. 1997 Guidance at 3. That is also how the Court has interpreted the regulation. Here, "EPA maintains that there is no statutory duty for the Agency to determine submission schedules under the Act," and asserts that if any schedule requirement exists, a partial schedule is sufficient. EPA Mot. 29. While the statute itself does not set a schedule requirement, EPA's regulation unambiguously does. On that point, EPA's position in this litigation is at odds with the 1997 Guidance.

As to the second point, the Court agrees with EPA that neither the statute nor the regulation requires submission of a full schedule, and that the 1997 Guidance's interpretation represents the correct interpretation of the regulation. Thus, the Court need not determine whether *Kisor* deference applies. The regulation imposes a duty on EPA and the states to jointly determine a schedule for submission of the TMDLs targeted for development within the next two years as identified in the priority rankings submitted every two years. A schedule going beyond

that, like the ones Oregon has submitted, may not be required but is likely to assist with planning and expeditious TMDL issuance, as EPA's 1997 and 2005 Guidance recognized.

Plaintiff also challenges the extent of EPA's involvement in developing Oregon's 2020 schedule. Pl. Mot. 32-33. In its review of Oregon's 303(d) list in 2020, EPA stated that it had reviewed the schedule but that "EPA is not taking any action to approve or disapprove this schedule pursuant to the CWA Section 303(d)." JA2483. EPA appears to have reviewed and approved Oregon's 2022 schedule. Saul Decl. Ex. 11 at 1-2. The Court does not evaluate the adequacy of that approval because Plaintiff does not challenge it. For the reasons discussed in resolving Claim Two, the capable of repetition but evading review exception to mootness applies. The schedule is submitted every two years along with the priority rankings.

Plaintiff criticizes EPA's treatment of DEQ's 2020 schedule as a "cursory rubber stamp." Pl. Mot. 32. Plaintiff states that EPA did not suggest priorities or additional TMDLs for development or criticize DEQ's slow pace. *Id.* at 33. The Court concludes that the regulation does not require any particular level of collaboration in developing the schedule. The regulation requires only that EPA and the states jointly "determine[]" the schedule. Thus, both parties must be involved in the process in some capacity, but a schedule will not be inadequate simply because either EPA or the state was only minimally involved in setting the schedule.

EPA argues that "this joint determination role is fulfilled when one entity reviews the schedule and does not object." EPA Mot. 31 (citing *Am. Canoe Ass'n v. EPA*, 54 F. Supp. 2d 621, 627 (E.D. Va. 1999)). In *American Canoe*, EPA and the State of Virginia entered into a Memorandum of Understanding ("MOU") that determined overarching schedules that were refined by a consent decree. 54 F. Supp. at 627. The district court held that Virginia participated in developing the schedules by entering into the MOU. *Id.* That, combined with Virginia's

decision not to object to the schedule set out in the consent decree, was enough. *Id.* This Court agrees with the district court in *American Canoe* that "EPA's regulations do not on their face require that [the state] and the EPA jointly determine every particular of the TMDL submission schedule." 54 F. Supp. at 627. It is enough if one party proposes a schedule, and the other reviews it and approves it. A failure to object might, under some circumstances, also constitute an approval. As EPA expressly disavowed taking any action to approve or disapprove Oregon's 2020 schedule, the Court will not conclude that EPA approved it.

In sum, Plaintiff and Defendants are each entitled to partial summary judgment on Claim Three. Defendants are entitled to partial summary judgment that the CWA does not require submission of a full schedule with target dates of completion for all TMDLs and that minimal collaboration between EPA and Oregon is sufficient to jointly determine the schedule. Plaintiff is entitled to partial summary judgment that EPA failed to approve or disapprove Oregon's 2020 schedule for submission of TMDLs targeted for development in the next two years. The appropriate remedy is a declaratory judgment, for the same reasons discussed in Claim Two.

## V.    Claim Four: Failure to Set TMDL Submission Schedule Under the APA

In Claim Four, Plaintiff alleges in the alternative that EPA's failure to develop a schedule for the submission of TMDLs was arbitrary and capricious under § 706(2)(A) of the APA, or an unreasonable delay of agency action under § 706(1) of the APA. Compl. ¶¶ 91-94. Plaintiff pleaded this claim as an alternative to Claim Three. Plaintiff argues that if the Court "finds that the regulation requires only that the Regional Administrator and DEQ need adopt a partial or short-term TMDL schedule," its APA claim is still viable. Pl. Mot. 34. The Court disagrees.

The APA does not provide a cause of action if the CWA provides a cause of action. *Oregon Nat. Res. Council v. U.S. Forest Serv.*, 834 F.2d 842, 851 (9th Cir. 1987). *See also W.*

*Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011) (where the Endangered

Species Act provided a citizen suit remedy, the APA did not apply). When the APA does apply,

"the only agency action that can be compelled under the APA is action legally *required.*" *Norton*

*v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (emphasis in original). Likewise, § 706(1) of

the APA "also authorizes courts to 'compel agency action ... unreasonably delayed'—but a delay

cannot be unreasonable with respect to action that is not required." *Id.* at n.1.

Here, the action legally required is to develop a schedule for the submission of TMDLs,

as discussed in Claim Three. Plaintiff has identified no basis for that obligation outside of the

CWA and its implementing regulations. The scope of that obligation is narrow. As the Court has

explained, the applicable regulation does not require a full schedule with dates for submission of

all TMDLs, only a partial schedule for submission of the TMDLs targeted for development in the

next two years under the priority rankings. Plaintiff also points to EPA's 1997 Guidance. Pl.

Mot. 34. But the 1997 Guidance does not interpret the statute or the regulation to require a full

schedule. Further, it is an interpretation of the CWA and its implementing regulations, 1997

Guidance at 2, and thus does not provide a separate basis for suit under the APA. In short,

because the only basis for a duty to act is grounded in the CWA, and the claim is actionable

under the CWA's citizen suit provision, Plaintiff cannot obtain relief under the APA. Claim Four

must be dismissed.

## VI.    Remedy

As discussed above, Defendants are entitled to summary judgment on Claims One and

Four and partial summary judgment on Claim Three. Plaintiff is entitled to summary judgment

on Claim Two and partial summary judgment on Claim Three. The appropriate remedy is a

declaratory judgment. The Court holds that EPA's approval of Oregon's 2020 priority rankings

was arbitrary and capricious. The Court also holds that EPA failed to jointly determine, with Oregon, Oregon's 2020 schedule for the submission of TMDLs targeted for development in the next two years. The Court declines to order EPA to re-do its review of the 2020 priority rankings or schedule for the reasons previously explained.

## CONCLUSION

Plaintiff's Motion for Summary Judgment [48], [67] is GRANTED IN PART and DENIED IN PART. Defendant EPA's Motion for Summary Judgment [59], [69] is GRANTED IN PART and DENIED IN PART. Defendant State of Oregon's Motion for Summary Judgment [60], [72] is GRANTED IN PART and DENIED IN PART. The Court directs the parties to confer and submit a proposed judgment within 30 days.

IT IS SO ORDERED.

DATED:____August 20, 2024____.

_____
MARCO A. HERNÁNDEZ
United States District Judge